**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| COMMUNITIES UNITED; | ) | |
| COMMUNITY RENEWAL SOCIETY; | ) | |
| NEXT STEPS NFP; ONE NORTHSIDE; | ) | |
| and the ACLU of ILLINOIS; on behalf | ) | |
| of their respective members, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17-cv-7151 |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Communities United, Community Renewal Society, Next Steps, ONE Northside, and the ACLU of Illinois allege as follows:

1.      For decades, Chicagoans have complained and a series of government-authorized investigations have found that the Chicago Police Department ("CPD") habitually uses unnecessary force.  Earlier this year the U.S. Department of Justice ("DOJ") found that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable" and "CPD officers' force practices unnecessarily endanger themselves and others and result in unnecessary and avoidable shooting and other uses of force."

2.      Black and Latino Chicagoans are disproportionately victimized by the CPD. Ninety-six percent of the people shot by the CPD, and ninety-seven percent of people Tased by the CPD are black or Latino.  Racism embedded in the CPD's policing tactics results in the CPD having more contacts with black and Latino residents, during which officers use other forms of unnecessary force.

3.      This brutality is also magnified for people with disabilities, who disproportionately interact with and are more likely to experience violence by the CPD. Nationally, an estimated one-third to one-half of people killed by police have a disability, with approximately one-quarter of people killed having a mental illness.  Non-lethal uses of police force also disproportionately involve people with disabilities.  The City of Chicago deploys CPD officers armed with guns and Tasers but not deployed with critical de-escalation skills, and in doing so subjects residents, police officers, and bystanders to harm.  When people with disabilities are subjected to CPD's use of force, the role that their disability played is often either ignored or cited to blame the victim.

4.      Many black and Latino residents live in fear that a routine interaction with the police will quickly escalate into severe injury or death.  Individuals with disabilities—including those with mental illness, who are deaf, or who have intellectual or developmental disabilities—similarly fear that the City's practice of dispatching inadequately trained (yet lethally armed) officers to respond to their emergency calls will end in tragedy.  Black and Latino people with disabilities face the combined threat of more contacts with the CPD and of interacting with officers who do not know how to safely serve individuals with disabilities.

5.      Public safety is at risk.  The unjustified force authorized by the City and exercised by some of its police officers is delegitimizing the CPD and undermining all officers' ability to do their job.  When police officers are not trusted by the communities they are assigned to protect, officers are unable to build and maintain the relationships necessary to prevent and solve crimes.

6.      In response to media attention to particularly appalling episodes, and to external reports emphasizing the urgency of the problem, the City has pledged over and over again to

2

self-reform.  Decades of half-measures and empty promises from politicians show that the City is unable or unwilling to do so.  As long as the City continues to engage in unlawful policing practices that victimize—rather than serve—individuals in Chicago, public safety will continue to be threatened and police officers' lives needlessly put at risk.

7.      Plaintiffs bring this civil rights action to permanently enjoin the City's unlawful actions.  The City cannot continue to evade judicial review of its unconstitutional policies and practices by spending tens of millions of dollars annually to privately settle victims' claims.  The DOJ found that the necessary policing reforms "will likely not happen or be sustained without the reform tools of an independent monitoring team and a court order."  Officials across the political spectrum agree.

8.      City leadership initially promised to work with the DOJ and then, more recently, with the Illinois Attorney General to implement reform.  And yet, almost nine months after the DOJ issued its findings, neither an independent monitor nor a plan for reform has been ordered or agreed upon, and disability is not even acknowledged in the lawsuit the City has publicly promised to settle.  Plaintiffs bring this action to ensure that public safety—and particularly the safety of people of color and people with disabilities—does not continue to be compromised as political winds shift.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367.

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2), because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Illinois and the City resides in this district.

## PARTIES

*Plaintiffs*

11.    **Plaintiff Communities United** is a private, non-partisan nonprofit corporation incorporated under the laws of Illinois with its principal place of business located in Chicago, Illinois.  Communities United is an organization that uses grassroots community organizing to alleviate social inequality.  Its mission is to develop local leaders to address issues and bring about policy change on a variety of social justice issues.  Communities United addresses the following issue areas through its organizing: immigrants' rights, affordable housing, public education, healthcare, violence prevention and gang involvement of young people, and workers' rights.  Communities United has more than 500 individual members in Chicago.

12.    Communities United, as a part of an alliance of community-based organizations from across Chicago, advocates to strengthen Chicago Police Department accountability structures and to improve policing in Chicago through the formation of a civilian community oversight board.  Communities United has also organized youth around policing issues, created a police "bill of rights," conducted know-your-rights trainings for police interactions, and advocated on the issue of police interactions with undocumented people.  Additionally, in a partnership with the Adler Institute on Public Safety and Social Justice at the Adler School of Professional Psychology (IPSSJ), Communities United is a member of "Right On Justice," an initiative aimed at identifying and dismantling punitive policies at the school and community level, advancing restorative justice alternatives to criminalization of communities of color, and reforming the justice system.

13.    **Plaintiff Community Renewal Society** ("CRS") is a private, non-partisan nonprofit corporation with its principal place of business located in Chicago, Illinois.  CRS operates with a Board of Directors, staff, and members.  CRS is a faith-based organization that

represents at least 10,000 people through its approximately 70 member congregations, more than 30 of which are in Chicago. CRS is a 135-year-old organization that works with people and communities to address racism and poverty. One of CRS's primary campaigns is police accountability and reform.

14. The mission of CRS is to inform and bring people of faith and congregations together, in partnership with communities, coalitions, interfaith organizations, and civic leaders, to intentionally and decisively transform society toward greater social justice at the intersection of racism and poverty. For example, CRS organizes its member congregations to create "faith in action" teams within each congregation to work on a variety of issues at the local level, including housing, employment, and state- and county-level work. However, in the past several years, CRS members and their "faith in action" teams have had to focus primarily on reforming the Chicago Police Department. CRS has at least 25 "faith in action" teams, comprised of at least 300 members of CRS congregations. More than 1,000 members of CRS congregations participate in their annual Martin Luther King Day convening.

15. **Plaintiff Next Steps** NFP ("Next Steps") is a private, non-partisan corporation incorporated under the laws of Illinois with an office in Chicago. Next Steps' mission is to ensure that people with lived experience of homelessness, mental illness, substance use, and/or substance abuse lead the development and implementation of health care, housing, and social policies at the state and local levels. A core tenet of Next Steps is: "nothing about us without us." Next Steps works to include people with lived experience of severe mental illness at every table, as laws are made, when policy is discussed and decided, while funding is allocated, and where education is delivered.

16.     Next Steps has a Board of Directors, employees, and supporters, including people who live, work, and spend time in Chicago.  It was recently charged by a federal grant to ensure that a network of people with lived experience with mental illness can participate in policy decisions that impact them.  A majority of the Board of Directors of Next Steps are people with lived experience with mental illness; the Board is comprised of people who are black and Latino.

17.     **Plaintiff ONE Northside** is a private, non-partisan nonprofit corporation with its principal place of business located in Chicago, Illinois.  ONE Northside's mission is to achieve racial, social, and economic justice.  To that end, ONE Northside practices community organizing in the areas of violence prevention, public education, affordable housing, healthcare and mental health justice, youth empowerment, and economic justice.  ONE Northside has specifically done community organizing about and offered policy assistance to the CPD in an effort to reform its policies and practices.  ONE Northside engages community members from the Rogers Park, Edgewater, Uptown, Ravenswood, North Center, Lakeview, and Lincoln Park neighborhoods of Chicago.  These diverse communities are home to some of the populations most vulnerable to the Chicago Police Department's unconstitutional practices—racial minorities, people with disabilities, immigrants, and low-income individuals.  ONE Northside is a membership organization, with about 100 organizational members and more than 600 individual members in Chicago.

18.     **Plaintiff ACLU of Illinois** ("ACLU") is a non-profit, non-partisan, statewide organization located in Chicago, Illinois.  The ACLU operates with a Board of Directors, employees, and members.  The ACLU has more than 27,000 members who reside in Chicago.

19.     The ACLU is dedicated to protecting and expanding the civil rights and civil liberties enshrined in the United States Constitution, the Illinois Constitution, and state and

federal civil rights laws.  The ACLU advocates on behalf of people harmed by unconstitutional

policing practices in the City of Chicago, including practices that disproportionately impact

people of color.  For example, the ACLU has brought litigation to challenge the City's practice

of unlawful surveillance, unsafe police transports, unjustified arrests, unconstitutional stop-and-

frisk practices, and other warrantless searches and seizures.  The ACLU also works to protect

people with disabilities from unlawful discrimination and segregation.  Many of these cases have

resulted in court orders requiring the City to change its policies and refrain from engaging in

unlawful and discriminatory practices.

*Defendant*

20.      Defendant City of Chicago ("City") is a municipal corporation, as defined in the

Illinois Municipal Code, 65 ILCS 5/1-1-2(1).  The City is located in the Northern District of

Illinois.

21.      The City is organized into various departments, including the Chicago Police

Department ("CPD").  The City owns, operates, manages, directs, and controls CPD, which is

the City's primary law enforcement agency.

22.      As of February 21, 2017, there were a total of 12,051 sworn officers in the CPD,

according to the City's Office of Inspector General.

23.      The City funds and operates municipal entities that oversee certain aspects of the

CPD, including the Office of Inspector General ("OIG"), the Police Board, the CPD's Bureau of

Internal Affairs ("BIA"), and the Independent Police Review Authority ("IPRA"), which

recently was renamed the Civilian Office of Police Accountability ("COPA").

24.      The City also owns, operates, manages, directs, and controls the Office of

Emergency Management and Communications ("OEMC").  The City has OEMC manage

incidents, operate communications systems, and provide technology to support services provided through the City's other departments. OEMC is responsible for answering 911 emergency calls and dispatching officers to respond to emergencies in the City of Chicago.

## FACTS

I.    **Chicagoans Have Been Injured by—and Are at Continuous Risk of Being Subjected to—Unreasonable Use of Force by Chicago Police Officers.**

      A.    **The CPD Engages in a Pattern of Using Excessive Force.**

25.    In January 2017, the DOJ found that "CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by the CPD." It noted that because "officers' accounts of force incidents were later discredited, in whole or part, by video evidence[,] . . . the pattern of unreasonable force is likely even more widespread than we were able to discern." (Ex. A, at 6.)

26.    The City's publicly released data demonstrate a propensity to use lethal levels of force. CPD officers shot at least 50 people in the last two years. At least 21 of these shootings were fatal. At least 7 more people have died in an "officer-involved motor-vehicle death."

27.    CPD officers also Tased more than 715 people in the last two years. The DOJ found that CPD officers use Tasers on suspects who flee under suspicion of minor offenses. For example, one officer shared with the DOJ that he or she used a Taser against someone suspected of a minor property crime as the suspect fled. The DOJ determined that the force was unreasonable and "unconstitutional on its face." (*Id.* at 32.) The DOJ also found unnecessary the uses of a Taser on a 110-pound boy who fled after he was caught painting graffiti on a garage. Taser use on suspects for low-level offenses who flee is just one manifestation of CPD's pattern and practice of using excessive force.

28.     The DOJ also found that officers were resorting to Tasers as a "tool of convenience, with insufficient concern or cognizance that it is a weapon with inherent risks that inflicts significant pain." (*Id.* at 33.)  For example, the DOJ described viewing a video in which a woman exited her car and placed her hands on her vehicle, after which officers threw her to the ground, hit her, and Tased her.  The DOJ's report also highlighted the potentially deadly consequences of unnecessarily using a Taser by describing incidents such as when an officer Tased a man trying to flee under suspicion of petty theft from a retail store, causing the man to fall, hit his head, and die.

29.     CPD causes more people to die than those it reports as gun fatalities and motor-vehicle deaths, and it severely injures more than those people it admits to shooting or Tasing.  In the previous two years, the City reports that there were 100 "extraordinary occurrences," a classification it uses to combine a death or injury to a person while in police custody or "other extraordinary or unusual occurrence in a lockup facility."

30.     Approximately 50% of the investigations opened by IPRA in the past two years were related to excessive force by a CPD officer.

31.     Numerous Chicagoans have been victims of CPD's excessive force and hundreds have individually sued the City.  The City opts to settle cases for money to compensate for the harms that it causes, but fails to fix the system that continues to perpetuate those harms.  Between 2011 and 2016, the City paid $280 million to settle 943 police misconduct cases, plus another $91 million for outside lawyers to help defend police officers in those suits, according to City records compiled for the public by the *Chicago Reporter*.  Of the few cases that the City chooses to litigate without settlement, juries have found evidence of excessive force and awarded

monetary judgments against the City—including, for example, an award of almost $5 million by a federal jury last month.

**B.     CPD's Use of Force Is Disproportionately Harming Black and Latino Residents.**

32.     Chicago Police Department officers are much more likely to stop or pull over black and Latino Chicagoans than white ones.  In 2016, 29.3% of Chicago's residents were black, 29.7% were Latino, and 32.6% were white.  Yet that same year in Chicago, Illinois Department of Transportation data reveals that black drivers comprised 60.5% of CPD's vehicle stops, and Latino drivers comprised 20.3%, while white drivers only accounted for 15.9%.  The disparity is even more glaring in CPD's pedestrian stops: During the first six months of 2016— the most recent data available—almost 71% of people stopped were black, 21% were Latino, and 8% were white.

33.     The CPD's disproportionate contacts with black and Latino Chicagoans means that the City's authorization to use unreasonable and unnecessary force has a disparate impact on them.  In 2016, 97% of people shot by CPD officers were black or Latino.  There are no signs that the racial bias in CPD's use of force is improving.  From 2008-2015, 88% of people shot by the police were black or Latino.

34.     In 2016, 97% of people Tased by CPD officers were black or Latino.  Again, the racial disparity of CPD's use of force is worsening.  From 2012-2015, 89% of those Tased by police were black or Latino.  Given the CPD's larger number of contacts with black and Latino Chicagoans, they are disparately exposed to the policies and practices described herein, and which result in unlawful and unjustified uses of force.

35.     Other types of force are also disproportionately levied at black and Latino Chicagoans.  The City's own Police Accountability Task Force ("Task Force") found that black

people were twice as likely as white people to be threatened with a weapon by a CPD officer. Compared to white people, all other groups were at least twice as likely to have been subjected to some form of force by a CPD officer.

36.     The Task Force admitted that CPD's own data gave "validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color." (Ex. B, at 7.)

37.     The City's oversight system for CPD is also racially disparate.  The Task Force found that the BIA and IPRA were nine times more likely to sustain a police misconduct complaint by a white filer than by a black one, and three times more likely for white filers when compared to Latino filers.

38.     This racial disparity also exists when IPRA evaluates allegations of excessive force.  The DOJ found that whites were three times more likely than black complainants to have CPD sustain their allegations of excessive force, and six times more likely than Latino complainants.

**C.     The City Unnecessarily Uses Force on Individuals with Disabilities.**

39.     The victims of CPD's use of force are often people with disabilities.

40.     The City, however, fails to maintain or track data regarding use of force incidents against people with disabilities.  Nor has the City disclosed statistics on how many people with disabilities are shot, Tased, or otherwise injured by the CPD.

41.     When governments have made such information available, the impact is devastating.  In 2012, the Albuquerque, New Mexico Public Defender Department reported that approximately 75% of recent police-involved shootings had a "mental health context." In Portland, Oregon, 75% of the people shot and killed by police over a three-year period were affected by mental illness.

11

42.     Although the role of disability most frequently goes unacknowledged, incidents highlighted by journalists and investigators demonstrate how the CPD unlawfully uses force on Chicagoans with disabilities.  Every day the City sends CPD officers into the streets where they encounter and respond to people with disabilities.  Without adequate training on how to recognize or respond to people with disabilities, CPD officers react quickly and violently to any perceived sign of non-cooperation (whether intentional or not) with escalating and too often deadly force.

43.      For example, less than two months ago an off-duty CPD sergeant shot an unarmed teenager who has autism and schizophrenia.  According to the CPD's statements to the *Chicago Tribune*, the officer questioned the boy, who the officer perceived as "elusive and unresponsive," and the encounter escalated until the officer fired his gun.

44.     Publicly released audio recordings show that, on December 26, 2015, 19-year-old Quintonio LeGrier called 911 three times, stating that "someone's threatening my life" and begging for an officer to be sent to his home.  His father also called 911 and stated that his son was trying to break down his bathroom door and was holding a baseball bat.  The OEMC employees who received the initial 911 calls did not respond appropriately.  The OEMC dispatcher that ultimately initiated a CPD response "did not recognize the call as one involving someone in crisis and did not ask questions that might have resulted in clues that it did," and CIT-trained CPD officers were not dispatched.  (Ex. A, at 37-38.)  When CPD officers arrived at the building, LeGrier was shot six times.  His neighbor, Bettie Jones, had opened her door for officers and was also shot and killed.  According to police reports obtained by the *Chicago Tribune*, LeGrier had been struggling with mental health issues in the months prior to his shooting, so much so that at least two of his university's police officers knew him by name.  In

one encounter, LeGrier repeatedly shouted "I am God!" and "I am in outer space!" and authorities involuntarily admitted him to a hospital for a psychiatric evaluation. The DOJ later found that LeGrier's and Jones's deaths "laid bare failures in CPD's crisis response systems." (*Id.* at 37.)

45.     In 2016, the Task Force found that CPD officers are "too often the first responders to those living with mental illness and experiencing a crisis. . . . In turn, police officers are arresting individuals experiencing mental illness and are symptomatic in their illness. This occurs because symptoms of mental illness are sometimes demonstrated in behaviors that may look criminal. Furthermore, officers who are not well trained to identify the signs and symptoms of mental illness can further escalate a situation to the point that an arrest is made." (Ex. B, at 117.) Accordingly, the Task Force did "not need to search very far to find examples of police encounters with persons experiencing mental health crises that went tragically wrong." (*Id.* at 115.)

46.     Similarly, in the DOJ's report the following year, it found that "CPD uses force against people in crisis where force might have been avoided had a well-trained CIT officer responded," "a meaningful number" of such uses of force were unconstitutional, "and deficiencies in CPD's CIT response contributes to the pattern or practice of unconstitutional use of force."

47.     The 2017 DOJ Report identified specific examples of "unreasonable and repeated uses of force against individuals in mental health crisis," including:

        (a)     use of a Taser against an unarmed, naked, 65-year-old woman with bipolar disorder and schizophrenia;

(b)     use of a Taser in "drive-stun mode" against a woman in mental health crisis who needed to be transported to a hospital for a mental evaluation and was not suspected of any crime;

(c)     use of a Taser by an officer who said it was used "to subdue a mental who ignored verbal commands";

(d)     use of a Taser to twice drive-stun a man who was then transported for a mental health evaluation;

(e)     use of a Taser in probe and drive-stun mode against an unarmed suicidal man;

(f)     use of a Taser against an unarmed woman who was "off meds" and "not violent."

The CPD did not conduct any investigation or review of these incidents to determine whether its response was appropriate or lawful, or whether force could have been avoided.

48.     After the DOJ's report was issued, the series of tragedies has only continued.  On February 10, 2017, a woman with bipolar schizoaffective disorder, Michelle Robey, was killed by police officers within minutes of their arrival.  A frustrated CVS store employee had called 911 to report that Robey was "screaming and causing a scene, swearing at customers." Employees tried to keep Robey in the store but she ran out.  Within five minutes of OEMC dispatching the call to CPD, two officers Tased, shot, and killed Robey on the street. Video from inside the store shows employees were not afraid of whatever weapon Robey waved at them, and a 911 caller who spotted Robey on the street said that she could have been holding a butter knife. In the three calls placed to 911, none of the OEMC dispatchers asked questions to determine whether a CIT-trained officer was needed.  Robey's estate sued the City, in part for its

unconstitutional failure to train, supervise and implement policies and practices for police interactions with people who are mentally ill.

49.     The City's unnecessary use of force on people with disabilities shows no sign of stopping.

**II.     Plaintiffs Have Been Injured by the City's Unlawful Use of Force, and Will Continue to Be Injured Absent Injunctive Relief.**

    **A.     Communities United**

50.     Communities United has members who have been injured by the City's unlawful uses of force.  Communities United has members in Albany Park, Belmont-Cragin, North Park, Irving Park, West Ridge, North Austin, and North Lawndale.  These community areas, which form Communities United's constituent member base, are home to some of the populations most hurt by the City's unconstitutional policing practices—minorities, immigrants, and low-income individuals.  North Austin and North Lawndale are among the most heavily policed neighborhoods in Chicago.  Communities United has individual members who are directly impacted by the policing methods of the Chicago Police Department including, in particular, the CPD's use of force.

51.     The individual members of Communities United living in Chicago face a real and immediate threat of injury from the City's authorization of unlawful and unnecessary use of force.  These members are at risk of being subjected to CPD's pattern or practice of using excessive force against people who do not present a threat and who are not suspected of a crime. The DOJ found that "CPD's pattern or practice of unreasonable force includes using excessive force against people who do not present a threat and who are suspected only of low-level crimes or, in some cases, no crime at all."  (Ex. A, at 32.)

52.     Communities United has members who are black and who are Latino.  Those members are in danger of being subjected to the City's policies and practices authorizing unconstitutional and unnecessary use of force.  CPD officers disproportionately stop and otherwise come into contact with black and Latino Chicagoans compared to white residents.  The City's use of force has a disparate impact on black and Latino Chicagoans, which includes members of Communities United.

53.     Communities United has members who are qualified individuals with disabilities, as defined in the Americans with Disabilities Act, 42 U.S.C. § 12131(2), including members who have a mental illness that substantially interferes with life activities, and who have an intellectual or developmental disability.  Some of these members have been or will become the subject of a future 911 call dispatched to the CPD when the member or a family member calls 911 for emergency assistance related to the member's disability.  These members will also come into contact with CPD officers because their disabilities manifest in ways that can be mistaken for criminal activity.

54.     In addition, Communities United members with disabilities are disproportionately likely to interact with CPD officers because they are 2.5 times more likely to become victims of violence (rape or sexual assault, robbery, aggravated assault, and simple assault) than the general population.  Persons with developmental disabilities are 4 to 10 times more likely to be victimized in some way, and persons with intellectual impairments have the highest rate of violent victimization.  The City's policies for responding to 911 calls, its authorization of escalation and unnecessary force, and its failure to adequately train and supervise CPD officers regarding interactions with individuals with disabilities mean that these Communities United members are in imminent danger of being injured or even killed by the City.

16

### B.    Community Renewal Society

55.    Individual members of CRS congregations and individual members of CRS's "faith in action" teams have been subjected to use of force by the CPD.

56.    The individual members of CRS congregations living in Chicago face a real and immediate threat of injury from the City's authorization of unlawful and unnecessary use of force.  Individual members of CRS's "faith in action" teams living in Chicago face a real and immediate threat of future injury from the City's authorizing unlawful and unnecessary use of force.  These members are at risk of being subjected to CPD's pattern or practice of using excessive force against people who do not present a threat and who are not suspected of a crime.

57.    CRS congregations have individual members who are black and who are Latino. CRS's "faith in action" teams include individual members who are black and who are Latino. CPD officers stop and otherwise come into contact with black and Latino Chicagoans at a disproportionate rate compared to white residents.  The City's use of force also has a disparate impact on black and Latino Chicagoans.  These members of CRS congregations are in danger of being subjected to the City's policies and practices authorizing unconstitutional and unnecessary use of force.

### C.    Next Steps

58.    The Board of Directors, employees, and supporters of Next Steps face a real and immediate threat of injury from the City's authorization of unlawful and unnecessary use of force.  These members are at risk of being subjected to CPD's pattern or practice of using excessive force against people who do not present a threat and who are not suspected of a crime.

59.    Next Steps includes qualified individuals with a disability, such as individuals whose severe mental illness manifests in episodes which substantially limit and interfere with their life activities.  Some of these individuals have been and will become the subject of a future

911 call dispatched to the CPD when the member or a family member calls 911 for emergency assistance related to the disability. Next Steps associates will also come into contact with CPD officers because some members' disabilities manifest in ways that can be mistaken for criminal activity, or because studies show that people with disabilities are 2.5 times more likely to become victims of violence than the general population. The City's policies for responding to 911 calls, its authorization of escalation and unnecessary force, and its failure to adequately train and supervise CPD officers regarding interactions with individuals with mental illness mean that these individuals are in imminent danger of being injured or even killed by the City.

60.  Next Steps includes Chicagoans who are black and who are Latino. CPD officers stop and otherwise come into contact with black and Latino Chicagoans at a disproportionate rate compared to white residents. The City's use of force also has a disparate impact on black and Latino Chicagoans. These members of Next Steps are in danger of being subjected to the City's policies and practices authorizing unconstitutional and unnecessary use of force.

**D.  ONE Northside**

61.  ONE Northside has individual members who have been injured by the Chicago Police Department's pattern and practice of unconstitutional policing. ONE Northside members have been previously Tased by the CPD. Members of ONE Northside face a real and immediate threat of injury from the City's authorization of unlawful and unnecessary use of force. These members are at risk of being subjected to CPD's pattern or practice of using excessive force even against people who do not present a threat and who are not suspected of a crime.

62.  ONE Northside has members who are black and who are Latino. Those members are in danger of being subjected to the City's practices and policies authorizing unconstitutional and unnecessary use of force. CPD officers disproportionately stop and otherwise come into contact with black and Latino Chicagoans compared to white residents. The City's use of force

18

has a disparate impact on black and Latino Chicagoans, which includes members of ONE Northside.

63.     ONE Northside also has members who are qualified individuals with a disability, such as members who have a mental illness and members who have an intellectual or developmental disability.  Some of these members have been or will become the subject of a future 911 call dispatched to the CPD when the member or a family member calls 911 for emergency assistance related to the member's disability.  Members will also come into contact with CPD officers because some members' disabilities manifest in ways that can be mistaken for criminal activity.  In addition, members with disabilities are disproportionately likely to interact with CPD officers because they are 2.5 times more likely to become victims of violence than the general population.  Persons with developmental disabilities are 4 to 10 times more likely to be victimized in some way, and persons with intellectual impairments have the highest rate of violent victimization.

64.     Members of ONE Northside are fearful that the City's policies for responding to 911 calls, its authorization of escalation and unnecessary force, and its failure to adequately train and supervise CPD officers regarding interactions with individuals with disabilities mean that these ONE Northside members are in imminent danger of being injured or even killed by the City.

65.     For example, ONE Northside member C.N. is at imminent risk of being subjected to excessive or unnecessary force by the CPD.  C.N. is a Latino veteran who has PTSD, anxiety, and bipolar depression.  After being assaulted by a man in September 2016, CPD officers found C.N. during his ensuing PTSD attack.  An officer mocked C.N.'s disclosure of his disability status, exacerbating his agitation, trauma, and emotional distress.  C.N. fears that in a future

episode of his mental illness, CPD officers' confrontational response to symptoms of his mental illness will escalate into C.N. being severely injured or even killed.

### E.    The ACLU

66.    Members of the ACLU living in Chicago face a real and immediate threat of injury from the City's authorization of unlawful and unnecessary use of force.  These members are at risk of being subjected to CPD's pattern or practice of using excessive force against people who do not present a threat and who are not suspected of a crime.

67.    The ACLU has members in Chicago who are black and who are Latino.  Those members are in danger of being subjected to the City's practices and policies authorizing unconstitutional and unnecessary use of force.  CPD officers disproportionately stop and otherwise come into contact with black and Latino Chicagoans compared to white residents.  The City's use of force has a disparate impact on black and Latino Chicagoans, including members of the ACLU.

68.    The ACLU has members who are qualified individuals with disabilities, such as members who are deaf, who have a mental illness that interferes with their life activities, and who have an intellectual or developmental disability.  Some of these members have been and will become the subject of a future 911 call dispatched to the CPD when the member or a family member calls 911 for emergency assistance related to the member's disability.  Members will also come into contact with CPD officers because some members' disabilities manifest in ways that can be mistaken for criminal activity.  In addition, members with disabilities are disproportionately likely to interact with CPD officers because they are 2.5 times more likely to become victims of violence than the general population.  People with developmental disabilities are four to ten times more likely to be victimized in some way, and persons with intellectual impairments have the highest rate of violent victimization.

69. Members of the ACLU are fearful that the City's policies for responding to 911 calls, its authorization of escalation and unnecessary force, and its failure to adequately train and supervise CPD officers regarding interactions with individuals with disabilities mean that these ACLU members are likely to be injured or even killed by the City.

70. For example, a Latino deaf member, R.R., believes he is at imminent risk of being subjected to force by the CPD because he was recently stopped, handcuffed, and temporarily detained by CPD officers unnecessarily, and all without the officers attempting to communicate with him.

**III.  The City's Policies, Practices, and Customs Are Directly Causing These Injuries.**

**A.  The City Fails to Accommodate Disabilities in Responding to 911 Calls.**

71. The City's Office of Emergency Management & Communications ("OEMC") oversees its 911 operations, which receive more than 5.5 million calls annually for emergency services.  In 2015, slightly less than half of these calls were dispatched to CPD officers.

72. When, prior to CPD officers being dispatched, emergency calls are identified as likely involving mental illness or developmental disabilities, the response can be assigned to a CPD officer that has participated in the City's Crisis Intervention Team ("CIT") training program or to an appropriate non-officer first responder.  In 2015, 25,000 of the City's emergency calls were pre-identified as being mental health-related.  The City's Task Force estimated that the City actually received between 73,500 and 245,000 mental health-related emergency calls.

73. Even for the fraction of calls that OEMC identified as requiring a CIT response, the City only sends CIT officers to respond approximately 25% of the time.  OEMC's recent response to a FOIA request shows that the City has not curtailed this practice since the Task

Force issued its report. In the past year approximately 2,162 emergency calls were dispatched to CIT-trained officers.

74. In combination with its failure to implement constitutional use of force policies and practices, the City's failure to identify key information prior to the dispatch of CPD officers results in excessive and unnecessary force being used on persons with disabilities because it causes the dispatch of CPD officers who are not adequately trained on how to safely interact with individuals with disabilities. Because the majority of 911 calls involving mental illness, intellectual or developmental disabilities are not being identified as such, CPD officers without appropriate training are being sent to respond to calls.

75. In light of these problems, in May 2016 IPRA recommended that:

(a) OEMC call takers be appropriately trained and relevant protocols be put in place to effectively identify calls involving mental health or psychological issues.

(b) CPD develop procedures that will enable the Department to evaluate how successfully its members are implementing crisis intervention training and policies.

(c) CPD publicly report on its crisis intervention program.

(d) CPD make greater efforts to expand the CIT unit to ensure that officers who are certified in crisis intervention are available when needed.

(e) CPD develop a community outreach plan specifically for crisis intervention related issues that engages all stakeholders.

(f) CPD provide more resources to the CIT program.

According to IPRA's annual report, published eight months later in January 2017, the CPD failed to respond to *any* of these recommendations.

76.     In an August 2016 letter from IPRA Chief Administrator Sharon Fairley to CPD Superintendent Eddie Johnson, IPRA also recommended that the CPD accelerate CIT training for all supervisory CPD members.  According to IPRA, the CPD similarly failed to respond to this recommendation.

77.     Despite City press releases touting a recent training of OEMC staff on mental health issues, the City still has not resolved its severe deficiencies.  The City lacks a policy to guide OEMC call takers on how to direct calls involving threats of suicide.  Call takers do not have advance direction on whether and when to refer these calls to an external suicide hotline, a paramedic, or to CIT-trained officers.  The City also lacks a policy on whether and how the call taker should note important information regarding disabilities other than mental illnesses—for example, that the call involves someone who is deaf or who has autism.

78.      Furthermore, the City refuses to use data to improve its future responses to 911 calls.  Responses to FOIA requests show that the City is not auditing its 911 calls to understand how many and what type of calls are not being identified as requiring a CIT response, but should be.  By failing to engage in post-action reviews, the City is refusing to assess the effectiveness of their training.

**B.      CPD's Policies Do Not Sufficiently Limit Use of Force.**

79.     In May 2017 the CPD overhauled its written use-of-force policy and that policy is expected to become effective shortly after the filing of this lawsuit.  However, the proposed use-of-force policy does not appear to end a number of City practices that have resulted in excessive force.  The policy continues to enforce the cultural norm within the CPD that officers can respond to any act of non-compliance, regardless its reason or result, with escalating physical force.

**1. CPD's Lack of a Foot Pursuit Policy Encourages Unnecessary Escalation.**

80.     The lack of policy, guidance, and oversight of foot pursuits by armed CPD officers shows the City's deliberate indifference to CPD officers' violations of constitutional and civil rights.

81.     Foot pursuits are inherently dangerous and present substantial risks to police officers and the public.  Nonetheless, CPD officers initiate foot pursuits even when they lack a basis for believing the person has committed a serious crime.

82.     The act of someone fleeing, alone, often triggers officers to initiate a foot pursuit that culminates in gunfire, sometimes fatal.  The heat of the pursuit causes officers to unnecessarily rush into close proximity to the fleer, with adrenaline running high and the officers' guns drawn.

83.     For example, the DOJ described a case where a man was walking down a residential street with a friend, and police officers drove up and ordered him to freeze "because he had been fidgeting with his waistband."  (Ex. A, at 25.)  The man ran, three officers gave chase and shot 45 rounds toward the unarmed man, killing him.

84.     The DOJ's January 2017 report could not have been clearer about how the CPD should begin to remedy this dangerous practice:  "[CPD] does not have a foot pursuit policy. It should."  The DOJ recommended developing, training officers on, and implementing a foot pursuit policy that: makes clear that foot pursuits are dangerous; sets forth guidelines for foot pursuits that balance the objective of apprehending the suspect with the risk of potential injury to the officer, the public, and the suspect; and addresses unsafe foot pursuit tactics to minimize risk.

85.     More than nine months later, and four months after the CPD rewrote its use-of-force policies, the City continues to intentionally and willfully ignore these warnings.

### 2. CPD's Proposed Use-of-Force Policy Does Not Acknowledge Disability.

86.     The City's proposed policies on use of force still fail to identify disability as a relevant consideration in officers' use and degree of force.

87.     In April 2017, McGuire Woods—a law firm hired by the City for a review— recommended providing CPD officers with a list of factors to consider regarding use of force. The firm found that many other police departments' use-of-force policies incorporate a compilation of factors that are to be considered when the officer is determining whether to apply force or when evaluating whether an officer has used reasonable force. Those factors included any disability of the subject.

88.     Nonetheless, in May 2017, the City proposed a new use-of-force policy that fails to include a list of such factors. The policy does not acknowledge that disabilities should be considered in whether force is objectively reasonable or whether force is proportional to a threat.

89.     CPD's new policy on the use of Tasers (G03-02-04) similarly does not require officers to consider a subject's disability when deciding whether and how much to use a Taser. This is despite the fact that the DOJ specifically recommended that the CPD revise its Taser policies to limit Taser use on people in a mental health crisis, after finding excessive use of Tasers on people with mental illness.

### C.     The City Refuses to Adequately Train Its Police Officers.

90.     The City's unlawful practices are also perpetuated by its refusal to invest resources into training CPD officers. As a result, there are engrained deficiencies in CPD's training system. The DOJ's interviews found that "[o]fficers at all ranks—from new recruits to the Superintendent—agree that CPD's training is inadequate." (*Id.* at 94.)

91.     The City's training failures occur at CPD officers' initial training and throughout their career, and the training is inadequate both in terms of the quality and quantity.  The DOJ found:

(a)     "Pre-service Academy training relies on outmoded teaching methods and materials, and does not equip recruits with the skills, knowledge, and confidence necessary to serve Chicago communities.  For example, we observed an Academy training on deadly force—an important topic, given our findings regarding CPD's use of force—that consisted of a video made decades ago, which was inconsistent with both current law and CPD's own policies.  The impact of this poor training was apparent when we interviewed recruits who recently graduated from the Academy: only one in six recruits we spoke with came close to properly articulating the legal standard for use of force." (*Id.* at 10.)

(b)     "Post-Academy field training is equally flawed.  The Field Training Officer (FTO) Program, as currently structured, does not attract a sufficient number of qualified, effective leaders to train new probationary police officers (PPOs), has an insufficient number of FTOs to meet demand, and fails to provide PPOs with appropriate training, mentorship, and oversight."  "Significant changes to the Field Training Program are necessary to ensure PPOs are adequately prepared to police constitutionally and safely." (*Id.* at 10, 97.)

(c)     "[I]n-service training is not provided pursuant to any long-term training plan or strategy. . . . CPD is often called upon to deliver ad-hoc trainings on tight timelines in response to crises.  Consequently, in-service trainings are often incomplete and ineffective at teaching officers important skills and information."  The DOJ

emphasized: "The impact of the lack of in-service training cannot be overstated. Without regular, mandatory training, CPD officers do not receive ongoing instruction on critically important topics, such as proper use of force [and] responding to persons in mental health crisis . . . . This prevents officers from accepting and emulating a culture of constitutional and fair policing." (*Id*. at 10, 100.)

92.     The DOJ recommended that the City work with community members from Chicago's diverse racial, ethnic, and disability groups to create and deliver cultural awareness training with the CPD, and to inform and suggest the development of additional measures that may improve police-community relations. The City has failed to do so.

1.  **The City Does Not Adequately Train CPD Officers on Use of Force.**

93.     The DOJ investigation revealed that "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force." (*Id.* at 5.) The City's training has resulted in CPD officers who are unprepared to police lawfully and effectively—and they know it. DOJ reported that "interviewees were unanimous in their belief that the lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments." (*Id.* at 100.)

94.     CPD officers have not been adequately trained on whether and how to use Tasers. The DOJ found that the City's recent CPD-wide "Taser training exemplifies CPD's problematic approach to in-service training. Large numbers of officers were cycled through this important training quickly in order to meet a deadline set by the City, without proper curriculum, staff, or equipment. This left many officers who completed the training uncomfortable with how to use Tasers effectively as a less-lethal force option—the very skill the training was supposed to teach." (*Id.* at 10.)

95.     Though the City has publicly promised to improve training during and in response to the DOJ review, the DOJ expressed significant skepticism regarding whether the CPD will effectively do so given its "haphazard approach" to training.

### 2. The City Does Not Adequately Train Officers Regarding Disabilities.

96.     The City also has failed to train CPD officers on how to serve and protect individuals with disabilities.  Symptoms of mental illness, deafness, and intellectual and developmental disabilities may be demonstrated in behavior that appears non-cooperative, or even criminal, and inadequately trained CPD officers often fail to recognize these symptoms and unnecessarily escalate situations.

97.     Although the Americans with Disabilities Act requires law enforcement to provide reasonable accommodations to people with disabilities when needed during their encounters with police, the City has failed to provide its officers with necessary training and guidance on how, when, and where to do so.

98.     The DOJ recommended that the City "[d]evelop and implement policy and training to better identify and respond to individuals with known or suspected mental health conditions, including persons in mental health crisis and those with intellectual or developmental disabilities ('I/DD') or other disabilities."  (*Id.* at 153.)  The City has failed to do so.

99.     Back in 2004, the CPD began training a selection of its officers on a CIT approach to responding to persons in crisis.  Studies have found CIT training in tandem with proper policies, resources, and supervision can reduce the use of force in encounters with persons with mental illness.  In the past decade, however, the City significantly reduced the number of personnel assigned to run the CIT program, leading to a bottleneck for training officers and eliminating resources for critical functions such as evaluating CIT incidents.

100.     Despite acknowledging the need for more CIT training, the City has failed to implement the administrative and procedural changes necessary.  For example, the CIT unit had nine staff members in 2008; the number had dropped to four members by early 2016; and by the end of 2016 the number had further dropped to three.  None of the City's public updates on its "self-reform," nor its responses to FOIA requests give any indication that it has increased the number of staff in the CIT unit, despite the explicit warnings of the Task Force and DOJ that it must do so.

101.     As with CPD encounters with people with disabilities in other contexts, the City "does not currently collect data on CIT calls in a way that would allow it to make informed staffing and deployment decisions to ensure an adequate number of CIT officers to cover all shifts in all districts."  (*Id.* at 40.)  The CPD's September 2017 response to a FOIA request shows that the City is still not tracking the basic information needed to make informed CIT staffing and deployment decisions, including how many CIT officers are currently available.  For example, when asked the number of CIT teams available in each police district as of June 1, 2017, the CPD stated that it did not have any such records.

102.     The ongoing harm caused by the City's failure to assess its CIT needs is not otherwise being mitigated.  As of April 2016, only 15% of CPD officers were certified as CIT officers and the Task Force recommended increasing that to 35%.  Information obtained through FOIA shows that the CPD has not been training enough officers to come anywhere close to that goal.[1]  The City is not ensuring that there are enough CIT-trained officers to respond to incidents requiring such training, either by training a significant number of CPD officers in CIT city-wide,

---

[1] In the fourteen months after the Task Force issued its recommendation, CPD held trainings with a mere 437 participants, or, approximately 3.5% of all officers.

or by targeting its training to officers in districts with fewer CIT-trained officers or more CIT emergency calls.

103.     The City also does not assess the effectiveness of its CIT program or officers, according to its response to a FOIA request.  Without such an assessment, the City cannot know whether its current training is effectively preparing officers to respond to incidents and whether certain officers are in need of re-training or do not have the requisite skills to be assigned CIT calls.

**D.     The City Fails to Supervise Officers' Use of Force.**

**1.     The City Does Not Monitor Officers' Use of Force.**

104.     The City's system for supervising officers leads again and again to mistreatment of people of color and people with disabilities in part because the City does not monitor officers' use of force.  The DOJ found that, "[r]ather than ensuring that officers under their watch are policing constitutionally, many sergeants instead focus on keeping their subordinates out of trouble when there may be reason for discipline."  (*Id.* at 105.)  Specifically:

(a)     Supervisors do not review the disciplinary and complaint records of the officers they are supervising.

(b)     Officers routinely fail to include factual information in written reports to justify their use of force, and instead use meaningless boilerplate language that is routinely approved by supervisors.

(c)     Supervisors are supposed to respond to the scene of each use of force and investigate every such incident, but they rarely do.

(d)     Although the City is required by law to investigate Taser discharges and officer-involved shootings where no one is hit, "in practice, it investigates neither."

105.    The City has been unable or unwilling to implement even its own modest, specific recommendations to improve supervision of officers' use of force.  A blatant example is the CPD's delay in reporting officers' weapon discharges to IPRA, the agency responsible for investigating when an officer fires a weapon, injures or kills someone.

106.    At the end of 2016, IPRA recommended that the CPD decrease the average amount of time it took CPD to notify IPRA of a weapon discharge from 50 to 10 minutes.  Six months later, IPRA reported that the patterns it observed in 2016 have continued into 2017: "Notifications have taken 22 minutes to nearly two hours (1 hour and 47 minutes).  Since making the recommendation last year, *none* of the notifications have met our previously recommended length of less than 10 minutes."  This delay in weapon discharge notification hampers IPRA's ability to investigate these shootings.

107.    The CPD also fails to collect and analyze information necessary to monitor whether more CPD officers need training regarding disabilities, or to supervise CPD officers' use of force on individuals with disabilities.

108.    Even for incidents that rise to the level of a CIT response, the "CPD has no ability to analyze the most concerning crisis incidents to evaluate its response."  (*Id.* at 40.)  Although CPD has "a Crisis Intervention Report that is designed to capture important information about its response to crisis calls . . . . Even under CPD's newly revised policies, however, officers do not complete this form if the incident requires any other reporting.  Thus, if an officer uses force during the crisis call, the officer will be required to fill out a Tactical Response Report (TRR) and therefore is not required to fill out a Crisis Intervention Report. . . . [T]he TRRs provide very little information about a use of force and include almost none of the information necessary to evaluate whether the crisis response was appropriate."  (*Id.*)

109.    DOJ's review of force incidents found many examples of force, including deadly force, being used against individuals with mental illness.  Yet it "did not see any evidence that CPD had engaged in after-action analysis to determine whether:  the force used was reasonable and necessary; the incident had been recognized as a crisis incident and if not, why not; a CIT officer was dispatched to the scene and, if not, whether there were any barriers to dispatching a CIT officer; the officer used crisis intervention techniques; or the incident demonstrated that improvements in policy or training are needed." (*Id.*)

110.    Though local law requires IPRA to investigate officer weapon discharges, the DOJ found that the City is failing to investigate most Taser discharges and no-hit shootings.

111.    Even when the City investigates officer-involved weapon discharges, its investigations do not provide any supervision of officers' use of force.  In March 2017, a law firm hired by IPRA issued a report making factual findings regarding IPRA's investigations of police-involved shootings and found insufficient: on-scene investigative steps and follow-up investigation; interviews of involved officers; efforts to locate and interview civilian witnesses; and interviews of civilian witnesses.  The report also criticized the City's failures to: analyze officer statements for discrepancies or inconsistencies; analyze officer statements against physical evidence; analyze officer statements against witness statements; explore and assess key issues; address legal standards with specificity; analyze and assess broader tactical conduct, judgment, and adherence to training; have any meaningful supervisory or specialized input; have consistency of assigned investigator; and keep complete files.

## 2.  CPD's Code of Silence Prevents Internal Detection of Misconduct.

112.    The City, its leadership, CPD leadership, and individual police officers all acknowledge that a "code of silence" exists among CPD officers, ensuring both that they stay silent about other officers' transgressions and that they take affirmative efforts to lie and conceal

evidence of officer misconduct. One CPD sergeant told the DOJ: "if someone comes forward as a whistleblower in the Department, they are dead on the street." (*Id.* at 75.)

113. The City's inaction has perpetuated this custom. Investigative agencies such as IPRA and the BIA treat officers' "efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." (*Id.* at 9.) IPRA rarely asserts charges "when officers make false exculpatory statements or denials in interviews about alleged misconduct, even when the investigation results in a sustained finding as to the underlying misconduct." (*Id.* at 76.)

114. Collective bargaining agreement ("CBA") provisions that the City agreed to, when combined with the City's failures to implement countervailing policies to ensure accountability, gut the integrity of investigations. For example, a CBA provision requires IPRA to wait 24 hours before interviewing officers regarding incidents.

115. The DOJ detailed how this procedure provides an opportunity for officers to collude and cover-up:

> Allowing involved officers to engage in private, unrecorded conversations with the commander, supervising sergeants, detectives, and union staff before ever speaking with IPRA allows for the inadvertent or intentional conflating of recollections, or the appearance thereof, and greatly impairs IPRA's investigative abilities. If false or mistaken narratives justifying shootings are created during these private conversations and advanced in reports and officer statements, it is exceedingly difficult for even well-trained and diligent investigators to accurately evaluate whether the shooting was justified.

(*Id.* at 57.) Unlike police departments in other major U.S. cities, "[n]o CPD policy requires involved or witness officers to separate themselves and avoid speaking to each other about a deadly force incident." (*Id.* at 58.)

116.    Earlier this year the DOJ clearly and specifically told the City how to alter their policies:

> CPD rules should at a minimum prohibit officers from discussing the incident (other than with counsel) outside of IPRA's presence, and this rule should be stringently enforced with significant penalties imposed for violations. To the extent these restrictions conflict with CBA notice provisions, such as the provision requiring that IPRA provide witness officers with two-hour notice and accused officers with 24-hour notice before interviews, then these provisions should be renegotiated or, alternatively, all witness discussions with CPD must likewise be delayed until IPRA can participate.

(*Id.*) The City has not made these changes.

### 3. The City Discourages External Complaints of Officer Misconduct.

117.    Despite the City's prior knowledge of the need for more oversight of CPD officers, the City entered into agreements with police unions to codify a municipal policy of discouraging civilian complaints against CPD officers. The City agreed to a collective bargaining agreement with provisions designed to reduce external reporting of misconduct by requiring affidavits, prohibiting anonymous complaints, and preventing investigation of older incidents.

118.    The City also allows a custom of officers and supervisors discouraging the filing of external complaints. CPD officers routinely intimidate potential complainants and witnesses from filing or testifying regarding misconduct, including by filing false assault and battery charges against the victims and witnesses. CPD supervisors often refuse to accept complaints of officer misconduct, including excessive force, and they are not investigated or disciplined for these refusals.

### 4. The City Does Not Track Complaints Against CPD Officers.

119.    The City does not track the behavior of, or complaints against, its CPD officers in a way that would identify repeat offenders.  It also does not take adequate action to discipline or re-train repeat offenders of which it is aware.

120.    The CPD has a data-tracking program (Performance Recognition System) that is meant to help supervisors recognize adverse behavior of officers under their command, but this program is "rarely" used and the DOJ found that supervisors do not understand how to use it. While supervisors reported not using it because it was not accurate, the DOJ pointed out that this had become a self-fulfilling prophecy: It was "inaccurate because CPD does not use it properly or consistently."  (*Id.* at 112.)  The CPD does nothing to audit supervisor adherence to its use.

121.    The CPD has intervention programs to which officers can be referred based on behavioral criteria, but these programs are ineffective and underutilized.  For example, between January 2010 and July 2016, the CPD enrolled only 38 officers in its Behavior Intervention System ("BIS"), despite there being 1,627 officers with five or more misconduct complaints during this time period.  Not enough officers are referred for intervention, and the CPD is not ensuring that those who are referred are actually enrolled.

122.    Furthermore, the collective bargaining agreements the City agreed to require the City to ignore and even destroy evidence of past misconduct, further impeding its ability to detect patterns of misconduct.

123.    The City's refusal to detect patterns of misconduct encourages its police officers to perpetuate an unchecked practice of excessive force.  For example, the DOJ's review of use-of-force files found two "egregious examples of excessive force where, in each incident, the officers involved had extensive histories of complaints of excessive force but were not on the BIS roster."  (*Id.* at 115.)

35

124.    On August 25, 2017, the City publicly released an update on its plan for self-reform.  The plan is silent on whether the City intends to train supervisors on how to use CPD's Performance Recognition System, or otherwise improve inputs into the system, and it also does not address how it will improve intervention systems like BIS.  It appears that the City is instead developing a new system that it is "targeting" to launch in early 2019.  The City does not explain how district command staff's trust in or use of a new system will be improved, nor does it describe training or policies designed to ensure that a new system is used more effectively than the current programs.

**5.    The City Fails to Investigate Complaints About Its Police Officers.**

125.    The DOJ's report found that the structure of how the City and the CPD investigate use of force complaints means "there is no meaningful, systemic accountability for officers who use force in violation of the law or CPD policy." (*Id.* at 7.)  The City has "helped create a culture in which officers expect to use force and not be questioned about the need for or propriety of that use." (*Id.*)  Individual officers know that they can use excessive force and will not be held accountable because:

(a)    The City does not investigate complaints that are too old or that are not supported by an affidavit.  The City's collective bargaining agreement generally prohibits such investigations, but the agreement includes an "override" provision.  The override provision is a catch-22: It requires that objective verifiable evidence exist *before* an investigation begins to allow an investigation into whether evidence supports a complaint.  It is unsurprising then that the City's policy, practice, or custom is not to use it:  In the last five years, it was only used 17 times.

(b)    A significant number of complaints are eligible to be investigated, are not investigated by the two agencies in charge of investigating police misconduct.  From 2011 to

36

2015, 40% of complaints filed were not investigated by either IPRA or the BIA, and were instead referred to the 22 individual police districts for investigation.

(c)     The City does not even necessarily investigate claims that result in a judgment because a court or jury found excessive force was used, or that the City deems worth settling. The DOJ found that the City has "paid over half a billion dollars to settle or pay judgments in police misconduct cases since 2004 without even conducting disciplinary investigations in over half of those cases, and it recommended discipline in fewer than 4% of those cases it did examine." (*Id.* at 46.)

(d)     When investigations do occur, they are incomplete, biased in favor of the officers, and not designed to uncover facts. The DOJ found many cases in which investigators failed to interview witnesses, including officer witnesses and even the accused officers. Investigators often allow union representatives and attorneys to coach officers in the middle of testifying, fail to collect basic and necessary evidence, and use leading questions to help the accused officers.

(e)     Though some misconduct cases are also the subject of a parallel criminal investigation, BIA and IPRA investigators do not review those proceedings to discover evidence or witnesses to assist in their investigations.

126.     The City's failure to properly investigate complaints that are filed is another missed opportunity for it to address the pattern of excessive force by CPD officers. The City has admitted that complaints of excessive force are the largest percentage of complaints that IPRA investigates. Of complaints filed between April 1 and June 30, 2017, 49% were categorized by IPRA as relating to excessive force. Of the investigations that were pending with IPRA as of June 30, 2017, 47% related to excessive force or use of force.

127.    Although the City has, once again, pledged to reform itself, the DOJ found that the proposed reforms, including replacement of IPRA with COPA, do "not directly address many of the problems we identified with IPRA's deeply flawed investigative system." (*Id.* at 92.) Indeed, the DOJ found that without true changes to the investigative practices, "COPA's expanded investigative authority simply exacerbates these investigative problems." (*Id.* at 93.) The City must implement "more than a name change to repair the broken trust that surrounds this investigative agency, particularly since most residents remember the last time the City employed this same rebranding strategy eight years ago when it replaced OPS with IPRA. … [T]he systematic and entrenched nature of the deficiencies we identify cannot be remedied by these reforms alone." (*Id.*)

E.    **The City Fails to Discipline Officers When Improper Use of Force Is Identified.**

128.     Even where the City thoroughly investigates a CPD officer and finds improper use of force or inappropriate treatment of people with disabilities, the City is unlikely to impose any real consequences on the CPD officers for his or her actions.  The DOJ found:

> On the rare occasions when an allegation of misconduct is sustained, and the even rarer occasions when the sustained finding results in true discipline, CPD initiates a convoluted, lengthy process of determining, and revisiting, the appropriate discipline through several layers. The lack of guidance for determining the initial disciplinary penalty; the many opportunities for second-guessing and undermining the penalty; and the amount of time this process takes, has made CPD's disciplinary policy illegitimate in the eyes of officers and the public alike, and rendered it ineffective at deterring misconduct and contributing to a culture of integrity.

(*Id.* at 80.)

129.    Many serious misconduct cases are resolved through a process called mediation, which was originally intended to apply to minor infractions only.  The DOJ found that mediation is "a euphemism for a plea bargain" from which the complaining party is completely excluded.

(*Id.* at 54.) "This standardless plea bargaining system is an impediment to appropriate investigation and true accountability." (Ex. B, at 78.)

130.    In cases in which officer discipline is recommended, arbitrators reduce the disciplinary recommendations over 56% of the time, and eliminate discipline altogether over 16% of the time, so that the discipline originally recommended is imposed only 27% of the time.

**IV.    The City's Ample Notice Demonstrates That It Is Deliberately Indifferent to the Harm It is Causing.**

   **A.    The City Was Repeatedly Warned About Its Inadequate Training and Culture of Police Brutality.**

131.    The City's practice of using force in violation of its residents' rights is entrenched and well-known.  The City, its officials, and the federal government have repeatedly authorized investigations into the CPD, issued factual findings, and identified necessary reforms.  These reports lead to promises for self-reform, but ultimately the City has failed to end its unconstitutional and unlawful policies, practices, and customs.

132.    In the 1970s, U.S. Representative Ralph Metcalfe conducted a panel to investigate police abuse in Chicago.  The panel was convened after several high profile incidents of police abuse.  First, on March 13, 1972, Dr. Herbert Odom, a prominent black dentist, was pulled over for a minor traffic violation, then thrown onto the hood of his car and handcuffed when he protested being searched in the street.  The handcuffs were so tight that his wrists were injured and he was unable to perform a surgical procedure the next day.  Then, on April 15, 1972, Dr. Daniel Claiborne, also a black dentist, suffered a stroke while driving and crashed into a parked car.  A CPD officer dragged Dr. Claiborne from his car, incompetently concluded that he was drunk, arrested him, and placed him—unconscious—in a cell without any medical attention.  He later died as a result of the delay in receiving medical treatment.

133.     After the City failed to address the community's concerns, Rep. Metcalfe assembled the Blue Ribbon Panel Hearings.  The panel issued a report documenting the widespread, unnecessary, and too-often-fatal use of force on citizens by the CPD.  Rather than promoting public safety, the panel found that "[s]uch conduct – particularly the use of excessive force – violates the constitutional rights of its victims and the criminal laws of the State of Illinois, and poisons police-community relations."  The panel noted that 75% of persons killed in Chicago were black, and that a black person was over six times as likely to be killed by the police as was a white person.  The panel found a "pattern of proven ineffectiveness of the police discipline system" to discover and punish unlawful conduct.

134.     In 1997, City Mayor Richard M. Daley appointed a Commission on Police Integrity to investigate corruption and brutality by the CPD.  The Commission issued recommendations that the City has still failed to enact.  For example, the Commission recommended "establishing an 'early warning system' to alert command personnel when an officer may be involved in a pattern of misconduct."  The report explained that "[v]irtually every major city police department in the country recognized the need for [such] a mechanism," due to a simple premise: "small problems become big ones if left unattended."  The Commission emphasized that "non-sustained" complaints against officers were not necessarily "unfounded," and therefore "some system needs to be in place which allows the [CPD] to take some appropriate action when a clear pattern of non-sustained complaints exists."  The report also recommended that the City take steps to expedite the disciplinary process for CPD officers because "the amount of time that passes between an infraction of the [CPD's] rules and the imposition of a sanction sends a message that the misconduct is not being taken seriously."

135. The City has repeatedly received jury verdicts against it over the past few decades, putting it on further notice of its unlawful policies and practices. For example, in 2003 in *Garcia v. Chicago*, No. 01-cv-8945 (N.D. Ill.), a federal jury found that as of 2001 the City had a custom and practice of not adequately investigating, disciplining, or prosecuting off-duty Chicago police officers who use excessive force. In February 2007 in *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994 the CPD maintained a code of silence that facilitated police misconduct. Similarly, in November 2012, a federal jury in the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), found that the City had either a widespread custom or practice of failing to investigate and/or discipline its officers, or a widespread custom or practice of a police code of silence, or both, which was the moving force behind a CPD officer's beating of Obrycka in February 2007.

136. In April 2014, CPD First Deputy Superintendent Alfonza Wysinger testified before the U.S. Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, at a hearing addressing law enforcement responses to Americans with disabilities. His testimony confirmed that the City knew it was failing to adequately train CPD officers for interacting with individuals with disabilities. Wysinger acknowledged that police in Chicago were receiving "increasing numbers of calls for service to respond to situations involving individuals with mental illness." He explained that "because no more than 20% of [CPD's] patrol officers are CIT-trained, less than a majority of mental health related calls were responded to by a CIT-trained officer. Thus, the outcomes of many thousands of mental health related calls were not benefited by interaction with an appropriately trained officer." He stated that this practice "add[ed] unnecessary risk of physical altercation and bodily harm during those calls[.]"

137.    In 2014, the City asked global management consulting firm A.T. Kearney and Chicago-based law firm Schiff Hardin to conduct an independent review and assessment of what the CPD was doing to prevent and address police misconduct and to suggest ways to improve. Their December 2014 findings detailed the need for CPD to adopt discipline guidelines, discharge officers engaging in the code of silence, and improve supervisory effectiveness and accountability.  The report warned the City of the existence of significant failures in their training, supervising, and disciplining of CPD officers that kept the City from preventing future misconduct.  It pointed out that the CPD did not use education and training as disciplinary options, even though in some situations "traditional punishments of reprimand or suspension run the risk of making the offending officer bitter without helping her to perform her responsibilities more effectively."  It also detailed the many ways officers could, and were, significantly delaying and preventing the implementation of punishment recommended by IPRA.

138.    In the face of the many reports of a culture of brutal force and cover-up from multiple groups hired *by the City*, multiple decision-makers of the City have admitted that there is an entrenched culture of unnecessary force and an unwritten policy of a code of silence.  For example, in December 2015, Mayor Rahm Emanuel said in an interview that "there is no doubt" that there is a code of silence "culture" among police officers.  In March 2016, former CPD Superintendent Richard Brzeczek said in an interview that there was no question that the CPD's code of silence existed during his tenure in the 1980s through today.

139.    Despite repeated notice to the City of its inadequate training of officers and the existence of a custom of CPD officers using excessive force with impunity, the City's unlawful practices continue.  Not only has the City failed to act on repeat warnings that it must better supervise and discipline CPD officers, but the City further committed itself to a hands-off

approach in 2012 by entering into a collective bargaining agreement with provisions designed to *prevent* the detection and discipline of officers with patterns of misconduct. As a result, today witnesses are deterred from filing complaints about CPD officers; many filed complaints are not investigated; those that are examined result in discipline in less than 4% of the time; and it takes an average of 2.5 years for IPRA to complete an investigation.

140.    Representative Metcalfe wrote in his 1972 report: "The time for action, for police reform, has come." Forty-five years later, the people of Chicago are still waiting for the City to act.

**B.      Numerous Incidents Also Made Obvious the Need for the City to Develop and Implement Policies, Practices, and Procedures With Respect to Individuals With Disabilities.**

141.    In addition to receiving notice from various government-authorized investigations, media reports and lawsuits also made obvious how necessary it was for the City to modify its policies, practices, and procedures to avoid discriminating against individuals on the basis of disability in the provision of emergency and policing services, programs, and activities.

142.    On May 6, 2002, Tim Crotty walked into a Chicago police station, mumbling unintelligibly and holding his pants in one hand, and a collapsible knife in the other. Soon after, a CPD officer shot and killed him. According to a *Chicago Tribune* interview with the security guard in Crotty's apartment building, Crotty was not known to be violent; when he would emerge from his apartment shouting every six months, they would call his social worker to administer medication.

143.    In the afternoon of May 7, 2006, a young Californian woman with mental illness named Christina Eilman was seen dancing in circles, "ranting" at people, and exposing herself on the subway platform at Chicago's Midway Airport. Instead of transporting her for a mental

health assessment, CPD officers arrested Eilman and transferred her to a police station in

Englewood. The next day, after disregarding several phone calls from her parents in which they

described her bipolar disorder and voiced their concerns for her safety, the officers discharged

her and left her to wander unfamiliar streets alone. Soon after, she was abducted and sexually

assaulted in a nearby public housing project, according to court filings and news reports. Eilman

then either fell, jumped, or was pushed from a seventh-floor window, leaving her unable to walk

and with limited cognitive ability. Her parents sued, and the City agreed to pay $22.5 million to

settle the case.

144.    On December 12, 2012, the mother of Philip Coleman called the police for help

with her adult son. When CPD officers arrived, Coleman was having a mental breakdown.

Rather than take him to a hospital, police arrested him. Publicly released video footage shows

that, the next day, six officers entered the holding cell where Coleman was sleeping to take him

to his bond appearance. As Coleman stood up, officers Tased him multiple times, then placed

him in handcuffs and dragged him out of the cell by the handcuffs. According to court filings, he

was eventually taken to a hospital, where he was Tased again and given a sedative. He died a

few hours later. Taser discharge records show that Coleman was Tased 16 times during the 22

hours that he was in police custody. Coleman's father sued the City. Judge Matthew Kennelly

held that one of the officers involved "chose to use brute force when it was no longer necessary"

and "unquestionably used excessive force in pulling Mr. Coleman's hands over his head and

dragging him from the cell." On April 13, 2016, the City Council approved a $4.95 million

settlement. In response to the video of Coleman's Tasing and dragging, Mayor Emanuel said he

did not "see how the manner in which Mr. Coleman was physically treated could possibly be

acceptable. … Something is wrong here—either the actions of the officers who dragged Mr. Coleman, or the policies of the department."

145.    On October 23, 2013, CPD officers shot and killed Terrance Harris in his mother's basement.  According to a lawsuit filed by his mother, she called the police because her son was suffering from an acute mental health episode caused by a diagnosed mental illness. When officers arrived, Harris refused to open the door and at least one officer heard him making nonsensical statements.  Officers then forced open the front door and a sergeant stepped into the entryway, where Harris cut him with a knife.  The officers retreated and called for backup, and Harris hid in the basement.  His mother alleges that she went outside where dozens of officers had gathered and informed them that Harris was off of his medication.  Despite this information, as well as the fact that the City should have known about his mental health issues because of prior 911 calls to that address, no attempt was made to dispatch a CIT-trained officer or apprehend him without lethal force.  Instead, a dozen officers stormed the home with their guns drawn and entered the basement without attempting to de-escalate the situation.  Three officers then fired 32 rounds, hitting Harris a total of 29 times.  According to the *Chicago Tribune*, the three officers who fired their guns were cleared by IPRA, after other officers in the house told IPRA that they did not have a clear view of the incident.

146.    On October 20, 2014, 17 year-old high school student Laquan McDonald was shot and killed by a CPD officer. According to the *Chicago Tribune*, McDonald had learning disabilities and was diagnosed with complex mental health problems, including post-traumatic stress disorder.  McDonald suffered physical and sexual abuse as a child and had three psychiatric hospitalizations by the age of 13, during which time he was diagnosed with post-traumatic stress disorder and other serious mental illnesses.  In October 2014, officers were

responding to a call about a man with a knife breaking into cars. Publicly released video footage shows that McDonald was walking in the middle of the street, holding a three-to-four-inch long folding knife, and was moving away from the officers. Even though several other officers were already on the scene by the time Officer Van Dyke and his partner arrived, Van Dyke jumped out, drew his weapon, and began firing at McDonald within six seconds of his arrival, according to then Cook County State's Attorney Anita Alvarez. Fifteen seconds later, Van Dyke had unloaded all sixteen bullets from his gun into the teen, most of them hitting McDonald while he was limp on the ground. In November 2015, the City finally publicly released video of McDonald's killing, visually demonstrating how multiple CPD officers had filed false reports to cover-up the murder. For example, one report stated that McDonald "was attacking with a knife . . . trying to kill" Van Dyke, while the video shows that McDonald never faced Van Dyke or moved toward him. Officer Van Dyke was the first CPD officer charged with first degree murder in nearly 35 years—despite the fact that hundreds have been shot to death by CPD officers during that time period. The City's Task Force found: "The truth is that at the time Van Dyke fired the first of 16 shots, Laquan McDonald posed no immediate threat to anyone." (*Id.* at 4.)

147. According to a lawsuit filed against the City, on September 25, 2015, the mother of 33-year-old James Anderson summoned police to her home by calling 911 because her son, who had a mental illness, had stopped taking his medication. He was confused and not attending to his personal hygiene, so his mother called 911 to have him escorted to the hospital in an ambulance to stabilize his behavior and regulate his medication, as she had done in the past. On this occasion, three CPD officers arrived and his mother explained that he was unarmed, not violent, and had no history of violent behavior; he simply needed to go to the hospital. She told

them that he was in his room listening to music. An officer drew his weapon, knocked on Mr.

Anderson's door, and got into a shooting position. The other two officers were also present. As

Anderson emerged from the bedroom unarmed, the officer shot him seven times, killing him.

The officers claimed that he was holding a "knifelike object" and refused orders to drop the

weapons, and that they twice attempted to Taser him. His mother filed a lawsuit against the City.

148.    Despite the fact that the City is and has been spending tens of millions of dollars

each year to settle lawsuits filed due to police misconduct, it has not adopted a system for

evaluating and addressing the risk issues identified in the lawsuits. As a result, the Plaintiffs

remain at risk of serious harm.

## CAUSES OF ACTION

### COUNT 1: Fourth Amendment, Section 1983

(all Plaintiffs v. the City)

149.    The allegations set forth above are realleged and incorporated by reference as if

fully set forth herein.

150.    Through its deliberate indifference the City encouraged, tolerated, and ratified a

widespread practice of excessive force by CPD officers by its failure to adequately train,

supervise, discipline, and control officers.

151.    The City's actions are the cause and moving force behind the deprivation of the

Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. §

1983.

152.    As a direct and proximate result, Plaintiffs have suffered injuries and are at

continuous risk of being subjected to additional injuries and harm.

153.    Plaintiffs are entitled to declaratory and injunctive relief, and attorneys' fees and

costs.

## COUNT 2: Americans with Disabilities Act (ADA), 42 U.S.C. § 12132

(Communities United, Next Steps, ONE Northside, and the ACLU of Illinois v. the City)

154. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

155. Plaintiffs have members who are qualified individuals with disabilities because they are deaf or have a mental health, intellectual, or developmental disability.

156. The City of Chicago is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1)(a), (b).

157. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

158. The regulations implementing Title II of the ADA provide that:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration – (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3).

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

159. In violation of Title II of the ADA, Plaintiffs' members have been and continue to be discriminated against on the basis of disability, denied reasonable modifications of policies,

practices and procedures, and denied the services and benefits of the City's emergency response and policing systems because the City has failed to adequately train and supervise CPD officers to respond to situations involving individuals with disabilities, including those who are deaf or have mental illness, intellectual and developmental disabilities.

160.    The City has been deliberately indifferent to the obvious discrimination of CPD officers and the need for more and different policies, practices, and procedures to prevent the violation of the rights of individuals with disabilities.

161.    Plaintiffs' members have been denied the services and benefits of the CPD because the City failed to supervise and discipline police officers' interactions with individuals who are deaf or who exhibit the signs and symptoms of mental illness or intellectual and developmental disabilities.

162.    As a direct and proximate result, Plaintiffs have suffered injuries and are at continuous risk of being subjected to additional injuries and harm.

163.    Plaintiffs are entitled to declaratory and injunctive relief, and attorneys' fees and costs.

### COUNT 3: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

(Communities United, Next Steps, ONE Northside, and the ACLU of Illinois v. the City)

164.    The allegations set forth in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

165.    Section 504 of the Rehabilitation Act states that no otherwise qualified individual with a disability shall be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

166.    The City is subject to the Rehabilitation Act as a public entity that receives federal financial assistance.  29 U.S.C. § 794(b); C.F.R. § 27.1.

167.    The City of Chicago is a public entity.

168.    Plaintiffs have members who are qualified individuals with disabilities because they are deaf or have a mental health, intellectual, or developmental disability.

169.    Plaintiffs were subjected to discrimination by and denied the services of the CPD because the City failed to adopt policies and practices that properly account for disabilities.

170.    Plaintiffs were denied the services and benefits of the CPD because the City and CPD have failed to train and supervise CPD officers to properly respond to situations involving individuals who are deaf or have mental illness, intellectual or developmental disabilities.

171.    Plaintiffs were subjected to discrimination by and denied the services of the CPD because the City has failed to supervise and discipline police officers' interactions with individuals who are deaf or who exhibit the signs and symptoms of mental illness, intellectual or developmental disabilities.

172.    Plaintiffs were subjected to discrimination by and denied the services of the CPD because the City failed to ensure that reasonable modifications of policies, practices, and procedures were made for people with disabilities, including individuals who are deaf or have mental illness, cognitive or developmental disabilities.

173.    As a direct and proximate result, Plaintiffs have suffered injuries and are at continuous risk of being subjected to additional injuries and harm.

174.    Plaintiffs are entitled to declaratory and injunctive relief, and attorneys' fees and costs.

## COUNT 4:  Illinois Constitution, art. I § 6 (unreasonable search and seizure)

(all Plaintiffs v. the City)

175.    The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

176.    The City intentionally encouraged, tolerated, and ratified a policy, practice and/or custom of the use of excessive force by CPD officers.

177.    The actions of the City described herein violate the rights of Plaintiffs to be free from unreasonable searches, seizures, and invasions of privacy as guaranteed by Article I, Section 6 of the Illinois Constitution.

178.    The City's actions are the cause and moving force behind the deprivation of the Plaintiffs' rights under the Illinois Constitution.

179.    As a direct and proximate result, Plaintiffs have suffered injuries and are at continuous risk of being subjected to additional injuries and harm.

180.    Plaintiffs are entitled to declaratory and injunctive relief, and attorneys' fees and costs.

## COUNT 5: Illinois Civil Rights Act of 2003, 740 ILCS 23/5

(all Plaintiffs v. the City)

181.    The allegations set forth in paragraphs above are realleged and incorporated by reference as if fully set forth herein.

182.    The City is a "local government" subject to the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5.

183.    The City's criteria and methods of administering police services in Chicago have the effect of subjecting individuals to discrimination because of their race, in violation of ICRA.

Specifically, the City's criteria and methods of law enforcement and use of force have a discriminatory impact on black and Latino individuals.

184.    As a direct and proximate result, Plaintiffs have suffered injuries and are at continuous risk of being subjected to additional injuries and harm.

185.    Plaintiffs are entitled to declaratory and injunctive relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    Enter a declaratory judgment that the City maintains policies and/or customs that violate the federal and state constitutions, the ADA, Section 504 of the Rehabilitation Act, and ICRA.

B.    Enter a permanent injunction on behalf of Plaintiffs enjoining the City from continuing their policies, practices, and/or customs of using unlawful force against black and Latino people and individuals with disabilities, and requiring the City to submit a plan detailing how it will modify its policies and train, supervise, and discipline CPD officers to prevent future civil rights violations.

186.    Award Plaintiffs their attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §§ 1988 and 12203, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq*.

C.    Award Plaintiffs other relief that this Court may deem just and proper.


DATED: October 4, 2017                    Respectfully submitted,

                                          COMMUNITIES UNITED; COMMUNITY
                                          RENEWAL SOCIETY; NEXT STEPS; ONE
                                          NORTHSIDE; and the ACLU OF ILLINOIS

                                          /s/ Karen Sheley
                                          *Lead Counsel for Plaintiffs*

Barry C. Taylor
Laura J. Miller
Amanda Antholt
EQUIP FOR EQUALITY
20 N. Michigan Ave., Ste. 300
Chicago, IL 60602
(312) 341-0022
barryt@equipforequality.org
laura@equipforequality.org
amanda@equipforequality.org

Karen Sheley
Kathryn Hunt Muse
Lindsay S. Miller
Rachel Murphy
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
ksheley@aclu-il.org
kmuse@aclu-il.org
lmiller@aclu-il.org
rmurphy@aclu-il.org