**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| COMMUNITIES UNITED, COMMUNITY RENEWAL SOCIETY, NEXT STEPS NFP, ONE NORTHSIDE, and the ACLU OF ILLINOIS, on behalf of their respective members, | |
| Plaintiffs, | Case No. 17-cv-7151 |
| vs. | Hon. Elaine E. Bucklo |
| THE CITY OF CHICAGO, | |
| Defendant. | |

<u>**DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS**</u>
<u>**PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO**</u>
<u>**FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND (B)(6)**</u>

TAFT STETTINIUS & HOLLISTER LLP
Allan T. Slagel (ARDC #6198470)
Heather A. Jackson (ARDC #6243164)
Elizabeth E. Babbitt (ARDC #6296851)
Jeffrey M. Schieber (ARDC #6300779)
Rachel L. Schaller (ARDC # 6306921)
111 East Wacker, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email: aslagel@taftlaw.com
hjackson@taftlaw.com
ebabbitt@taftlaw.com
jschieber@taftlaw.com
rschaller@taftlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ........................................................................................................ 1

ARGUMENT ................................................................................................................ 3

I.      Standard Of Review. ........................................................................................ 3

II.     The Court Should Dismiss The Amended Complaint Under Rule 12(b)(1)
        Because It Lacks Subject Matter Jurisdiction. ................................................ 5

        A.      Plaintiffs Lack Associational Standing To Seek Declaratory And
                Injunctive Relief. ................................................................................... 5

                1.      Plaintiffs Have Not Shown – And Cannot Show – That Even One
                        Of Their Members Is In Immediate Danger Of Sustaining A Direct
                        Injury. .......................................................................................... 5

                2.      Plaintiffs' Allegations Regarding Their Individual Members Do
                        Not Support Standing. .................................................................. 7

                3.      Plaintiffs' Statistical Allegations Do Not Support Standing. ...... 9

                4.      Plaintiffs' Allegations Regarding Non-Members Do Not Support
                        Standing. ...................................................................................... 10

        B.      Plaintiffs Have Not Shown Organizational Standing To Seek Declaratory
                Or Injunctive Relief. ............................................................................. 11

        C.      Plaintiffs' Claims Are Moot In Light of Changes To The Policies And
                Practices At Issue. ................................................................................. 13

                1.      CPD Revised Its Use of Force Policies. ...................................... 16

                2.      CPD Has Implemented Training On Its Revised Use of Force
                        Policies. ........................................................................................ 19

                3.      The City Has Revamped Its Response To Individuals In Mental
                        Health Crises. ............................................................................... 20

                4.      Additional Reform Is Occurring. ................................................. 21

III.    Plaintiffs' Claims Should Be Dismissed Pursuant To Rule 12(b)(6). ............ 23

        A.      Plaintiffs Fail To State A *Monell* Claim Under § 1983. ...................... 23

1.      Plaintiffs Have Not Pled An Underlying Constitutional Violation Of Either The Fourth Or The Fourteenth Amendment. ............................ 24

2.      Plaintiffs Fail To Allege The Existence Of A Municipal Policy Or Custom That Was The "Moving Force" Behind An Equal Protection Violation. ......................................................................... 26

B.      Plaintiffs Have Not Pled Valid ADA Or Rehabilitation Act Claims. ................... 28

1.      Plaintiffs' Allegations Do Not Suffice to Show Intentional Disability Discrimination. ......................................................... 28

a.      Plaintiffs Do Not Identify What Service, Program Or Benefit Their Members Allegedly Were Denied. ......................... 29

b.      Plaintiffs' Conclusory Allegations Are Not Sufficient To Plead That Any Denial Was "By Reason" Of Their Members' Disability. ...................................................... 30

2.      Plaintiffs' Allegations Do Not Suffice To Show That Their Members Sought And Were Denied A Reasonable Modification. ........... 31

a.      The ADA And Rehabilitation Act Do Not Require Consideration Of Accommodation During Pre-Arrest Encounters ................................. 31

3.      Plaintiffs Fail to Adequately Allege that Any Disabled Person Put The City On Notice Of Their Disability, That They Requested An Accommodation, And/Or That The City Refused To Provide A Reasonable Accommodation. ................................................. 33

4.      Plaintiffs Cannot Proceed On A Disparate Impact Theory Because They Do Not Identify A Facially Neutral Policy That Disproportionately Impacts Disabled People ............................................ 37

5.      Plaintiffs' "Failure to Train Claims" Are Not Cognizable Under the ADA or the Rehabilitation Act. ......................................... 38

C.      The Illinois Constitution Does Not Provide Plaintiffs An Independent Cause Of Action ............................................................................. 39

D.      Plaintiffs' Claim Under the Illinois Civil Rights Act Should Be Dismissed. ........ 40

1.      Plaintiffs Have Not Identified A Particular Practice That Causes Disparate Impact. ...................................................................... 41

2.      Disparate Impact Liability Does Not Apply to Policing Strategies. ......... 44

3.      If Disparate Impact Liability Applies, Plaintiffs Have Not Pled
        Causation Sufficient to State a Prima Facie Case. .................................. 45

CONCLUSION ................................................................................................................. 47

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 4

*Aslin v. Fin. Indus. Regulatory Auth., Inc.*,
704 F.3d 475 (7th Cir. 2013) ......................................................................... 3

*Ass'n for Disabled Americans v. Claypool Holdings, LLC*, No. IP00-0344-C-T/G,
2001 WL 1112109 (S.D. Ind. 2001) ............................................................ 12

*Bates v. Chesterfield County, Va.*,
216 F.3d 367 (4th Cir. 2000) ....................................................................... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 4

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ......................................................................... 5

*Bolden v. Stroger*,
No. 03 C 5617, 2005 WL 283419, at *1 (N.D. Ill. Feb. 1, 2005) .................... 6

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ......................................................................... 4

*Capitol Leasing Co. v. FDIC*,
999 F.2d 188 (7th Cir. 1993) ......................................................................... 4

*Cent. Austin Neighborhood Ass'n v. City of Chicago*,
2013 IL App (1st) 123041, ¶ 10 .............................................................. 40, 44

*Chavez v. Illinois State Police*,
251 F.3d 612 (7th Cir. 2001) ................................................................... 27, 28

*Ciarpaglini v. Norwood*,
817 F.3d 541 (7th Cir. 2016) ....................................................................... 23

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ............................................................ 1, 5, 6, 7, 8, 9, 10, 11

*City of Los Angeles v. Wells Fargo & Co.*, No. 2:12-cv-09007,
2015 WL 4398858 (C.D. Cal. July 17, 2015) ............................................... 42

*Collier v. Rock Island Police Officers Phillip Ledbetter*,
No. 4:14-CV-4103-SLD-JEH, 2016 WL 5796765 (C.D. Ill. Sept. 30, 2016) ................. 25

*Daniels v. Southfort*,
    6 F.3d 482 (7th Cir. 1993) ...................................................................... 10, 12

*Davenport v. Dovgin*,
    545 F. App'x 535 (7th Cir. 2013) ..................................................................... 30

*Dillary v. City of Sandusky*,
    398 F.3d 562 (6th Cir. 2005) ........................................................................... 39

*Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*,
    522 F.3d 796 (7th Cir. 2008) ........................................................................... 11

*Dunnet Bay Cosntr. Co. v. Borggren*,
    700 F.3d 676 (7th Cir. 2015) ........................................................................... 40

*Earl v. Espejo*, No. 17 C 195,
    2017 WL 3704826 (N.D. Ill. Aug. 28, 2017) .................................................. 32

*Estate of Sims ex rel. Sims v. Cty. of Bureau*,
    506 F.3d 509 (7th Cir. 2007) ........................................................................... 24

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008) ...................................................... 4, 13

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ........................................................................... 12

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................... 3, 5, 23

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971) .................................................................................. 40, 41

*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*,
    570 F.3d 811 (7th Cir. 2009) ............................................................................. 3

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................................. 11, 12

*Hicks v. City of Chicago*, 15-cv-06852,
    2017 WL 4339828 (N.D. Ill. Sept. 9, 2017) ................................................... 27

*Ill. Native Am. Bar Ass'n v. Univ. of Ill.*,
    368 Ill. App. 3d 321 (1st Dist. 2006) .............................................................. 40

*Illinois v. City of Chicago,* No. 17-cv-6260 ................................................... 15, 23

*Inclusive Communities Project, Inc. v. Tex. Dept. of Housing and Comm. Affairs*, No.
    3:08-CV-0546-D, 2016 WL 4494322 ....................................................... 42, 43

*Inclusive Communities Project, Inc. v. U.S. Dept. of Treasury*, No. 3:14-CV-3013-D,
    2016 WL 6397643 (N.D. Tex. Oct. 28, 2016) ............................................................ 42, 43

*Jackson v. Cerpa*,
    696 F. Supp. 2d 962 (N.D. Ill. 2010) .............................................................................. 40

*Jaros v. Illinois Dep't of Corr.*,
    684 F.3d 667 (7th Cir. 2012) ........................................................................................... 28

*Kudina v. I.N.S.*,
    No. 99 C 6689, 2001 WL 1064789 (N.D. Ill. Sept. 10, 2001) ......................................... 3

*Lucien v. Jockish*,
    133 F.3d 464 (7th Cir. 1998) ............................................................................................. 8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................................... 5

*Maglaya v. Kumiga*, 14-cv-3619,
    2015 WL 4624884 (N.D. Ill. Aug. 3, 2015) ................................................................... 26

*Majeske v. Fraternal Order of Police, Local Lodge No. 7*,
    94 F.3d 307 (7th Cir. 1996) ............................................................................................. 28

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ..................................................................................... 24, 26

*McFadden v. Bd. of Educ. for Ill. School Dist. U-46*,
    984 F. Supp. 2d 882 (N.D. Ill. 2013) .............................................................................. 40

*McLachlan v. Astrue*,
    703 F. Supp. 2d 791 (N.D. Ill. 2010) ................................................................................ 4

*McNair v. Coffey*,
    279 F.3d 463 (7th Cir. 2002) ............................................................................................. 9

*McReynolds v. Merrill Lynch & Co., Inc.*,
    694 F.3d 873 (7th Cir. 2012) ............................................................................................. 4

*Menominee Indian Tribe of Wisc. v. Thompson*,
    161 F.3d 449 (7th Cir. 1998) ........................................................................................... 16

*Milw. Police Ass'n v. Bd. of Fire and Police Comm'rs of Milw.*,
    708 F.3d 921 (7th Cir. 2013) ...................................................................................... 5, 14

*Monell v. Department of Social Services of City of New York*,
    436 U.S. 658 (1978) ........................................................................................... 2, 23, 24, 27

*Nikolich v. Village of Arlington Heights*,
    870 F. Supp. 2d 556 (N.D. Ill. 2012) ............................................ 37

*Paine ex rel. Eilman v. Johnson*, No. 06 C 3173,
    2010 WL 785397 (N.D. Ill. Feb. 26, 2010) ................................... 33

*Paine v. City of Chicago*, No. 06 C 3173,
    2009 WL 10687409 (N.D. Ill. May 21, 2009) ............................... 30

*Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, *No. 09C5619*,
    2010 WL 1979569 (N.D. Ill. May 17, 2010) ................................. 12

*Perez v. City of Chicago*, No. 13 CV 4531,
    2016 WL 4493425 (N.D. Ill. August 26, 2016) ............................... 8

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ......................... 24

*Plotkin v. Ryan*,
    239 F.3d 882 (7th Cir. 2001) ............................................... 12, 13

*Polk v. Dent*, No. 13 CV 9321,
    2015 WL 2384601 (N.D. Ill. May 19, 2015) ................................. 10

*Puffer v. Allstate Ins. Co.*,
    675 F.3d 709 (7th Cir. 2012) ..................................................... 37

*Raytheon Co. v. Hernandez*,
    540 U.S. 44, 53 (2003) ............................................................ 37

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ................................................................ 41

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ................................................................. 9

*Roberts v. City of Chicago*,
    817 F.3d 561 (7th Cir. 2016) ............................................... 37, 38

*Robinson v. City of Chicago*,
    868 F.2d 959 (7th Cir. 1989) ...................................................... 5

*Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Commissioners*,
    870 F.3d 471 (6th Cir. 2017) ................................. 33, 35, 36, 37

*S.J. v. Perspectives Charter Sch.*,
    685 F. Supp. 2d 847 (N.D. Ill. 2010) ................................. 2, 39, 40

*San Francisco v. Sheehan*,
    135 S. Ct. 1765, 1773 (2015) ................................................... 32

*Schmude v. Sheahan*,
    312 F. Supp. 2d 1047 (N.D. Ill. 2004) ........................................................... 16

*Scozzari v. City of Clare*,
    723 F. Supp. 2d 974 (E.D. Mich. 2010), aff'd, 454 F. App'x 455 (6th Cir. 2012) .......... 36

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015 ......................................................... 3

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ........................................................................................ 40

*Stewart v. City of Chicago*,
    513 F. App'x 619 (7th Cir. 2013) ................................................................... 8

*Swan v. Bd. of Educ. of City of Chicago*,
    No. 13 C 3623, 2013 WL 4401439 (N.D. Ill. Aug. 15, 2013) ......................... 37

Swanson v. Citibank, N.A.,
    614 F.3d 400 (7th Cir.2010) .......................................................................... 26

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ....................................................................... 25

*Tex. Dept. of Housing and Comm. Affairs v. Inclusive Comm. Proj., Inc.*,
    135 S. Ct. 2507 (2015) ................................................................................... 40

*Thao v. City of St. Paul*,
    No.03-5306, 2006 WL 1004379, at *8 (D. Minn. Apr. 13, 2006) ................... 38

*Wagoner v. Lemmon*,
    778 F.3d 586 (7th Cir. 2015) ......................................................................... 28

*Waller v. City of Danville, Va.*,
    515 F. Supp. 2d 659 (W.D. Va. 2007) ........................................................... 38

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ....................................................................................... 46

*Washington v. Pierce*, 16-cv-9880,
    2017 WL 1437054 (N.D. Ill. Apr. 24, 2017) ................................................ 27

*Winfrey v. City of Chicago*,
    957 F. Supp. 1014 (N.D. Ill. 1997) ................................................................ 8

*Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*,
    465 F.3d 737 (7th Cir. 2006) ......................................................................... 28

**Statutes**

42 U.S.C. § 12132 ................................................................................................ 32, 44

740 ILCS 23/5(a)(2) ................................................................................................ 44

Illinois Civil Rights Act of 2003, 740 ILCS 23/5(b) .................................................. 10

**Other Authorities**

Chi. Mun. Ord. § 2-78-105 ....................................................................................... 24

Chi. Mun. Ord. § 2-78-120 ....................................................................................... 25

Chi. Mun. Ord. § 2-78-200 *et seq.* .......................................................................... 24

Chi. Mun. Ord. §§ 2-56-205, 2-56-210, 2-56-230 .................................................... 25

**Rules**

Rule 12(b)(1) ................................................................................................ 3, 4, 7, 52

Rule 12(b)(6) ................................................................................................ 2, 3, 5, 52

# INTRODUCTION

Plaintiffs—five organizations that claim to serve black, Latino, and disabled residents of Chicago—allege that the Chicago Police Department ("CPD") has a practice of using "unnecessary force" that disproportionately impacts black and Latino Chicagoans. (Amended Complaint, ECF No. 28 ("Am. Compl.") ¶¶ 1-2.) Plaintiffs further allege that individuals with disabilities are disproportionately impacted by the CPD's use of force practices. (*Id.* ¶ 3.) Plaintiffs assert that CPD's practices result in violations of: (1) the Fourth Amendment of the United States Constitution, (2) Title II of the Americans with Disabilities Act ("ADA"), (3) the Rehabilitation Act, (4) the "search and seizure" provision of Article I, Section 6 of the Illinois Constitution, (5) the Fourteenth Amendment of the United States Constitution, and (6) the Illinois Civil Rights Act ("ICRA"). (*Id.* ¶¶ 399-437.) Plaintiffs seek a declaration to that effect, and an injunction barring CPD's practices and requiring the City to submit a plan to modify its policies to prevent future violations. (*Id.* at Prayer for Relief ¶¶ A, B.) The Amended Complaint should be dismissed for each of the following reasons.

First, this Court lacks subject-matter jurisdiction because Plaintiffs do not have either associational or organizational standing to bring this suit. Plaintiffs seek injunctive and declaratory relief only. (*Id.*) To establish standing to seek this relief, Plaintiffs must plead facts showing that either they or at least one of their members is "immediately in danger of sustaining some direct injury" due to the CPD's alleged unlawful use of force. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). Plaintiffs present no such allegations.

This Court lacks subject-matter jurisdiction for the additional reason that Plaintiffs' claims are moot. The Amended Complaint parrots certain findings and recommendations of the 2017 Department of Justice Report (the "DOJ Report") and the 2016 Police Accountability Task

Force Report (the "Task Force Report") regarding CPD. However, recently, CPD conducted a comprehensive and well-publicized review of its use of force practices and significantly revised its policies, procedures, and training relating to use of force to address the issues identified in the DOJ and Task Force Reports. Additionally, Plaintiffs allege fourteen members of their organizations had prior encounters with CPD officers that Plaintiffs believe violated their rights. Tellingly, nearly all of the alleged encounters occurred *before* CPD made these significant changes to its policies, procedures and training. Because CPD has discontinued the practices about which Plaintiffs complain, their requests for declaratory and injunctive relief are moot, and the Amended Complaint should be dismissed for a lack of a justiciable case or controversy.

Moreover, even if the Court had jurisdiction to hear this case, certain claims should be dismissed under Rule 12(b)(6) because Plaintiffs have failed to state claims upon which relief may be granted. First, Counts 1 and 5, alleging violations of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment, should be dismissed because Plaintiffs fail to allege an underlying constitutional violation and a widespread custom or practice that was the moving force behind such violation as required to state a *Monell* claim under § 1983. Next, Plaintiffs' claims under the ADA (Count 2) and the Rehabilitation Act (Count 3) should be dismissed because Plaintiffs have not stated a disability discrimination claim under any recognized theory. Count 4, an alleged violation of Article I, Section 6 of the Illinois Constitution, should also be dismissed. Plaintiffs cannot state a claim under the Illinois Constitution because where, as here, "adequate remedies exist under state common law or federal law for certain causes of action, a plaintiff may not maintain an independent cause of action under the Illinois Constitution." *S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 862 (N.D. Ill. 2010). Finally, Plaintiffs fail to state a claim under ICRA (Count 6), because they

have failed to identify an offending policy, that Act does not apply to policing strategy decisions, and, even if it did, Plaintiffs failed to plead a *prima facie* case of disparate impact under ICRA.

## ARGUMENT

### I.  Standard Of Review.

The City brings this motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion tests whether the Court has subject-matter jurisdiction, while a motion under Rule 12(b)(6) tests the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). If the Court finds that it lacks subject-matter jurisdiction, it need not reach the merits of the Rule 12(b)(6) motion. *See, e.g.*, *Kudina v. I.N.S.*, No. 99 C 6689, 2001 WL 1064789, at \*5 (N.D. Ill. Sept. 10, 2001).

The City first moves under Rule 12(b)(1) because Plaintiffs lack standing. "To establish Article III standing, 'a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). It is the plaintiff's burden to establish standing. *Id.* at 173.

The City seeks dismissal under Rule 12(b)(1) on the alternate ground that Plaintiffs' claims are moot. "A case becomes moot, and the federal courts lose subject matter jurisdiction, when a justiciable controversy ceases to exist between the parties." *Aslin v. Fin. Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013). A case will be moot where "a plaintiff seeks only injunctive or declaratory relief and the defendant discontinues the conduct in dispute." *Id.* at 477-78. In determining whether to dismiss a claim on mootness grounds, "the district court

may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (internal quotations omitted).[1]

The City also moves to dismiss under Rule 12(b)(6), which requires dismissal where the plaintiff has failed to state a claim upon which relief may be granted. "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, well-pled facts are taken as true and reasonable inferences are drawn in favor of the plaintiff. *See id*. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) ("[A]llegations in the form of legal conclusions are insufficient."). To determine if a claim is plausible on its face, the court makes a "context-specific" inquiry and "draw[s] on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

---

[1]   Such "[c]onsideration of evidence outside of the pleadings will not convert the motion attacking federal jurisdiction into one for summary judgment." *McLachlan v. Astrue*, 703 F. Supp. 2d 791, 795 (N.D. Ill. 2010) (citing *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)).

## II.    The Court Should Dismiss The Amended Complaint Under Rule 12(b)(1) Because It Lacks Subject Matter Jurisdiction.

### A.    Plaintiffs Lack Associational Standing To Seek Declaratory And Injunctive Relief.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185. "When the plaintiff applies for prospective relief against a harm not yet suffered—or one he believes he will suffer again—he must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical.'" *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (quoting *Lyons*, 461 U.S. at 102).

Plaintiffs are five organizations who claim to have associational standing to pursue prospective relief. An organization has standing to sue on behalf of its members (associational standing) if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Milwaukee Police Ass'n v. Bd. of Fire and Police Comm'rs of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013). Plaintiffs' claims falter at the first requirement.

### 1.    Plaintiffs Have Not Shown – And Cannot Show – That Even One Of Their Members Is In Immediate Danger Of Sustaining A Direct Injury.

Because Plaintiffs seek declaratory and injunctive relief only (Am. Compl. at Prayer for Relief ¶¶ A, B), to establish the first element of associational standing, Plaintiffs must show at least one of their members "is in immediate danger of sustaining some direct injury." *Robinson v. City of Chicago*, 868 F.2d 959, 966, 968 (7th Cir. 1989) (citing *Lyons*, 461 U.S. at 105-06, and

dismissing actions for lack of standing where plaintiffs sought only declaratory and injunctive relief); *see also Bolden v. Stroger*, No. 03 C 5617, 2005 WL 283419, at *1 (N.D. Ill. Feb. 1, 2005) (Bucklo, J.) (holding that *Lyons* requires dismissal of plaintiffs' claims where plaintiffs sought injunctive and declaratory relief from the defendants' alleged policy of barring individuals with mental illness from pre-release programs). Plaintiffs cannot establish the first element of associational standing, warranting dismissal under Rule 12(b)(1).

The Supreme Court's opinion in *Lyons* is controlling. There, the plaintiff, Lyons, sued the City of Los Angeles and Los Angeles police officers, claiming the officers improperly used a chokehold when he was stopped for a traffic violation five months earlier. 461 U.S. at 97. Lyons sought an injunction barring the use of chokeholds except when a suspect threatens to use deadly force. *Id.* at 98. The Supreme Court held that Lyons lacked standing to seek this relief because there was no "real and immediate threat" that Lyons would suffer the same injury in the future. *Id.* at 105. As the Court explained, "[t]he additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.* Rather, to establish standing, Lyons would have to allege he would have another encounter with police and also: "(1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06 (emphasis in original).

This case is no different from *Lyons*. Relying on the DOJ Report, Plaintiffs' have alleged that some CPD officers have a "pattern or practice" of using excessive force during police-citizen encounters. (Am. Compl. ¶ 1.) But Plaintiffs have not alleged – and, indeed, they cannot

allege – that *all* CPD officers *always* use excessive force in police-citizen encounters, or that they are authorized or ordered to do so. Thus, as in *Lyons*, Plaintiffs' allegations fall far short of establishing that their members have standing to seek declaratory and injunctive relief. And because Plaintiffs' members lack standing, Plaintiffs cannot show that they have associational standing.

### 2. Plaintiffs' Allegations Regarding Their Individual Members Do Not Support Standing.

Plaintiffs forward allegations about fourteen members of Communities United, Community Renewal Society ("CRS"), One Northside and the ACLU,[2] including those members' alleged past encounters with police. But these allegations do nothing to establish standing. In particular, Plaintiffs allege that fourteen individuals who are members of their organizations have had interactions with Chicago police that violated their rights and/or caused them to fear their rights would be violated in the future. (Am. Compl. ¶¶ 101-119 (John Doe), 120-130 (K.B.), 131-44 (A.M.), 157-162 (D.B.), 177-179 (C.N.), 180-193 (D.T.), 194-206 (Jack Doe), 207-210 (Jane Doe), 211-217 (C.P.), 218-234 (N.T.), 238-249 (P.F.), 250-254 (Jose Doe), 255-273 (R.R.), 274-279 (Joe Doe).) Plaintiffs further allege that a family member or guardian of at least some of these individuals fears that police will use excessive force on that individual in the future. (*Id.* ¶¶ 105, 108, 234, 249.)

At the threshold, many of the individual encounters alleged are too remote in time to support standing. (*See id.* ¶¶ 110 (describing incident that occurred over ten years ago), 128 (describing incident that occurred in 2014), 132-135, 143 (describing incident that occurred when A.M., now in his twenties, was a teenager), 181-189 (describing incident that occurred in

---

[2] Plaintiffs do not advance any allegations about specific members of Next Steps NFP ("Next Steps"). (*See id.* ¶¶ 163-70.)

or around 2009), 214-215 (describing incident that occurred approximately 30 years ago), 246 (describing incident that occurred in approximately 2000 or 2001).) This is plainly insufficient under *Lyons*, where the Supreme Court held that the plaintiff was not in imminent danger of injury in part because his prior encounter with police occurred five months before he filed suit and he had not had another adverse encounter with police since that time. *See* 461 U.S. at 108. Thus, consistent with *Lyons*, Plaintiffs cannot rely on encounters that occurred years ago to establish standing.[3]

Moreover, Plaintiffs' allegations that certain of their members suffer from conditions that could, in the future, result in conduct that CPD might misinterpret as criminal activity (Am. Compl. ¶¶ 108, 118, 129, 179, 253, 273) are entirely speculative. *See Lyons*, 461 U.S. at 108 (finding it was "no more than speculation to assert" that Lyons will again be stopped for a traffic or other violation in the near future and be subjected to a chokehold without any provocation). Further, Plaintiffs present nothing more than speculation to assert members will be subject to force in those future encounters. These allegations therefore are insufficient to confer standing for equitable relief. *Id*. Likewise, allegations that Plaintiffs' members currently suffer "emotional consequences" of prior encounters with police "are not a sufficient basis for an

---

[3] Indeed, Plaintiffs' allegations do not reveal a single member of Communities United has had an adverse encounter with a CPD officer in the past two years. Not only are events older than two years too remote under *Lyons*, many of the members Plaintiffs identify would not even have a claim for damages because, among other reasons, such claims would be barred by the applicable statutes of limitations. *See Perez v. City of Chicago*, No. 13 CV 4531, 2016 WL 4493425 at *4 (N.D. Ill. August 26, 2016) (finding the two-year statute of limitations applied to claims for injunctive relief, and that those claims accrued when plaintiffs were allegedly seized and detained); *Stewart v. City of Chicago*, 513 F. App'x 619, 621 (7th Cir. 2013) (two-year statute of limitations for Fourth Amendment claims); *Winfrey v. City of Chicago*, 957 F. Supp. 1014, 1023 (N.D. Ill. 1997) (two-year limitations periods for claims under Title II of the ADA and the Rehabilitation Act); Illinois Civil Rights Act of 2003, 740 ILCS 23/5(b) (two-year statute of limitations for ICRA claims); *Lucien v. Jockish,* 133 F.3d 464, 467 (7th Cir. 1998) (two-year statute of limitations for § 1983 equal protection claim).

injunction absent a real and immediate threat of future injury by the defendant." *Lyons*, 461 U.S. at 107, n.8; (Am. Compl. ¶¶ 119, 130, 143-44, 162, 179, 191-92, 203-05, 209-10, 216-17, 233-34, 248-49, 252, 272.) It is equally unavailing for Plaintiffs to rely on past interactions between Plaintiffs' members and Chicago police that do not involve any allegations that force was used. *See McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002) (noting the Supreme Court "repeatedly says or assumes that there cannot be *excessive* force without *some* force. . ."); (Am. Compl. ¶¶ 158-62, 178-79, 208-10, 258-67.) Because Plaintiffs' allegations about certain individual members add nothing to suggest that a specific, non-speculative harm is likely to befall even one of those members as a result of CPD's alleged use of force practices, Plaintiffs' members lack standing to sue in their own right, and it follows that Plaintiffs themselves also lack standing.

### 3.      Plaintiffs' Statistical Allegations Do Not Support Standing.

Plaintiffs' reliance on general and outdated statistics also does not establish that their members are in immediate danger of sustaining a direct injury. (*See* Am. Compl. ¶¶ 27-28, 37-41, 60, 350.) Plaintiffs allege that to the extent CPD officers use excessive force, such acts "disproportionately involve" black, Latino, and disabled Chicagoans, and point to statistics that they believe support this claim. (*Id*. ¶¶ 2-3, 37-41, 60.) But these allegations do not demonstrate, as *Lyons* requires, that "*all* police officers" in Chicago "*always*" use excessive force on "any citizen with whom they happen to have an encounter" (or even on all such black, Latino, or disabled citizens), or that the City "ordered or authorized" its officers to "act in such a manner," such that Plaintiffs' members would likely be subject to excessive force if they were to encounter a CPD officer in the future. 461 U.S. at 108; *see also Rizzo v. Goode*, 423 U.S. 362, 375-76 (1976) (alleged "failure to act in the face of a statistical pattern" and "eliminate future police misconduct" does not by itself confer standing to pursue equitable relief). Plaintiffs' statistical allegations thus do not confer standing.

9

### 4. Plaintiffs' Allegations Regarding Non-Members Do Not Support Standing.

Finally, Plaintiffs' allegations regarding encounters between CPD officers and individuals who are not members of Plaintiffs' organizations likewise do nothing to show standing. Plaintiffs must demonstrate a "personal stake in the outcome" of the litigation beyond an abstract injury. *Lyons*, 461 U.S. at 101, 111 ("[A] a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."). "[P]laintiffs may not bring generalized claims of municipal conduct on behalf of other citizens." *Polk v. Dent*, No. 13 CV 9321, 2015 WL 2384601 at *3 (N.D. Ill. May 19, 2015) (citing cases); *see also Portis v. City of Chicago*, 347 F. Supp. 2d 573, 575 (N.D. Ill. 2004) ("A plaintiff must show that his or her interest in remedying the alleged illegality is stronger than the general public's interest in seeing that government officials comply with [their constitutional] obligations."); *Daniels v. Southfort*, 6 F.3d 482, 485–86 (7th Cir. 1993) (explaining that "only those incidents in which [plaintiff] allegedly suffered personal injury" should be considered "when evaluating whether he has sufficiently pled a pattern of police misconduct in which equitable relief is an appropriate remedy.")

As an initial matter, claims concerning many of the non-member incidents have already been judicially resolved. (*See, e.g.,* Am. Compl. ¶¶ 364-368; 369-376; 385-392; *see also* https://www.cityofchicago.org/city/en/depts/dol.html (last visited Jan. 5, 2018). Thus, even if these individuals were members of Plaintiffs' organizations, Plaintiffs could not establish they have standing in their own right, as their claims would be barred by *res judicata* or a settlement release. More importantly, allegations about individual instances of alleged police misconduct drawn from the DOJ Report, court records, and the media, such as Plaintiffs forward here, do not establish that Plaintiffs themselves have a "personal stake" in the outcome of the litigation.

Absent a specific likelihood that Plaintiffs' members will be wronged in a similar way, Plaintiffs' are no more entitled to an injunction than any other citizen of Chicago. *Lyons*, 461 U.S. at 111.

> **B.**    **Plaintiffs Have Not Shown Organizational Standing To Seek Declaratory Or Injunctive Relief.**

In addition to associational standing, Plaintiffs Communities United, CRS, Next Steps and One Northside also claim organizational standing. (Am. Compl. ¶ 11.) By contrast, Plaintiff ACLU of Illinois brings claims only on behalf of its members. (*Id.*) As explained, however, Plaintiffs have failed to show that even one of their members is in a real and immediate danger of sustaining a direct injury; the claims of Plaintiff ACLU of Illinois should be dismissed for this reason alone. The remaining Plaintiffs can sue on their own behalf (organizational standing) if they meet Article III's requirements of "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008). They fail to make this showing.

The non-ACLU Plaintiffs appear to base their claim to organizational standing on the principle announced in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), that an organization has standing to sue in its own right if it can establish a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." (*See* Am. Compl. ¶¶ 94, 147, 165, 172.) But *Havens* is inapplicable where, as here, an organization seeks only equitable relief. Case in point, in *Havens*, the organizational plaintiffs sought only damages. 455 U.S. at 378. It is within this context that the Court held the (past) diversion of resources was an injury in fact sufficient to confer standing to pursue a damages claim. *Id.*; s*ee also Fair Elections Ohio v. Husted,* 770 F.3d 456, 460 n.1 (6th Cir.

2014) (finding *Havens* inapposite where an organization seeks equitable relief only). Assuming, *arguendo*, that Plaintiffs have in fact diverted their resources as a result of City action, this harm occurred, if at all, in the past. Plaintiffs do not allege that they are in immediate danger of diverting future resources. Further, a remedy at law (i.e., money damages) would be sufficient to remedy the alleged harm (diversion of resources), rendering injunctive relief unavailable and warranting dismissal of the Amended Complaint. *See, e.g.*, *Daniels*, 6 F.3d at 485-86 (dismissing complaint for injunctive relief because damages were an adequate remedy at law).

Even if *Havens* does apply here, Plaintiffs' allegations about impact on their activities are insufficient to confer standing. "[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing." *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001); *see also Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, *No. 09C5619*, 2010 WL 1979569, at \*20 (N.D. Ill. May 17, 2010) (dismissing organizational plaintiffs because expenditure of time and resources helping their members deal with issues resulting from defendant's alleged misconduct was within their ordinary course of business); *Ass'n for Disabled Americans v. Claypool Holdings, LLC*, No. IP00-0344-C-T/G, 2001 WL 1112109, at \*15 (S.D. Ind. 2001) ("As it appears that the Association's purpose and activities are the pursuit of litigation directed against alleged discrimination in public accommodations, the Association's participation in the instant case does not impair the Association's ability to do its work; rather, it is the very work of the Association to litigate alleged discrimination in violation of the ADA.")

While Plaintiffs allege they have spent resources to address policing and police reform, such initiatives are squarely within Plaintiffs' own descriptions of their work. For example, according to Plaintiffs, the mission of Communities United is to "bring about policy change on a

12

variety of social justice issues," including by "advocat[ing] to strengthen Chicago Police Department accountability structures and to improve policing in Chicago through the formation of a civilian community oversight board." (Am. Compl. ¶¶ 12, 13.) Similarly, the mission of CRS is to "address racism and poverty," and "[o]ne of its primary campaigns is police accountability and reform." (*Id.* ¶ 14.) CRS's "goals are to advance racial and economic justice" and it sometimes "devotes resources to a new issue area." (*Id.* ¶¶ 145, 150.) The mission of Next Steps includes ensuring "people with lived experiences of homelessness, mental illness, substance use and/or substance abuse lead the development and implementation of . . . social policies at the state and local levels." (*Id.* ¶ 16.) "ONE Northside's mission is to advance racial and economic justice," including through "community organizing about and offer[ing] policy assistance to the CPD in an effort to reform its policies and practices." (*Id.* ¶ 18.) Finally, while Plaintiffs allege Communities United has been harmed because they must divert resources "organizing youth," Plaintiffs also allege Communities United's work ordinarily includes working with students and other young people. (*Id.* ¶¶ 88, 89, 95.) In short, Plaintiffs' allegations that these organizations have spent resources addressing police reform amount to "ordinary expenditures" within the organizations' stated missions, and therefore "do not constitute the necessary injury-in-fact required for standing." *Plotkin*, 239 F.3d at 886. Therefore, Plaintiffs have not established organizational standing to bring their claims, and the Amended Complaint must be dismissed.

### C. Plaintiffs' Claims Are Moot In Light of Changes To The Policies And Practices At Issue.

"Mootness is a threshold jurisdictional question that insures that the court is faithful to the case or controversy limitation in Article III of the Constitution." *Evers*, 536 F.3d at 662. A case is moot if "there is no reasonable expectation that the wrong will be repeated." *Milwaukee*

13

*Police Ass'n* 192 F.3d at 747 (7th Cir. 1999) (internal quotations and citations omitted). Here, Plaintiffs seek declaratory and injunctive relief on the basis that their members are in imminent danger of being injured as a result of the City's policies and practices relating to the use of force and interactions with persons with disabilities. But Plaintiffs ignore that the policies and practices about which they complain were substantially reformed to address concerns raised by the Task Force and DOJ Reports.[4] Because the policies and practices about which Plaintiffs complain have been discontinued, their claims are moot.

Many of Plaintiffs' allegations repeat statements from the DOJ and Task Force Reports. (*See* Am. Compl. ¶¶ 26-30 (describing the DOJ Report's conclusion on Taser use); 43-46 (describing the DOJ and Task Force Reports' conclusions on racial disparities in use of force); 65-67 (describing the DOJ and Task Force Reports' conclusions on use of force against individuals with disabilities); 302-313 (describing the DOJ Report's conclusions on CPD training); 316-321 (describing the DOJ Report's conclusions on use of force); 324-328 (describing the DOJ Report's conclusions on code of silence); 331-340 (describing the DOJ Report's conclusions on officer complaints); 341-343 (describing the DOJ and Task Force Reports' conclusions on officer discipline).) Plaintiffs also forward allegations about some of their members' purported encounters with, and/or fear of, Chicago police. Likewise, Plaintiffs draw from the experiences of non-members who have been the subject of media reports or civil litigation. Yet, many of these encounters occurred years, if not decades before CPD engaged in

---

[4] The City continually reviews its policies and practices to ensure they are consistent with nationwide best practices. By reforming or revising its policies and practices, the City does not admit or concede that its prior policies or practices were unconstitutional. Additionally, it is well-established that subsequent remedial measures are inadmissible to establish culpable conduct. *See* Federal Rule of Evidence 407.

substantial reforms.[5]   Beyond this smattering of individual, and in many cases outdated, incidents, the Amended Complaint offers little more than a reproduction of certain conclusions from the DOJ and Task Force Reports, accompanied by a demand for injunctive relief barring CPD from continuing its use of force policies and practices and requiring the City to "submit a plan detailing how it will modify its policies and train, supervise, and discipline CPD officers" with regard to use of force. (*Id.* at Prayer for Relief, § B.)

But the City and CPD *already* have reformed CPD's use of force policies and practices. In 2017, CPD extensively revised its use of force policies and practices to address the concerns raised by the DOJ and Task Force Reports, including concerns about training, accountability, and discipline as they relate to uses of force by CPD members and interactions between police and people with disabilities.  Moreover, the City and the Office of the Illinois Attorney General are attempting to negotiate a consent decree that will place CPD's policies and practices relating to use of force under the oversight of a court-appointed monitor.  (*See Illinois v. City of Chicago,* No. 17-cv-6260.)  Because the policies and practices about which Plaintiffs complain have been discontinued, and because components of the "plan" they seek have been effectuated, their claims are moot, requiring dismissal of the Amended Complaint.

---

[5] For example, Plaintiffs allege one of their members, R.S., is afraid that under current CPD policy, her son will be subjected to excessive force if he encounters CPD officers. (Am. Compl. ¶ 118.)  This fear, Plaintiffs claim, is based on an incident that occurred more than ten years ago during which CPD officers allegedly should have but failed to de-escalate her son's behavior. (*Id*. ¶¶ 110-11.)  During 2017, however, CPD enacted new written policies addressing both de-escalation and force mitigation techniques and provided training on those policies. This is but one example of how the individual incidents alleged in the Amended Complaint are stale because they fail to account for the many reforms that have been implemented at CPD.

### 1. CPD Revised Its Use of Force Policies.

In 2016 and 2017, CPD conducted a comprehensive review of its use of force policies, including its general orders detailing the Department's Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), and Canine Use (G03-02-06). *See* Declaration of Karen Conway ("Conway Decl.") (attached hereto as Exhibit A) ¶ 3. Working with national experts, CPD analyzed and updated these policies in light of the issues identified by the Task Force and DOJ Reports, to provide clearer direction for officers on the appropriate use of force, to revise certain procedures, and to make the sanctity of life the touchstone of the policies. *See* Kelly Bauer, "Chicago Police's New Use of Force Policy Focuses On 'Sanctity of Life,'" DNAInfo (May 17, 2017) (available at https://www.dnainfo.com/chicago/20170517/bronzeville/chicago-police-use-of-force-policy-cpd) (last accessed Nov. 7, 2017); Dan Hinkel, "Chicago police finalize tighter rules on when to shoot, other uses of force," Chicago Tribune (May 17, 2017) (available http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-use-of-force-met-20170517-story.html) (last accessed Nov. 7, 2017); In change to force rules, Chicago police discourage using Tasers on people who flee (available at http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-taser-force-rules-20171218-story.html) (last accessed Jan. 5, 2018).[6]

---

[6] The Court can take judicial notice of media reports. *See Menominee Indian Tribe of Wisc. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper" and does not convert a motion to dismiss into one for summary judgment); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) (it is "routine" for courts to take judicial notice of newspaper articles). For the Court's convenience, the City has compiled and attached all media reports cited herein as Exhibit B.

Then, for the first time, CPD incorporated a public comment component into the process of revising its policies, providing the public with two opportunities to review and comment on two separate drafts of the revised use of force policies. *See* Associated Press, "Chicago Police Department drafts new use-of-force policy," Daily Herald (Oct. 7, 2016) (available http://www.dailyherald.com/article/20161007/news/310079913) (last accessed Nov. 7, 2017). After each comment period, CPD, in consultation with legal and technical experts, reviewed the more than 1,000 comments received and made revisions to the draft policies based on those comments before publishing the final version of the policies. *See* Conway Decl. ¶ 7.

CPD's revised use of force policies took effect in October 2017, after officer training (which is described below) was complete. *See* Revised Policies (Ex. 3 to Conway Decl.).[7] The revised policies emphasize key principles, including the sanctity of life, ethical behavior, objective and proportional uses of force, and de-escalation and force mitigation, as well as the imposition of appropriate limitations on the use of less-than-lethal and lethal force. *See* Exhibit B, Kelly Bauer, "Chicago Police's New Use of Force Policy Focuses On 'Sanctity of Life,'" DNAInfo (May 17, 2017) (available at https://www.dnainfo.com/chicago/20170517/bronzeville/chicago-police-use-of-force-policy-cpd) (last accessed Nov. 7, 2017); Sam Charles, "CPD Reform Road Map: Training, transparency and accountability," Chicago Sun Times (March 14, 2017) (available at http://chicago.suntimes.com/news/officials-to-offer-road-map-of-police-reform-efforts/) (last accessed Nov. 7, 2017). The revised policies also provide new protocols for investigating lower-level uses of force, and create within CPD a Force Review Unit, which is responsible for

---

[7] The revised policies are also available at https://home.chicagopolice.org/use-of-force-policy/ (last accessed Nov. 7, 2017).

reviewing certain uses of force and identifying trends and opportunities for improvement in training, tactics, and equipment. *See* Revised Policies (Ex. 3 to Conway Decl.) Finally, the revised policies prohibit the use of excessive force, discriminatory force, punitive or retaliatory force, and force in response to the exercise of First Amendment rights. *See id.* The revised policies also emphasize that all uses of force must be reported, and further emphasize that intervention and reporting is required when officers witness improper or excessive uses of force. *See id.*

CPD's policy revisions address the concerns identified in the DOJ and Task Force Reports, including those cited by Plaintiffs in the Amended Complaint. For example, Plaintiffs allege that "officers routinely fail to include factual information in written reports to justify their use of force." (Am. Compl. ¶ 316(b).) However, the revised use of force policies, and the new Tactical Response Report ("TRR"), require officers to document the justification for their use of force in a newly added narrative section. Specifically, the revised General Order G03-02-02 ("Incidents Requiring the Completion of a Tactical Response Report") states: "The involved member will be required to complete the 'Narrative' section of the TRR, describing with specificity, the use of force incident, the subject' actions, and the involved member's response, including force mitigation efforts and specific types and amount of force used." Similarly, although Plaintiffs allege, relying on the DOJ Report, that CPD officers have improperly used Tasers in "drive stun" mode and on fleeing persons (*see* Am. Compl. ¶¶ 29, 67(b), 67(d), 67(e)), the revised Taser policy specifically prohibits the use of Tasers on moving persons and in drive stun mode in most circumstances. *See* General Order G03-02-04, II.D.4. Likewise, Plaintiffs complain CPD officers have, in the past, failed to use de-escalation techniques. (*Id.* ¶¶ 3, 111, 226, 382). Yet, the revised use of force policies are explicit that CPD officers "will use de-

escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances." (*See* Revised Policies, Ex. 3 to Conway Decl.) In short, the revisions to CPD's use of force policies thus address the concerns the Amended Complaint raised regarding uses of force by CPD officers.

### 2. CPD Has Implemented Training On Its Revised Use of Force Policies.

Similarly, Plaintiffs' claim that "[t]he City Does Not Adequately Train CPD Officers on Use of Force" (Am. Compl. § III(C)(1)) has been addressed through training that was recently provided to over 12,000 CPD officer. Therefore, these allegations have been rendered moot.

After revising its use of force policies, and with the assistance of outside experts, CPD developed and implemented department-wide training on the revised policies. *See* Declaration of Commander Daniel Godsel ("Godsel Decl.") (attached hereto as Exhibit C) ¶ 3. Between June and October 2017, CPD provided a specially developed four-hour classroom training course to all of its officers. *Id.* ¶ 5. Training was provided prior to the October 2017 effective date of the revised policies to ensure that officers understood and were provided direction on the revised use of force policies before they went into effect. *See id.* CPD also developed and provided training for supervisory officers on their duties under the revised policies to investigate and review uses of force. *See id.* ¶ 6. The new use of force training emphasizes, among other things de-escalation and force mitigation techniques, which are precisely the skills Plaintiffs claim are lacking from CPD officers' interactions with people with disabilities. (Am. Comp. ¶ 3.)

In addition, CPD developed a second, 16-hour training course on the revised policies, which include scenario-based training focusing on force mitigation and de-escalation principles, as well as interactions with people in mental health crisis or with mental disabilities. Godsel Decl. ¶ 7. This second course will be provided to CPD members in 2018. *See id.*; Mayor's Press Office, "CPD Announces Use of Force Training Underway," City of Chicago (July 5, 2017)

(available                                                                              at
https://www.cityofchicago.org/city/en/depts/mayor/press_room/press_releases/2017/july/UseofF
orce.html) (last accessed Nov. 7, 2017); Heather Cherone, "Police Training On When Police Can
Use     Force     Begins,"     DNAInfo     (July     5,     2017)     (available     at
https://www.dnainfo.com/chicago/20170705/jefferson-park/police-training-on-when-cops-can-
use-force-starts-today) (last accessed Nov. 7, 2017).  CPD plans to continue to provide additional
use of force training to its members on an annual basis.  *See* Godsel Decl. ¶ 8.

Beyond the centralized use of force training provided to the entire Department in 2017,
and further Department-wide training which will be provided in 2018, CPD has also provided
supplemental use of force training through its newly established "decentralized" training model.
*Id*. ¶ 9.  Under this model, a cadre of CPD Academy instructors provides roll-call and one-on-
one training within the individual police districts to supplement and reaffirm centralized training
efforts.  *Id*.  The Department's decentralized trainers focused on topics including force mitigation
and force options during the 12th and 13th CPD Periods[8] (from November 12, 2017 through
January 6, 2018).  *Id*. ¶ 10.  The decentralized training model is anticipated to cover specific
topics with CPD officers within the districts during each CPD Period.  *Id*.

### 3.     The City Has Revamped Its Response To Individuals In Mental Health Crises.

Plaintiffs further allege that the City failed to follow the recommendations of the
Independent Police Review Authority ("IPRA") regarding interactions with individuals in mental
health crisis, including training 911 call-takers in the City's Office of Emergency Management
and Communications ("OEMC") and expanding the Crisis Intervention Team ("CIT") unit to

---

[8] A CPD Period is a 28-day period that CPD uses for administrative purposes, including vacation
scheduling and watch changes.

ensure CIT trained officers are available when needed. (Am. Compl. ¶ 286(a), (d).) To the contrary, the City, working in partnership with the National Alliance on Mental Illness, provided training to all OEMC call-takers and dispatchers with regard to mental health awareness and de-escalation techniques; the training was completed by early 2017. *See, e.g.,* Patrick M. O'Connell, "All Chicago police dispatchers now trained in mental health awareness," Chicago Tribune (Feb. 25, 2017) (available at http://www.chicagotribune.com/news/local/breaking/ct-911-operators-mental-health-training-met-20170225-story.html) (last accessed Nov. 7, 2017). CPD also appointed Lt. Antoinette Ursitti, a 16-year CPD veteran and licensed professional counselor, to lead the Crisis Response Unit, *id.*, and developed a citywide Mental Health Steering Committee to inform community members on mental health resources, including the option to request a CIT-trained officer in the event of a crisis. *See* Citywide Mental Health Steering Committee Takes Steps on Police Reform, Mental Health Crisis Response (Aug. 30, 2017) (available at https://www.cityofchicago.org/city/en/depts/mayor/press_room/press_releases/2017/august/MentalHealthCommittee.html) (last accessed Jan. 5, 2018). In addition, technological improvements have been implemented that allow OEMC to more accurately track CIT-related responses to dispatches with a mental health component. Conway Decl. ¶ 10, Exhibit 3.

### 4.    Additional Reform Is Occurring.

These are only some of the reforms that have been implemented by CPD and the City since the issuance of and in response to concerns raised by the Task Force and DOJ Reports. Additional reforms include:

- The passage of an ordinance establishing, beginning on September 15, 2017, the Civilian Office of Police Accountability ("COPA"), the successor to IPRA, which is an independent City agency responsible for investigating high levels of use of force and citizen complaints, among other things. *See* Chi. Mun. Ord. § 2-78-200 *et seq.* COPA provided its investigative and legal staff with six weeks

of training through the "COPA Academy." *See* "COPA Celebrates the First Training Class of Academy Graduates," COPA (July 11, 2017) (available at http://www.chicagocopa.org/copa-celebrates-the-first-training-class-of-academy-graduates/) (last accessed Nov. 7, 2017). The ordinance requires a minimum funding level for COPA of not less than one percent of CPD's budget to ensure that COPA has the necessary resources to meet its mandate of conducting thorough and accurate investigations into complaints of police misconduct. *See* Chi. Mun. Ord. § 2-78-105. Additionally, COPA's jurisdiction is more expansive than IPRA's, as COPA is responsible for investigating allegations of improper search and seizure and has authority to investigate patterns and practices of misconduct in any form. *See* Chi. Mun. Ord. § 2-78-120.

- Even prior to the transition to COPA, IPRA implemented new rules and regulations governing the investigation of police misconduct complaints. *See* IPRA Rules (effective June 28, 2016) (available at http://www.iprachicago.org/wp-content/uploads/2016/08/Final-IPRA-Rules-Regulations.pdf) (last accessed Nov. 7, 2017). Additionally, IPRA reviewed certain closed excessive force complaints to determine whether discipline is warranted. *See, e.g.*, Dan Hinkel, William Lee, and Todd Lighty, "IPRA reopens investigation into fatal 2014 shooting by Chicago Police," Chicago Tribune (Aug. 3, 2017) (last accessed Nov. 7, 2017).

- The creation of a new position of Deputy Inspector General for Public Safety to audit and review the policies, procedures, and practices of CPD, the Police Board, and COPA. *See* Chi. Mun. Ord. §§ 2-56-205, 2-56-210, 2-56-230.

- The adoption, in June 2016, of a video release policy, pursuant to which the City promptly releases video, audio, and documents relating to police-involved shootings and incidents involving death or serious bodily injury due to Taser use or while in police custody. *See* Video Release Policy for the City of Chicago (available at https://www.cityofchicago.org/content/dam/city/depts/cpd/Policies/VideoReleasePolicyfortheCityofChicago.pdf) (last accessed Nov. 7, 2017).

- The creation of a Community Policing Advisory Panel, which has engaged the community to make recommendations regarding community policing and reform efforts to rebuild trust with the City's residents. After incorporating public comment, the Panel issued its final report in October 2017, which was accepted by Superintendent Johnson in November 2017. *See* Chicago Police Department, Community Policing (available at https://home.chicagopolice.org/reform/community-policing/) (last accessed Nov. 7, 2017). The report identifies seven pillars of community policing to guide CPD. *See* Chicago Police Department, "Report of the Superintendent's Community Policy Advisory Panel," October 2017 at 11 (available at https://home.chicagopolice.org/wp-content/uploads/2017/08/CPD-Final-CPAP-Report-103117.pdf) (last accessed Nov. 7, 2017).

- The development of an Early Intervention System ("EIS") that will use available CPD data to identify officers who may need additional training or support to avoid involvement in an excessive force or shooting incident, and to provide non-disciplinary interventions for those officers. *See* City of Chicago, "Progress Report: City of Chicago Police Reforms," at 5 (available at https://www.cityofchicago.org/content/dam/city/depts/mayor/Public%20Safety %20Reforms/ProgressReport-PoliceReforms.pdf).

Further CPD reform efforts are detailed in its written plan entitled "Next Steps for Reform" and the Public Update thereto. *See* CPD, "Next Steps for Reform" (Mar. 14, 2017) (available at https://policy.chicagopolice.org/cpds-next-steps-for-reform/); CPD Next Steps for Reform – Public Update (available at https://home.chicagopolice.org/reform/updates-on-reform/).

While the reforms discussed above are sufficient to moot Plaintiffs' claims, the City is continuing to review and evaluate its policies and practices to ensure they remain consistent with national best practices. Further, the City is in negotiations with the Illinois Attorney General regarding the terms of a consent decree that will include an independent monitor who will be overseen by a federal judge. *See Illinois v. City of Chicago,* No. 17-cv-6260. The City recognizes that "a defendant seeking dismissal based on its voluntary change of practice or policy must clear a high bar." *Ciarpaglini v. Norwood*, 817 F.3d 541, 545 (7th Cir. 2016). But the reforms already undertaken reflect substantial and meaningful changes to CPD's policies and practices such that the conduct Plaintiffs allege "'cannot reasonably be expected to start up again.'" *Id.* (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189).

## III.  Plaintiffs' Claims Should Be Dismissed Pursuant To Rule 12(b)(6).

### A.  Plaintiffs Fail To State A *Monell* Claim Under § 1983.

Because Plaintiffs sued only the City, and not any individual officer, the Fourth and Fourteenth Amendment claims must be dismissed unless Plaintiffs adequately allege municipal liability under *Monell*. In order to state a *Monell* claim, Plaintiffs must allege: (1) the existence of an underlying constitutional violation; and (2) the City maintained a policy or practice which

was the "moving force" behind the injury. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) ("[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported."); *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Plaintiffs' allegations concerning their members are insufficient to state Fourth or Fourteenth Amendment violations, and, in some cases, affirmatively indicate no constitutional violation occurred. Additionally, Plaintiffs fail to allege the existence of a municipal policy or custom of violating the Equal Protection Clause. Accordingly, Plaintiffs fail to state a claim for municipal liability under *Monell*, requiring dismissal of Counts 1 and 5.

### 1. Plaintiffs Have Not Pled An Underlying Constitutional Violation Of Either The Fourth Or The Fourteenth Amendment.

Plaintiffs generally allege that their members have been subjected to excessive and discriminatory uses of force as a result of CPD's policies and practices. (*See, e.g.*, Am. Compl. ¶¶ 1-2, 96-100, 155-56, 168-70, 173-76, 236-39). Such legal conclusions should be disregarded on a motion to dismiss. *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011). In addition, Plaintiffs identify fourteen members whom, they allege, have had adverse encounters with police. (Am. Compl. ¶¶ 101-119 (John Doe), 120-130 (K.B.), 131-44 (A.M.), 157-162 (D.B.), 177-179 (C.N.), 180-193 (D.T.), 194-206 (Jack Doe), 207-210 (Jane Doe), 211-217 (C.P.), 218-234 (N.T.), 238-249 (P.F.), 250-254 (Jose Doe), 255-273 (R.R.), 274-279 (Joe Doe).) Encounters pertaining to eight of Plaintiffs' members appear to have occurred more than two years ago prior to the filing of this action. (*See Id*. ¶¶ 110 (describing incident that occurred over ten years ago), 124 (describing incident when K.B. was approximately 14 years old, but failing to state the year); 128 (describing incident that occurred in 2014), 132-135, 143 (describing incident that occurred when A.M., now in his twenties, was a teenager), 181-189 (describing incident that occurred in or around 2009), 214-215 (describing incident that occurred

approximately 30 years ago), 246 (describing incident that occurred in approximately 2000 or 2001); 252 (stating only that "Jose Doe has previously been Tased by Chicago police" but not when it occurred)). Any claim, including a *Monell* claim, based on these incidents therefore is time barred. *See Stewart*, 513 F. App'x ag 621 (two-year statute of limitations for Fourth Amendment claims); *Lucien v. Jockish*, 133 F.3d at 467 (two-year statute of limitations for Fourteenth Amendment equal protection claim). Additionally, allegations relating to encounters that did not involve any use of force fail to support Plaintiffs' *Monell* claims. (Am. Compl. ¶¶ 158-62, 178-79, 208-10, 258-67.)

That leaves only three incidents upon which Plaintiffs might base a *Monell* claim. Three incidents is too few to establish a municipal policy or custom for purposes of *Monell*. *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) ("The district court found, and we agree, that these three incidents were too few to indicate that the City had a widespread custom of which City policymakers had reason to be aware."). Moreover, Plaintiffs' allegations regarding even these three incidents lack the specificity needed to put the City on notice of the nature of the claim. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008) (to survive dismissal, a complaint "needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense."); *see also Collier v. Rock Island Police Officers Phillip Ledbetter, No*. 4:14-CV-4103-SLD-JEH, 2016 WL 5796765, at *5-6 (C.D. Ill. Sept. 30, 2016) ("Pleading isolated incidents" of five allegedly unconstitutional arrests was "insufficient to establish a widespread custom or practice," and failed "to fulfill *Monell*'s notice requirement."). For example, Plaintiffs do not provide either the date or location of the alleged incidents, nor do Plaintiffs provide the name of the officer(s) or citizen involved. Indeed, regarding these three incidents, Plaintiffs allege merely that:

- In 2016, one of N.T.'s relatives called 911 after N.T. got into a fight with a relative and grabbed a knife. (*Id*. ¶¶ 220-24.) When officers arrived, N.T. did not obey their commands to get on the ground and became agitated when officers tried restrain him. (*Id*. ¶ 225.) As a result, Plaintiffs allege an officer discharged a Taser at him, although Plaintiffs do not allege whether the Taser actually struck N.T. (*Id*. ¶ 226.) While N.T.'s hands were handcuffed, but his legs no longer restrained, Plaintiffs allege N.T. tried to evade police, prompting officers to use additional force on N.T. *Id*. ¶¶ 228-29.

- P.F. has been subjected to force by Chicago police on at least two occasions. (*Id*. ¶¶ 247-48.) Plaintiffs allege in 2016, Chicago police had probable cause to arrest P.F. for suspected burglary. (*Id*. ¶ 247.) Plaintiffs allege during the course of the encounter, a Chicago police officer hit P.F. with an object. (*Id*.)

- In August 2017, Joe Doe's foster mother reported him missing, and that a few hours later, an off-duty CPD officer shot Joe Doe after perceiving him as being elusive and unresponsive to questions. (*Id*. ¶¶ 276-79.)

Bare-bones allegations like these do not afford the City sufficient information to investigate and prepare a defense. Counts 1 and 5 of Plaintiffs' Amended Complaint, the *Monell* counts, should be dismissed for failure to plead an underlying constitutional violation.

### 2. Plaintiffs Fail To Allege The Existence Of A Municipal Policy Or Custom That Was The "Moving Force" Behind An Equal Protection Violation.

Plaintiffs allege generally that "Black and Latino Chicagoans are disproportionately victimized by CPD. . . Racism is embedded in the CPD's policing tactics." (Am. Compl. ¶ 2.) For purposes of federal pleadings standards, allegations of racism "embedded" with CPD undoubtedly makes this a "more complex case," meaning that Plaintiffs are "require[d]" to provide "more detail" regarding their support for their claim that the City has maintained a policy, practice, or custom of *intentional* discrimination *See McCauley* (quoting *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir.2010)); *see also, e.g., Maglaya v. Kumiga*, 14-cv-3619, 2015 WL 4624884, at *5 (N.D. Ill. Aug. 3, 2015) (allegations of five separate widespread practices of wholesale corruption of the entire police force was "far along on the complexity scale-" requiring detailed allegations). Instead of providing such detail, Plaintiffs repeat

26

anecdotes from the Task Force and DOJ Reports describing unidentified, individual officers who allegedly exhibited racial animus, which the City allegedly failed to address. (*Id*. ¶¶ 47-51; 53-56.)

Initially, racially insensitive remarks by themselves do not violate the Constitution. *Chavez v. Illinois State Police*, 251 F.3d 612, 646 (7th Cir. 2001). And while they may be probative of discriminatory intent, *see id*., Plaintiffs do not allege any CPD officer exhibited racial animus during an encounter with one of their members. Racial animus exhibited by a handful of officers who had no dealings with Plaintiffs' members, or the City's alleged failure to discipline the officers for making these statements, is not sufficient to plead that a municipal policy or custom was the "moving force" behind any alleged constitutional violations. *See Hicks v. City of Chicago*, 15-cv-06852, 2017 WL 4339828, at *9 (N.D. Ill. Sept. 9, 2017) (allegations concerning the Laquan McDonald shooting and cover up had "no direct or inference-generating connection to the extortion alleged" in the complaint, and thus failed to demonstrate a widespread custom sufficient to state a *Monell* claim); *Washington v. Pierce*, 16-cv-9880, 2017 WL 1437054, at *1–2 (N.D. Ill. Apr. 24, 2017) (finding the DOJ Report did not supply the requisite factual specificity because plaintiff did not explain its connection to the constitutional violations alleged in the complaint).

Finally, while Plaintiffs include statistics apparently intended to suggest that black and Latino citizens are subject to disproportionately greater uses of excessive force than white citizens (Am. Compl. ¶¶ 37-43, 52), much of this data (such as Plaintiffs' statistics relating to vehicle stops and pedestrian street stops) does not relate to police uses of force and therefore does not support Plaintiffs' Fourteenth Amendment claim. Equally important, these statistics, at best, would support a claim alleging disparate impact; they "do[] not satisfy the pleading

requirements for" a claim alleging intentional discrimination. *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996); *Chavez,* 251 F.3d at 647–48 ("It is true that his complaint relies primarily on statistics, which are disfavored as *per se* evidence of discriminatory intent."). In short, because Plaintiffs offer only unrelated anecdotes that "some CPD officers are racist" and statistics relating to alleged disparities in police uses of force, Plaintiffs fail to adequately plead that there exists a municipal custom or practice of intentional discrimination that was the moving force behind any equal protection violation.

### B.    Plaintiffs Have Not Pled Valid ADA Or Rehabilitation Act Claims.

Plaintiffs claim the City violates the Title II of the ADA and the Rehabilitation Act by denying people with disabilities the services and benefits of CPD. (Am. Compl. ¶ 421.) For purposes of this case, the relief available under the Rehabilitation Act and ADA is coextensive and "the analysis governing each statute is the same." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). A claim under the ADA and Rehabilitation Act arises where "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). Plaintiffs' allegations fail to establish a cognizable ADA or Rehabilitation Act claim under any theory.

### 1.    Plaintiffs' Allegations Do Not Suffice to Show Intentional Disability Discrimination.

A plaintiff seeking to establish that the defendant intentionally acted on the basis of disability must show "[1] that he is a 'qualified individual with a disability,' [2] that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and [3] that the denial or discrimination was 'by reason of' his disability.'" *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (quoting 42

U.S.C. § 12132). Plaintiffs' allegations fail to establish that their members were denied the benefits of any service, program, or activity, much less that such denial was "by reason of" a disability.

> **a.      Plaintiffs Do Not Identify What Service, Program Or Benefit Their Members Allegedly Were Denied.**

Plaintiffs allege a number of incidents in which they claim that unidentified Chicago police officers violated their members' rights under the ADA and Rehabilitation Act.  (Am. Compl. ¶¶ 101-119 (John Doe), 120-130 (K.B.), 177-179 (C.N.), 207-210 (Jane Doe), 211-217 (C.P.), 218-234 (N.T.), 238-249 (P.F.), 250-254 (Jose Doe), 255-273 (R.R.).)  Some of these encounters involved the use of force, while others did not.  For example, Plaintiffs allege C.N. was mocked by CPD officers but does not allege he has been subjected to the use of force by a CPD officer.  (*Id.* ¶¶ 177-179.)  Likewise, Plaintiffs allege Jane Doe has been the subject of 911 calls due to her disability but does not allege she has been subjected to the use of force by a CPD officer as a result of these calls for service or at any other time.  (*Id.* ¶¶ 207-210.)  Similarly, Plaintiffs allege R.R. was detained and searched without adequate justification, and was denied auxiliary aids to facilitate communication, but do not allege he was subjected to any use of force during the course of this encounter. (*Id.* ¶¶ 258-269.)  To the extent Plaintiffs are attempting to claim CPD denies their members police encounters free from the use of unnecessary force, these incidents do not support that contention.

Even where Plaintiffs allege force was used, they do not specify what service, program or benefit was denied during or as a result of such use of force. At best, Plaintiffs allege the City needs "more and different policies, practices, supervision and control to prevent the violation of the rights of individual with disabilities."  (*Id.* ¶ 410.)  Such allegations clearly lack the specificity required to state an ADA claim. *See Davenport v. Dovgin*, 545 F. App'x 535 (7th Cir.

2013) (dismissing ADA claim of arrestee who alleged she was denied access to a bathroom and mistreated during her detention because she failed to identify the service, program, or activity she believed she had been excluded from because of her disability). Having failed to identify what service, program or activity Plaintiffs believe their members were denied, Plaintiffs' claims under the ADA and Rehabilitation Act should be dismissed.

> **b.** **Plaintiffs' Conclusory Allegations Are Not Sufficient To Plead That Any Denial Was "By Reason" Of Their Members' Disability.**

Even assuming Plaintiffs had properly identified the service, benefit, or program they believe their members were unlawfully denied, Plaintiffs' ADA and Rehabilitation Act claims still should be dismissed because Plaintiffs have failed to allege such denial was "by reason of" their members' disability. *See, e.g.*, *Bates v. Chesterfield County, Va.*, 216 F.3d 367, 373 (4th Cir. 2000) (affirming denial of ADA claim where police arrested plaintiff, not because of his disability, but because of his "objectively verifiable misconduct.") *Paine v. City of Chicago*, No. 06 C 3173, 2009 WL 10687409, at *8 (N.D. Ill. May 21, 2009) (finding police did not arrest plaintiff "after misperceiving the lawful effects of her disability as criminal activity; rather, she engaged in objectively verifiable misconduct that supported her arrest.")

Here, Plaintiffs allege that member C.P. has schizophrenia and that 30 years ago he was beaten by CPD officers. (*Id.* ¶¶ 213, 215.) However, Plaintiffs do not allege any facts explaining why C.P. was beaten, much less that he was beaten "*because* of" his schizophrenia. Likewise, Plaintiffs allege that member Jose Doe "has previously been Tased by Chicago police officers." (Am. Compl. ¶¶ 254.) Yet, Plaintiffs do not assert he was Tased *because* of his multiple sclerosis, or, in fact, provide any context for this occurrence. (*Id.*) At best, Plaintiffs speculate that officers might one day misinterpret the physical manifestations of Jose Doe's multiple sclerosis and subject him to unnecessary force. (*Id.* ¶ 255.) Similarly, Plaintiffs allege

member P.F., who has cognitive and other disabilities, called CPD officers for help as he was trying to hide from gang members, but the officers misinterpreted his call for help and Tased him. (*Id*. ¶¶ 241, 248.) Plaintiffs do not explain how the call for help, or the officers' alleged misinterpretation of this action, was in any way related to P.F.'s disabilities. (*Id*.) Simply put, Plaintiffs allegations fail to put the City on notice of whether a member's disability, or some other factor, prompted a use of allegedly excessive force.

Beyond allegations concerning Plaintiffs' members' encounters with police, Plaintiffs rely on statistics and raw numbers to link disability with uses of force. (Am. Comp. ¶ 3.) That is, Plaintiffs allege members with disabilities are likely to have more frequent contacts with police, and more frequent contacts will lead to a greater incidence of uses of force against disabled members. (*Id*.) But even if Plaintiffs' statistics were properly considered, they are not evidence of *intentional* discrimination against people with disabilities. *See Majeske*, 94 F.3d at 311 ("Disparate impact alone does not satisfy the pleading requirements" for a claim of intentional discrimination); *Chavez*, 251 F.3d at 647 (same). Rather, they show at most that a group that has more frequent encounters with police is likely to have more encounters that involve the use of force. More is required to show that the police action about which Plaintiffs' complain was "because of" their members' disabilities.

      **2.**    **Plaintiffs' Allegations Do Not Suffice To Show That Their Members Sought And Were Denied A Reasonable Modification.**

           **a.**    **The ADA And Rehabilitation Act Do Not Require Consideration Of Accommodation During Pre-Arrest Encounters.**

As explained above, Plaintiffs' allegations are insufficient to state a claim that the City intentionally discriminated against their members on the basis of a disability. Plaintiffs also cannot state a claim that they were denied a reasonable accommodation.

Plaintiffs do not contend any of their members were subjected to disability discrimination post-arrest. Rather, the incidents Plaintiffs describe occurred pre-arrest or detention, during the uncertain and evolving circumstances surrounding field activities. (*See* Am. Compl. ¶¶ 101-119 (John Doe), 120-130 (K.B.), 218-234 (N.T.), 238-249 (P.F.), 250-254 (Jose Doe), 255-273 (R.R.).) Because the ADA and Rehabilitation Act do not require police to provide reasonable accommodations during pre-arrest encounters, any reasonable accommodation claim predicated on these pre-arrest encounters should be dismissed.

In *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit held that the ADA (and therefore the Rehabilitation Act) "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Id* at 801. As the court explained:

> Law enforcement officers conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.

*Id.* The Supreme Court has not decided whether the ADA applies to pre-arrest police encounters. *See San Francisco v. Sheehan*, 135 S. Ct. 1765, 1772-73 (2015) (expressly reserving this question, which the Court deemed "important"). Courts in this district also have not decided whether the ADA or Rehabilitation Act applies during pre-arrest encounters. *See*, *e.g.*, *Earl v. Espejo*, No. 17 C 195, 2017 WL 3704826, at *2 (N.D. Ill. Aug. 28, 2017) (reviewing conflicting authority).

32

For the reasons stated by the Fifth Circuit in *Hainze*, this court should hold that the ADA and Rehabilitation Act do not apply to pre-arrest, on-the-street police encounters prior to securing the safety of the arresting officers, other officers, and any nearby civilians. Whether a person has a disability that is covered by the ADA and requires accommodation often requires a complex determination that cannot be made over the span of seconds or even minutes. As the *Hainze* court recognized, requiring an officer to identify whether an individual has a disability that requires accommodation in a pre-arrest situation that often involves rapidly changing circumstances that can be life-threatening would place an often insurmountable burden on law enforcement officers and endanger the public.

To be sure, *after* an arrest has occurred, a qualified individual with a disability can state a claim against a police department under the ADA or Rehabilitation Act by alleging the denial of a reasonable accommodation. *See Paine ex rel. Eilman v. Johnson*, No. 06 C 3173, 2010 WL 785397, at *8 (N.D. Ill. Feb. 26, 2010) ("Once an arrestee with a disability is in custody, the police have a duty to reasonably accommodate the arrestee's disability."). Even then, however, such cases are "highly fact-specific, requiring case-by-case inquiry." *Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Commissioners*, 870 F.3d 471, 489 (6th Cir. 2017). Plaintiffs do not allege, however, that any of their members were denied reasonable accommodations or otherwise discriminated against after arrest. Plaintiffs' ADA and Rehabilitation Act claims should therefore be dismissed.

### 3. Plaintiffs Fail to Adequately Allege that Any Disabled Person Put The City On Notice Of Their Disability, That They Requested An Accommodation, And/Or That The City Refused To Provide A Reasonable Accommodation.

Even if the ADA and Rehabilitation Act could be held to apply to pre-arrest encounters, any claim by Plaintiffs that their members were denied a reasonable accommodation still should

be dismissed because Plaintiffs fail to allege their members requested accommodations, or that the need for an accommodation was "obvious," particularly under the exigent circumstances Plaintiffs describe.

A failure to accommodate claim requires that a public entity provide accommodations only to the "known" limitations resulting from a disability. *See* Title I of the ADA, 42 U.S.C. § 12112(b)(5)(A); *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750, n.8 (7th Cir. 2006) (recognizing Title II of the ADA "does not contain a specific accommodation requirement" but Title I of the ADA does); *Windham v. Harris Cty., Texas*, 875 F.3d 229, 235 (5th Cir. 2017) (incorporating the theory of "failure to accommodate" codified in Title I of the ADA into a Title II claim). Whether a person has a disability that is covered by the ADA and requires accommodation is often a complex determination that cannot be made over the span of seconds or even minutes. *See, e.g.*, *Wisc. Community Services, Inc.*, 465 F.3d at 749 (whether a person is disabled under the ADA and requires an accommodation is a "highly fact-specific inquiry and requires balancing the needs of the parties."). Thus, where the need for an accommodation is not "obvious," the individual must actually request an accommodation before a public entity is required to evaluate and potentially provide the accommodation. *J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 (10th Cir. 2015) ("If a police officer incurs a duty to reasonably accommodate a person's disability during an arrest, this duty would have arisen only if Deputy Sharkey had known that J.P. needed an accommodation.")

The Amended Complaint references numerous disabled individuals who were allegedly detained or arrested by CPD but contains virtually no allegations that might suggest that the officers at the scene were put on notice that the individuals were disabled, that any accommodation had been requested, and/or that the officers had refused to provide an

accommodation.  In only two instances do Plaintiffs seemingly attempt to satisfy these pleading requirements.  Concerning member N.T. (Am. Compl., ¶¶ 218-234), Plaintiffs allege that "[o]ne of N.P.'s [sic] relatives called 911, and explained that N.T. was experiencing a mental health crisis," but Plaintiffs do not allege that anyone at the scene, including N.T.'s relatives, informed the officers that N.T. was experiencing a mental health crisis, that any accommodation was requested, or that the officers refused to provide any particular accommodation.  Similarly, Plaintiffs allege that member R.R. is deaf (*id*. ¶¶ 255-273), but they do not allege that the officer at the scene actually knew this or that the other person with whom R.R. had been communicating, A.M., attempted to advise the officer that R.R. was deaf or requested any accommodation on his behalf.  Plaintiffs' failure to allege that the City refused to provide any disabled member an accommodation is yet another reason why they cannot proceed on a "reasonable modification" theory.

Even if Plaintiffs alleged their members had known limitations or requested accommodations, the exigent circumstances Plaintiffs describe would render such accommodations unreasonable.  In *Roell*, the Sixth Circuit held that a municipality did not violate the ADA as a result of its officers' failure to "use verbal de-escalation techniques, gather information from witnesses, and call EMS services" prior to using force against an individual suffering a mental health crisis.  870 F.3d at 489.  As the court explained, the officers "unquestionably faced exigent circumstances while attempting to restrain and arrest Roell."  *Id*. They were "required to make a series of quick, on-the-spot judgments in a continuously evolving environment."  *Id*.  In these circumstances, the court held, the ADA did not require police to use verbal de-escalation techniques before using force, because doing so would be "unreasonable . . . in light of the overriding public safety concerns."  *Id*. (citing cases).  Indeed, even in the absence

of exigent circumstances, "the ADA does not require that police officers contact a mental health professional any time they interact with an individual with mental health problems." *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 981 (E.D. Mich. 2010), aff'd, 454 F. App'x 455 (6th Cir. 2012).

This is consistent with DOJ guidance regarding compliance with Title II of the ADA. *See* Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act, available at https://www.ada.gov/cjta.html (last visited Jan. 11, 2018). Specifically, DOJ guidance provides:

> Title II's general prohibitions against discrimination are subject to limitations. When an individual poses a "direct threat" to the health or safety of others, i.e., a significant health or safety risk that cannot be mitigated or eliminated by a reasonable modification of policies, practices or procedures, Title II does not require a public entity to permit that individual to participate in, or benefit from, services, programs or activities. * * * Every agency and justice system is unique, and state and local leaders are the ones who determine the most effective implementation strategies for their agencies. * * * Exigencies and safety considerations play a significant role in determining whether a modification is reasonable. Officers need not make modifications that would interfere with their ability to respond to a safety threat, as such modifications would not be reasonable.

*Id*.

Plaintiffs present circumstances in which officers were "required to make a series of quick, on-the-spot judgments in a continuously evolving environment." *Roell*, 870 F.3d at 489. For example, Plaintiffs allege that police were called to assist with John Doe because his relatives could not control the situation and, further, that he was irate and screaming throughout the encounter. (Am. Compl. ¶¶ 110-111.) Similarly, Plaintiffs allege the family members of N.T. called police after he got in a fight with a relative and grabbed a knife. (*Id*. ¶¶ 220-229.) Plaintiffs allege that police were called to take K.B. to a mental health facility against her will.

36

(*Id.* ¶¶ 124-127.)  Plaintiffs criticize police for allegedly resorting to force instead of using de-escalation techniques, but as the Sixth Circuit explained in *Roell*, and as DOJ guidance confirms, neither the ADA nor the Rehabilitation Act impose such requirements on police in the "unquestionably . . . exigent circumstances" Plaintiffs describe.  *Roell*, 870 F.3d at 489.

**4. Plaintiffs Cannot Proceed On A Disparate Impact Theory Because They Do Not Identify A Facially Neutral Policy That Disproportionately Impacts Disabled People.**

Plaintiffs' allegations fail to state an ADA or Rehabilitation Act claim under a disparate impact theory.  A plaintiff may pursue a disparate impact theory under the ADA, *see Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003), but such a claim requires "proof that a facially neutral policy unjustifiably falls more harshly on a protected group than on others," *Nikolich v. Village of Arlington Heights*, 870 F. Supp. 2d 556, 563 (N.D. Ill. 2012).

Thus, to state a disparate impact claim under the ADA, "a plaintiff must (1) isolate and identify specific practices that are allegedly responsible for any observed statistical disparities; and (2) establish causation by 'offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused the alleged harm because of their membership in a protected group.'"  *Swan v. Bd. of Educ. of City of Chicago*, No. 13 C 3623, 2013 WL 4401439, at \*12, fn. 5 (N.D. Ill. Aug. 15, 2013) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012)); *see also Roberts v. City of Chicago*, 817 F.3d 561, 566-67 (7th Cir. 2016) (affirming dismissal of ADA claim under disparate impact theory where the complaint was "devoid of any factual content" showing that the City's practice "caused a relevant and statistically significant disparity between disabled and non-disabled" individuals) (internal quotations omitted)).

The Amended Complaint is silent on both these points.  (*See* Am. Compl. ¶¶ 404-423.) Plaintiffs do not point to any specific practice by the CPD that results in disabled individuals being unfairly targeted.  At most, Plaintiffs allege generally that CPD's use of force policies and

37

practices disproportionately impact people with disabilities because individuals with disabilities "disproportionately interact with and are more likely to experience violence by the CPD." (*Id.* ¶¶ 3, 409.) But Plaintiffs do not present statistical evidence that individuals with disabilities are more likely to experience excessive use of force *because of* their disabilities, rather than *as of a consequence of* their disabilities. *See Roberts*, 817 F.3d at 566 ("The City failed to hire them not because of their disabilities, but rather due to the extensive medical requests that were a *consequence* of their disabilities[.] . . . [T]his is insufficient to establish causation[.]"). Accordingly, to the extent Plaintiffs seek to assert disparate impact claims under the ADA and Rehabilitation Act, those claims should be dismissed.

### 5. Plaintiffs' "Failure to Train Claims" Are Not Cognizable Under the ADA or the Rehabilitation Act.

Finally, Plaintiffs' ADA and Rehabilitation Act claims rely at least in part on a "failure to train" theory. (*See* Am. Compl. ¶¶ 308-315) ("The City Does Not Adequately Train Officers Regarding Disabilities"). These allegations fail to state a claim under the ADA and Rehabilitation Act.

The acts that the ADA and Rehabilitation Act prohibit – the denial of government "services, programs, or activities" or otherwise subjecting an individual to acts of discrimination on the basis of disability – must, by their very nature, occur *after* any training a government agent may receive. Accordingly, courts have consistently held that the ADA and Rehabilitation Act do not support a theory of recovery based upon a "failure to train" by a governmental agency. *See Paine v. City of Chicago*, No. 06 C 3173, 2009 WL 10687409, at *3 (N.D. Ill. May 21, 2009) (rejecting failure to train claim under the ADA and citing *Waller v. City of Danville, Va.*, 515 F. Supp. 2d 659, 665 (W.D. Va. 2007), *aff'd*, 556 F.3d 171 (4th Cir. 2009); *Thao v. City of St. Paul*, No.03-5306, 2006 WL 1004379, at *8 (D. Minn. Apr. 13, 2006), *aff'd*, 481 F.3d 565

(8th Cir. 2007); *Dillary v. City of Sandusky*, 398 F.3d 562, 568 (6th Cir. 2005); *Hainze*, 207 F.3d at 801). As the court in *Paine* explained:

> Under the ADA's plain language, a violation occurs at the point in time that a public entity denies a disabled individual the benefits of a service, program or activity. However, a failure to train officers does not exclude an individual from the benefits of a service, program, or activity; the exclusion, if any, occurs at a later time. At the time that the officers received allegedly inadequate training, no exclusion occurred. Without an exclusion, there cannot be a violation of Title II of the ADA.

2009 WL 10687409, at *3 (citing 42 U.S.C. § 12132). To the extent that Plaintiffs' ADA and the Rehabilitation Act claims rest on a failure to train theory, those claims must be dismissed.

### C.   The Illinois Constitution Does Not Provide Plaintiffs An Independent Cause Of Action.

Plaintiffs purport to bring a claim under the search and seizure provision of Article I, Section 6 of the Illinois Constitution.[9] However, there is no independent cause of action under the Illinois Constitution for the violations alleged here. *See S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 862-63 (N.D. Ill. 2010). This is because "where adequate remedies exist under state common law or federal law for certain causes of action, a plaintiff may not maintain an independent cause of action under the Illinois Constitution." *Id.* (collecting cases). Because the state common law and federal law provide adequate remedies for unreasonable searches and seizures, including acts of excessive force, the district court in *S.J. v. Perspectives Charters*

---

[9] While Plaintiffs also allege their claim under Article I, Section 6 of the Illinois Constitution arises from invasions of privacy, the Amended Complaint is devoid of any allegations concerning privacy rights, and thus this aspect of the claim should be dismissed.

*School* declined to recognize an independent cause of action under the Illinois Constitution to redress such alleged violations. So, too, should this Court.

###    D.    Plaintiffs' Claim Under the Illinois Civil Rights Act Should Be Dismissed.

ICRA prohibits local governments from utilizing "criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2). A claim "under . . . ICRA requires only a disparate impact regardless of intent." *McFadden v. Bd. of Educ. for Ill. School Dist. U-46*, 984 F. Supp. 2d 882, 890 (N.D. Ill. 2013). ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon." *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (emphasis in original) (citing *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill. App. 3d 321, 327 (1st Dist. 2006)). Thus, ICRA "was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law." *Dunnet Bay Cosntr. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015). Accordingly, Illinois courts "look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation of" ICRA. *Cent. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10 ("*CANA*").

Disparate impact liability has traditionally been associated with employment and housing discrimination. *See Tex. Dept. of Housing and Comm. Affairs v. Inclusive Comm. Proj., Inc.*, 135 S. Ct. 2507, 2525 (2015) (recognizing disparate impact claims under federal Fair Housing Act); *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (same under federal Age Discrimination in Employment Act); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (same under Title VII of the Civil Rights Act of 1964). To proceed on a disparate impact claim pursuant to an employment or housing action, a plaintiff must identify each particular practice that allegedly

causes a disparate impact and provide "statistical evidence demonstrating a causal connection" between any statistical disparity and the challenged practice. *Inclusive Comm.*, 135 S. Ct. at 2523; 42 U.S.C. 2000e-2(k)(B)(i) (stating a disparate impact claim is established under Title VII only if a complaining party "demonstrates that a respondent uses a particular employment practice that causes disparate impact... the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact.") If that threshold is met, the burden shifts to the defendant to identify a legitimate interest justifying the challenged policy or practice. *See id.* at 2518. Before rejecting such a justification, "a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)).

Plaintiffs' disparate impact claim under ICRA should be dismissed for three reasons. First, Plaintiffs fail to identify a particular practice allegedly causing a disparate impact. Second, even if Plaintiffs have identified a particular practice, that practice relates to policing strategy, which is not a cognizable basis for a disparate impact claim. Third, even if such a claim were cognizable, Plaintiffs have not pled facts sufficient to establish a prima facie case of disparate impact.

### 1. Plaintiffs Have Not Identified A Particular Practice That Causes Disparate Impact.

"Disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Inclusive Communities*, 135 S. Ct. at 2522 (quoting *Griggs*, 401 U.S. at 431). Indeed, the Supreme Court has cautioned that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523.

"Guidance from the Supreme Court," therefore, "is unambiguous that disparate impact claims must solely seek to *remove* barriers." *City of Los Angeles v. Wells Fargo & Co.*, No. 2:12-cv-09007, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) (emphasis in original) (granting defendant's motion for summary judgment on disparate impact claim where plaintiff argued "that a *lack* of policy produced the disparate impact"). Thus, where a plaintiff alleges "that the *lack* of a policy produced the disparate impact," its claim fails, as there is no "authority that suggests that litigants can use disparate impact claims to impose new policies on government actors." *Inclusive Communities Project, Inc. v. U.S. Dept. of Treasury*, No. 3:14-CV-3013-D, 2016 WL 6397643, at *11 (N.D. Tex. Oct. 28, 2016) (granting motion to dismiss disparate impact claim where plaintiff challenged defendant's "*failure to act* to prevent" disparate impact) (emphasis in original). In short, a plaintiff must "affirmatively identify a specific policy that produced a disparate impact, rather than point to a lack of policy that caused it." *Inclusive Communities Project, Inc. v. Tex. Dept. of Housing and Comm. Affairs*, No. 3:08-CV-0546-D, 2016 WL 4494322, at *6-7 (granting defendant's motion to dismiss on remand from the Supreme Court where plaintiff failed to "sufficiently identify a specific, facially-neutral policy that has caused a statistical disparity" because, absent such identification by plaintiff, "the court cannot fashion a remedy that removes that policy").

Plaintiffs' ICRA claim suffers from same problem, and does so repeatedly. The complaint repeatedly accuses the City of sins of omission rather than commission:

- **Identification of mental health related calls:** Plaintiffs allege that the "City lacks a policy to guide OEMC call takers on how to direct calls involving threats of suicide. Call takers do not have advance direction on whether and when to refer these calls to an external suicide hotline, a paramedic, or to a CIT-trained officers. The City also lacks a policy on whether and how the call taker should note important information regarding disabilities other than mental illness—for example, that the call involves someone who is deaf or who has autism." (Am. Compl. at ¶ 288; *see also id.* at ¶¶ 285 ("the City's failure to identify key

42

information prior to the dispatch of CPD officers results in excessive and unnecessary force being used on persons with disabilities"), 286-287 (alleging that CPD failed to respond to recommendations from IPRA regarding crisis intervention training).)

- **Foot pursuits:** Plaintiffs assert that "[t]he lack of a policy, guidance, and oversight of foot pursuits . . . shows the City's deliberate indifference to CPD's officers' violations of constitutional and civil rights." (*Id.* at ¶ 291; *see also id.* at ¶¶ 295-296 (criticizing the City for failing to implement foot pursuit policy).)

- **Use of force policy and disabilities:** Plaintiffs claim that the City's "new policies on use of force still fail to identify disability as a relevant consideration in officers' use and degree of force." (*Id.* at ¶ 297; *see also* ¶¶ 299-300 (use of force and Taser policies do not require officers to consider disability).)

- **Training on disabilities:** Plaintiffs allege that the City "has failed to provide its officers with necessary training and guidance" on providing reasonable accommodations to persons with disabilities and that the City has failed to implement the DOJ's recommendations on identifying and responding to persons with disabilities. (*Id.* at ¶¶ 309-310.)

- **Monitoring and supervision:** Plaintiffs assert that the City "does not monitor officers' use of force." (*Id.* at ¶ 316; *see also id.* at ¶¶ 319 (City fails "to collect and analyze information necessary" to monitor whether more training on disabilities is needed or to supervise use of force on individuals with disabilities), ¶ 325 (the "City's inaction has perpetuated" an alleged code of silence), ¶ 331 (the "City does not track the behavior of, or complaints against, its CPD officers in a way that would identify repeat offenders").)

Thus, instead of "affirmatively identify[ing] a specific policy that produced a disparate impact," plaintiffs have "point[ed] to a lack of polic[ies] that caused it." *Inclusive Communities*, 2016 WL 4494322, at *6. Because Plaintiffs have not "identified a specific . . . policy that has caused a statistical disparity, the court cannot fashion a remedy that removes that policy." *Id.* at *7. Plaintiffs' allegations regarding the City's "*failure to act*" do not make out a case for disparate impact liability, and their ICRA claim should consequently be dismissed. *Inclusive Communities*, 2016 WL 6397643, at *11.

43

## 2.    Disparate Impact Liability Does Not Apply to Policing Strategies.

Even if the Court finds Plaintiffs have affirmatively identified a specific policy that allegedly produced a disparate impact, that policy would relate solely to policing strategy. The City has been unable to locate any decision in which a court sustained a challenge to a policing strategy using a disparate impact analysis, thereby contemplating judicial intrusion into core policing policy decisions absent evidence of intentional discrimination.[10]   This distinction is critical.  Intruding on core police policy decisions is justified when discrimination is intentional; moreover, intentional discrimination is more easily cured, as the agency need merely, for example, to stop using race or other prohibited factors as the basis for law enforcement actions and remains otherwise free to pursue its law enforcement goals as it sees fit.

By contrast, disparate impact arises not from illicit intent but from the application of an affirmative practice that happens to produce the disparate impact as an unfortunate byproduct. Accordingly, applying disparate impact liability here would require the Court to assess whether CPD's policing strategy serves CPD's undeniably legitimate interests in public safety and, if so, whether Plaintiffs can identify other reasonably available policing strategies that would serve CPD's public safety goals with less disparate impact.   Doing so would enmesh the Court in policing strategy questions outside the scope of its expertise.    Thus, absent evidence of intentional discrimination, decisions regarding CPD's policing strategies properly lie with CPD.

---

[10]  In *CANA*, the Illinois Appellate Court reversed the district court's decision denying the City's motion to dismiss the plaintiffs' ICRA claim.  However, the court did not hold that the plaintiffs – who alleged that persons in predominantly African-American and Hispanic neighborhoods waited longer for police to arrive in response to 911 calls than those in predominantly white neighborhoods – had, in fact, stated a claim under IRCA.  *See* 2013 IL App (1st) 123041, ¶ 1. Rather, the court held that the political question doctrine did not divest the trial court of jurisdiction, and that the trial court should not have dismissed the complaint on this basis.  *Id.* ¶ 28. ("because the complaint does not present a nonjusticiable political question, we reverse the trial court's judgment and remand for further proceedings in accord with this order").

For this reason, ICRA does not provide an appropriate framework to address Plaintiffs' concerns, and Plaintiffs' ICRA claim should be dismissed.

### 3. If Disparate Impact Liability Applies, Plaintiffs Have Not Pled Causation Sufficient to State a Prima Facie Case.

If the Court elects to create new law by holding that a disparate impact challenge to CPD's policing strategies is at least theoretically cognizable, the Court should still dismiss Plaintiffs' ICRA claim because Plaintiffs have not provided allegations sufficient to establish a causal connection between CPD's policies and practices and any racial disparities. In *Inclusive Communities*, the plaintiffs challenged a state agency's selection criteria for allocating the low-income housing tax credits it distributed to developers because those credits went disproportionately toward low-income housing in majority African-American urban areas as opposed to majority white suburban neighborhoods. *See* 135 S. Ct. at 2513-14. Relying on a disparate impact theory, the plaintiffs sought a court order requiring the agency to modify its criteria to encourage the construction of low-income housing in the suburbs. *See id.* at 2514. Although the Supreme Court recognized the possibility of disparate impact liability under the Federal Housing Act, it declined to hold that plaintiffs had established a prima facie case based solely on a statistical disparity in the allocation of the housing credits. *See id.* at 2522. Rather, to make out a prima facie case for disparate impact liability, the Court held that the plaintiffs must draw an explicit, causal connection between the challenged policy and the statistical disparity. *Id.*

As the Court explained, "[i]t may be difficult to establish causation because of the multiple factors that go into [policymaking decisions]." *Id.* at 2523-24. This "robust causality requirement ensures that 'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities

they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 653 (1989)). Thus, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.*

Plaintiffs here cannot satisfy the "robust causality requirement" mandated by the Supreme Court. Although Plaintiffs allege that black, Latino and disabled people are subjected to excessive force more frequently than white people, they do not allege facts or identify statistical evidence sufficient to demonstrate of a causal connection between CPD's policies and these purported disparities. Furthermore, Plaintiffs ignore other plausible explanations for the alleged disparities, such as the demographics of areas where crime occurs most frequently or the demographics of criminal suspects. Because "'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact,'" Plaintiffs' ICRA claim should be dismissed. *Inclusive Communities*, 135 S. Ct. at 2523-24.

## CONCLUSION

The Court should dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1), as Plaintiffs lack standing and their claims are moot. Alternatively, the Court should dismiss Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), because Plaintiffs have not stated a claim upon which relief may be granted.

Dated: January 12, 2018                                  Respectfully submitted,

                                                         CITY OF CHICAGO


                                          By:    s/ Allan T. Slagel
                                                 One of its Attorneys


Allan T. Slagel (ARDC No. 6198470)
Heather A. Jackson (ARDC No. 6243164)
Elizabeth E. Babbitt (ARDC No. 6296851)
Rachel L. Schaller (ARDC No. 6306921)
Jeffrey Schieber (ARDC #6300779)
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:        (312) 527-4000
Email:            aslagel@taftlaw.com
                  hjackson@taftlaw.com
                  ebabbitt@taftlaw.com
                  rschaller@taftlaw.com
                  jschieber@taftlaw.com

21828328.3

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMUNITIES UNITED, COMMUNITY RENEWAL SOCIETY, NEXT STEPS NFP, ONE NORTHSIDE, and the ACLU OF ILLINOIS, in behalf of their respective members,<br><br>                                        Plaintiffs,<br><br>                    v.<br><br>CITY OF CHICAGO, et al.<br><br>                                        Defendant. | Case No. 17-cv-7251<br><br>Hon. Elaine E. Bucklo |

## DECLARATION OF KAREN CONWAY

Pursuant to 28 U.S.C. § 1746, I, Karen Conway, state and affirm as follows:

1.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.      I am the Director of the Division of Research and Development of the Chicago Police Department ("CPD").  In that capacity, I have been involved in the process of revising CPD's use of force policies.

3.      Beginning in 2016, CPD began a comprehensive review of its use of force policies, including the main Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), and Canine Use (G03-02-06).  True and correct copies of the prior policies (as they existed before the revisions) are attached as Exhibit 1.

4.      CPD analyzed and revised these policies in response to feedback provided by the Police Accountability Task Force and the United States Department of Justice, and to provide clearer direction for officers on the appropriate use of force, with an emphasis on the sanctity of life.

21575704.4

5.     Additionally, CPD sought public feedback regarding the revised policies, inviting the public to comment on two revised versions of the use of force policies. This is the first time that the Department has sought public comment regarding a policy governing CPD operations.

6.     On October 7, 2016, CPD opened an online portal on the CPD website where Department and community members could provide feedback regarding the initial revisions into the use of force policies. CPD collected and considered public comments received through the online portal, and revised the policies. After the initial round of revisions resulting from public commentary, CPD released a second revised set of use of force policies again for public comment. CPD considered the public comments and again revised the policies to address relevant feedback.

7.     At the end of the two comment periods, CPD command staff, in consultation with legal and technical experts, had reviewed over 1,000 comments, and incorporated suggestions and improvements identified through the comment period. CPD's Research and Development Division to prepare and publish a final version of the policies.

8.     The revised use of force policies became effective after CPD completed an initial round of four-hour training for all members of the Department on the revised use of force policies in September, 2017.

9.     A true and correct copy of the revised use of force policies Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), Canine Use (G03-02-06), are attached as Exhibit 2, and are publicly available on the Department's website at https://home.chicagopolice.org/use-of-force-policy. These policies went into effect on October 16, 2017.

21575704.4

10. In addition to these revisions, CPD revised two Special Orders to allow the Office of Emergency Management and Control ("OEMC") to more accurately track dispatches with a mental health component. A true and correct copy of the Special Orders Responding to Incidents Involving Persons in Need of Mental Health Treatment (S04-20-01) and Crisis Intervention Team (CIT) Response (S05-14-01) are attached as Exhibit 3, and are publicly available on the Department's website at http://directives.chicagopolice.org/directives/.

11. I declare under penalty of perjury that the foregoing is true and correct.

Date: January 11, 2018

Karen Conway
Director
Research and Development Division
Chicago Police Department

# EXHIBIT B

DNAinfo has closed.
Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

BRONZEVILLE & WASHINGTON PARK (//WWW.DNAINFO.COM/CHICAGO/BRONZEVILLE-WASHINGTON-PARK)

Crime & Mayhem (//www.dnainfo.com/chicago/topics/crime-mayhem)   Politics (//www.dnainfo.com/chicago/topics/politics)

# Chicago Police's New Use Of Force Policy Focuses On 'Sanctity Of Life'

By Kelly Bauer (//www.dnainfo.com/chicago/about-us/our-team/editorial-team/kelly-bauer) | May 17, 2017 12:23pm | *Updated on May 19, 2017 11:37am*

@bauerjournalism (http://twitter.com/bauerjournalism)

  



The Chicago Police Department unveiled its new use of force policy on Wednesday.

▲ View Full Caption                                                                                    DNAinfo/Kelly Bauer

CHICAGO POLICE HEADQUARTERS — A new Chicago Police Department Use of Force policy that aims to focus on "sanctity of life" marks a "big win" for Chicagoans, said an activist whose work led to the changes.

> The Police Department spent more than a year reworking the policy, which governs how and in what situations police can use force, including deadly force. The new policy advises officers that their force must be objectively "reasonable" and "proportional," said Supt. Eddie Johnson during a Wednesday news conference.
>
> DNAinfo has closed.
> Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

Officers still will be able to use deadly force when there is a threat of great bodily harm or death, Johnson said. The policy also tells officers how to "safely and humanely" use tools like Tasers or canines, Johnson said.

BRONZEVILLE & WASHINGTON PARK»
Chicago Police's New Use Of Force Policy Focuses On 'Sanctity Of Life'
(/chicago

"I'm not naive," Johnson said. "I know that there will be some who think that these policies are too restrictive for officers to do their jobs, and some who think it isn't restrictive enough. ... I do believe the set of policies we're releasing today are in the best interest of everyone."

The new policy "clearly, clearly" calls on officers to report others who don't follow the policy when using force, Johnson said, and officers who don't report misdeeds can be "culpable."

Johnson, Police Board President Lori Lightfoot and activist Will Calloway attributed the changed policy to the death of Laquan McDonald at the hands of an officer. (http://www.dnainfo.com/chicago/tags/laquan-mcdonald-case) The Police Department came under intense scrutiny after video of the teen's fatal shooting was released in November 2015.

"The incident with Laquan really was the catalyst, and it was paramount on how we got here," said Calloway, who fought for the video of McDonald's shooting to be released and worked with police on crafting the new use of force policy. "This is a big win for us. Our voices were heard."

The Police Department hopes the policy — as well as other reforms — can help police officers rebuild trust with Chicago community members.

"I know that CPD is only as good as the faith that the community has in it," Johnson said.

Officers will start online training sessions on the policy within the next few weeks. They'll have to go through four-hour, in-person training by the fall, when the policy will go into effect, Johnson said, and there will be another eight hours of training next year.

Police have been working on changing the policy for months, billing it as part of the reforms that have gone through the department since McDonald's death. The Police Department released drafts and asked officers and community members for feedback, something it hadn't done before. It received hundreds of comments during the process, which Lightfoot called "historic."

"I think the process that was used will serve as a precedent going forward," Lightfoot said. "It is inclusive, it is transparent, it is exactly what is needed.

"This policy is a good step in the right direction. Clearly, there's more work that needs to be done," she said.

A first draft of the policy had placed a "heavy emphasis on the sanctity of life," (https://www.dnainfo.com/chicago/20161007/bronzeville/chicago-police-use-of-force) police said in October, advising officers to only use force when absolutely necessary and to avoid using deadly force.

But a revised draft, unveiled in March, instead said officers could use force that is "reasonable and proportional," (https://www.dnainfo.com/chicago/20170316/bridgeport/chicago-police-use-of-force-policy-reform-brutality-department-of-justice-report-supt-eddie-johnson) Johnson said.

The draft also did away with language that had advised officers to use force only when "no alternative appears to exist."

**Read the new policy here:**

Use of Force Full Text (https://www.scribd.com/document/348669630/Use-of-Force-Full-Text#from_embed) by Jen Sabella (https://www.scribd.com/user/58727968/Jen-Sabella#from_embed) on Scribd

# Chicago police finalize tighter rules on when to shoot, other uses of force

ADVERTISEMENT

The Chicago Police Department has revised its use-of-force rules. (Chicago Tribune)

By **Dan Hinkel**
Chicago Tribune

MAY 17, 2017, 7:08 PM

hicago police officials on Wednesday announced policy changes intended to cut back on questionable shootings and other uses of force that have haunted the department for years.

The changes, made after months of back-and-forth revisions, will tighten department rules that experts and advocates have criticized as too permissive of unnecessary uses of force.

The policy changes — expected to take effect this fall — represent a milestone for a department upended nearly 18 months ago by the release of video of a white officer shooting black teenager Laquan McDonald 16 times.

The revised rules, however, do not go as far in some respects as the rules proposed by police Superintendent Eddie Johnson in October, when the department and Mayor Rahm Emanuel faced more intense federal scrutiny amid the immediate fallout over the video.

The final version of the department's main use-of-force policy substantially resembles the scaled-back proposal Johnson made in March after rank-and-file police complained that his first proposal was too extreme.

In one key change, the policy holds that an officer can't shoot a fleeing person unless that person presents an imminent threat to police or others. The rule that has been in place says an officer can shoot any person fleeing after committing or trying to commit a felony using force.

The new policy also calls on officers to use their new de-escalation training to try to defuse incidents. The adopted language is less strict than Johnson's first proposal, though. Officers have to try de-escalation only "when it is safe and feasible to do so."

Johnson announced the new rules at an event at police headquarters designed to show unity among his command staff, rank-and-file officers and residents. Johnson spoke to a crowd of officers as he was flanked by Ald. Ariel Reboyras, 30th, an Emanuel ally who lauded the new rules in both English and Spanish.

Johnson was also joined by activist William Calloway, who helped force the release of the McDonald video. Onstage during questioning by the media, Calloway greeted Johnson with a handshake and "What's up, Supe?" He credited the protests over the McDonald shooting with creating change in the department.

"This is a big win for us, that our voices were heard," Calloway said.

But he added the caution that it won't be clear how effective the rules are until they are in place.

The policies are yet another point of disagreement between top department officials and the Fraternal Order of Police, the union that represents rank-and-file officers and whose contract with the city expires this year.

Kevin Graham, elected FOP president last month, released a statement Wednesday decrying the "anti-law enforcement climate" in Chicago. Graham has opposed the idea that the department needs outside oversight or tougher discipline.

"Three Chicago police officers have been shot in the last two weeks. The reality is that many offenders do not want to go to jail and they become resistant or combative with officers. These violators determine the level of response by officers," Graham said in a written statement.

"For these reasons, we do not believe that extensive changes should made to the current use of force policy. Nevertheless, we are always willing to discuss new measures with the superintendent that insure the safety of our officers and those of the public," the statement read.

Johnson, meanwhile, said the department can't compromise on either officer safety or residents' rights.

"I'm not naive. I know that there will be some who will think that these policies are too restrictive for officers to do their jobs, and there will be some who think it isn't restrictive enough," he said.

"However, I do believe that the set of policies we are releasing today is in the best interest of everyone," he said.

In a break from tradition for a department that has done little to train officers on policy changes, all of the approximately 12,000 officers will receive both computerized and in-person training on the new force rules, Johnson announced.

The rules are expected to take effect this fall after officers have each received four hours of in-person training. That will be followed by eight more hours of training next year.

Department rules can be more than symbolic — they set boundaries that officers can face punishment for breaking.

Officer discipline has been rare and often light in Chicago, and oversight officials aiming to strengthen accountability have sought changes to use-of-force policies widely criticized as too permissive. More specific rules could give disciplinary authorities stricter standards to apply to officers who use force in questionable circumstances.

Sharon Fairley, who runs the city's main police oversight agency and will head the city's revamped Civilian Office of Police Accountability when it begins operations this year, lauded the new rules.

"We believe these new policies incorporate new concepts that are essential to fair and effective policing," she said in a statement.

The department's force policies drew intense focus after Emanuel was forced in November 2015 to release video of Officer Jason Van Dyke shooting McDonald as the teen walked away from police with a knife in his hand.

Furious protests followed, and the U.S. Department of Justice launched an investigation into the department. Emanuel, meanwhile, made changes aimed at getting ahead of federal authorities. One of his early moves was to propose new rules on the use of force.

Johnson, appointed to lead the department as the crisis deepened, first proposed new force rules in October that were markedly more restrictive than the rules in place. Some officers said the draft policy was too exacting for cops making split-second decisions under pressure.

Months after Johnson put that proposal out for public comment, the Justice Department finalized a report that concluded officers used force too aggressively, often against minorities and with limited fear of repercussions.

But President Donald Trump's election and his appointment of Jeff Sessions as attorney general upended the political discussion about police reform. Sessions has signaled that he is unlikely to seek court enforcement of reforms, and the lack of federal pressure would leave Emanuel largely in control.

Emanuel, for his part, is trying to boost officer morale and tamp down surging violence on the South and West sides, which some blame on officers scaling back activity to avoid trouble.

Emanuel and Johnson have both vowed to continue pursuing reforms, but experts have voiced skepticism that meaningful change will come without federal pressure.

In March, Johnson scaled back and tweaked his proposal from October on the department's main use-of-force guidelines.

The final version of the main force policy resembles the one Johnson proposed in March.

Like past revisions of the rules proposed by Johnson, the final policy begins with a symbolic statement of the department's commitment to protecting human life.

Beyond rhetoric, certain changes are aimed at addressing long-standing issues in the department, including the new rule that an officer can only shoot a fleeing person who poses an imminent threat to an officer or other person. The rules that have been in place allow an officer to shoot a fleeing person who has committed a felony using force.

A database compiled by the Tribune last year showed that foot chases played a role in more than a third of the 235 police shootings from 2010 through 2015 that ended with someone wounded or killed.

The new policy expands on the comparatively bare-bones one that has been in place, which focuses largely on whether a use of force is reasonable. The department's new overarching rule on using force emphasizes that it must be objectively reasonable, necessary and proportional to the threat.

The new rules also require officers to intervene verbally or by other means when another officer uses excessive force. Johnson's original proposal suggested officers could physically intervene when colleagues use excessive force, inspiring ridicule from observers who suggested it could call for a cop to shoot his partner. The final version calls on an officer to intervene, but it does not specify that the intervention could be physical.

The final rules also closely resemble Johnson's scaled-back proposal on officers giving medical attention. The earliest proposal mandated that officers give medical care to the wounded, but the final rules say officers may do so if they are properly trained.

Experts and reform advocates had little time Wednesday to digest the extensive new rules, but attorney Jon Loevy, who has often sued the department over uses of force, said he was pleased with the more specific rules.

"I'm not afraid to criticize the Chicago Police Department, but this is something that I think they deserve credit for," he said.

*dhinkel@chicagotribune.com*

*Twitter @dhinkel*

Copyright © 2017, Chicago Tribune

**This article is related to:** Shootings, Eddie Johnson, Rahm Emanuel, Chicago Police Department, Laquan McDonald, U.S. Department of Justice

*Daily Herald*

---

**Chicago** | **updated: 10/7/2016 1:49 PM**

# Chicago Police Department drafts new use-of-force policy

 **Associated Press**

---

CHICAGO -- Chicago's police chief on Friday released details of a proposed new policy that would require officers to use the least amount of force necessary and emphasizes the "sanctity of life."

The proposal requires officers to intervene if they see another officer violating department policy. Deadly force could only be used to prevent immediate threat of death or great bodily harm. The announcement comes as the U.S. Department of Justice investigates the department after a white officer was charged with murder for the fatal shooting of a black teenager in 2014. Laquan McDonald was shot 16 times.

Police Superintendent Eddie Johnson told reporters at a news conference that the draft aims to "clarify response options to officers during split-second decisions or in the critical time before those moments while placing a heavy emphasis on the sanctity of life."

The policy will undergo 45 days of public comment , something the superintendent called a department first and a step toward previously promised transparency efforts. He said the department would use less-lethal methods as often as possible.

"When I say to you that this is a new day at CPD, it's not a joke and I'm not kidding about it," Johnson said.

After the public feedback period ends Nov. 21, the department will review contributions with the goal of having a final version of the policy by the end of the year. Officers will then be trained according to the policy.

Anne Kirkpatrick, the department's chief of organizational development, said the policy includes the need for independent justification every time a tool, like a stun gun or baton, is used in force.

"This is a new way for us to do business," she said.

The policy also would require police to offer medical aid to those injured in use-of-force incidents. It asks them to de-escalate situations and not use force unless "all other reasonable alternatives have been exhausted."

Last month, the department started mandatory de-escalation training to help officers better assess how to respond to complex and tense situations. The department also has expanded its use of body cameras.

Mayor Rahm Emanuel, in his second term, has been trying to rebuild trust in his leadership, particularly after the McDonald shooting. Officer Jason Van Dyke was charged with first-degree murder, but only after a judge ordered the public release of the squad car video last year. The graphic video of the shooting prompted citywide protests and police leadership changes.

Emanuel's administration also has announced plans to add nearly 1,000 police officers. Earlier this week, the Chicago City Council voted to form a new agency to investigate the police force called the Civilian Office of Police Accountability and create a new deputy inspector whose job will be to monitor the department.

Chicago has seen a dramatic rise in the number of shootings and homicides this year, including 91 homicide victims in August, the deadliest month in the city in two decades. Overall, the city has recorded more than 500 homicides this year - higher than all of 2015 - and is on pace to climb past the 600-homicide mark for the first time since 2003.

The city's image has also come up on the presidential campaign trail with Republican nominee Donald Trump suggesting that Chicago is more violent than Afghanistan. Trump also endorsed a stop-and-frisk policing method for the city, which a federal judge said New York City used unconstitutionally because of its overwhelming impact on minority residents.

ER GRAVY        CLICK T

# News (https://chicago.suntimes.com/section/news/)

## CPD reform road map: Training, transparency and accountability

**CHICAGO NEWS (HTTPS://CHICAGO.SUNTIMES.COM/SECTION/NEWS/)** 03/14/2017, 09:17pm



(https://t(https://ww...
url=https#//chtcps//e/:
2b3e&te...2b3CPD%:

☁: 43°

(https://chicago...

**BUSINESS**

Trump seeks more tax breaks on Chicago tower with Ald. Ed Burke's help

(https://chicago.suntimes.com/ne...s/t...

**CHICAGO NEWS**

Man charged with armed robberies at CTA station, in Lake View (https://chicago.suntimes.com/news/r charged--with-armed-robberies-at...

**CHICAGO NEWS**

Fire crews battle extra-a River West commercial (https://chicago.suntime battle-bla-e-in-ri-er-wes...

‹        ›

● ● ● ● ● ● ● ○ ○ ○ ○



*Chicago Police Superintendent Eddie Johnson discusses police reforms Tuesday.* | *James Foster/Sun-Times*

### Sam Charles (https://chicago.suntimes.com/author/scharlescst/)

@samjcharles (https://twitter.com/intent/user?screen_name=samjcharles) | email (mailto:scharles@suntimes.com)

## Sign-Up for our News & Politics Newsletter

✉ Sign-Up (https://r1.surveysandforms.com/062jcp97-2819pvaa)

Chicago Police Supt. Eddie Johnson, the department's command staff and Chicago Police Board President Lori Lightfoot on Tuesday laid out plans for further reforms of the embattled department that range from improving community policing to revising CPD's use-of-force policy.

The five-pronged approach will focus on improving manpower and supervision; a further investment in community policing; better officer training; revised guidance on use-of-force, and more transparency and accountability.

"I believe this framework demonstrates our commitment to keep the Chicago Police Department on the path to reform," Johnson, flanked by his staff, told reporters at a Tuesday news conference at police headquarters. "And while reform is critical, it won't be done in a vacuum."

Training to establish the new reforms will begin sometime before the end of this year, with officers in supervisory roles receiving it first, Johnson said.

Among the changes being proposed was the establishment of a new police training oversight committee, to be chaired by First Deputy Supt. Kevin Navarro, that will oversee "all aspects" of training, Johnson said.



Chicago Police Dept. Reforms

SPONSORED CONTENT

**How We Can Defend Ourselves From Ballistic Missiles**

By Ars Technica

A new hotline and website are being set up for officers to anonymously report misconduct by their colleagues "without fear of being ostracized," Johnson said.

The department also will allow for an additional public comment period — through March 16 — on another revision to the department's use-of-force policy.

"The new policies emphasize the sanctity of life, the reasonable and proportional use of force, de-escalation and force mitigation, and limitations on the use of deadly force," Johnson said.

He added that the public comments so far received by the department have been helpful in drafting new policies.

"We have to acknowledge that we don't know everything," he said.

Mayor Rahm Emanuel and the police department have been under intense pressure since November 2015, when a judge ordered the release of a police dashcam video that showed Chicago police officer Jason Van Dyke shooting black teenager Laquan McDonald 16 times.

Public outrage led to protests and calls for Emanuel to step down. Emanuel survived, but he also fired police Supt. Garry McCarthy. The McDonald controversy also is widely seen as a factor in the election defeat last year of Cook County State's Attorney Anita Alvarez, who did not charge Van Dyke with murder until after the release of the video. Van Dyke has pleaded not guilty.

In the waning days of President Barack Obama's administration, the U.S. Department of Justice issued a scathing report in which it concluded that the Chicago Police Department had a long history of civil rights violations and excessive force. The findings were announced in Chicago by then-Attorney General Loretta Lynch.

But last month, President Donald Trump's new attorney general, Jeff Sessions, sent his strongest signal to date that Emanuel will be on his own — without a consent decree and, therefore, without court oversight — to implement the sweeping police reforms that Lynch's Justice Department had recommended.

---

**BRIEFING:** The Laquan McDonald videos, police reports (https://chicago.suntimes.com/news/laquan-mcdonald-briefing-the-videos-the-police-reports-2/)

**RELATED:** Kim Foxx planning wrongful-conviction unit revamp (https://chicago.suntimes.com/politics/kim-foxx-planning-cook-county-wrongful-conviction-unit-revamp/)

---

Johnson said the department has been in discussion with all unions representing officers in crafting the reforms. Asked if the reforms could impact upcoming officer contract negotiations, Johnson said: "That remains to be seen."

Dean Angelo, president of Lodge 7 of the Fraternal Order of Police, said though the union has regular contact with the department, most of the specifics in the proposed reforms have not been discussed.

Training for Field Training Officers has been addressed, Angelo said, adding that he was confident the other proposed reforms would be addressed before they're implemented.

"I'm sure by the time this process gets to scheduling officers for classes and getting officers in the academy for familiarization and training, I will have had conversations with them," Angelo said.

"What we are looking for are opportunities to articulate protections within the development and expansion of the program to make sure members have review opportunities," he added.

Lightfoot acknowledged that the reforms would not be a cure-all, but could still help lay the groundwork for future improvements.

"This isn't everything, it's not the specifics of the project plan," Lightfoot said. "But if these specific reforms are implemented in 2017 I feel confident they will create a foundation on which the department can continue to build."

**Contributing:** *Stefano Esposito*

DNAinfo has closed.
Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

JEFFERSON PARK, PORTAGE PARK & NORWOOD PARK (//WWW.DNAINFO.COM/CHICAGO/JEFFERSON-PARK-PORTAGE-PARK-NORWOOD-PARK)

**Crime & Mayhem (//www.dnainfo.com/chicago/topics/crime-mayhem)**   **Politics (//www.dnainfo.com/chicago/topics/politics)**

# Police Training On When Police Can Use Force Begins

By Heather Cherone (//www.dnainfo.com/chicago/about-us/our-team/editorial-team/heather-cherone) | July 5, 2017 10:31am | *Updated on July 7, 2017 11:17am*
🐦 @HeatherCherone (http://twitter.com/HeatherCherone)





The Chicago Police Department unveiled its new use of force policy on Wednesday.

▲ View Full Caption

DNAinfo/Kelly Bauer

CHICAGO — Officials on Wednesday began training the city's 13,000 police officers on the Chicago Police Department's new use of force policy that aims to focus on the "sanctity of life."

> The policy, which will be implemented once all members of the department have been trained, requires that the use of force be "reasonable and proportional."
>
> DNAinfo has closed.
>
> Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)
>
> The policy was adopted in May after a year spent reworking the rules in the wake of the fatal shooting of Laquan McDonald

(https://www.dnainfo.com/chicago/20151124/archer-heights/laquan-mcdonald-video-shows-police-shooting-him-16-times). That shooting prompted an investigation by the U.S. Justice Department that found Chicago officers routinely violated the civil rights of residents (https://www.dnainfo.com/chicago/20170113/downtown/chicago-police-doj-justice-department-probe-laquan-mcdonald-loretta-lynch-rahm-emanuel-civil-rights) by using excessive force; it also cited poor training and nonexistent supervision.

# 503 Service Temporarily Unavailable

Mayor Rahm Emanuel (https://www.dnainfo.com/chicago/people/rahm-emanuel) Wednesday said the effort to revise the use of force policy was "one part of the comprehensive reform" coming to the Police Department.

Emanuel has said the goal of the policy is to give officers the "certainty" they need to be proactive to fight a surge of murders and shootings (https://www.dnainfo.com/chicago/20170301/downtown/shootings-murders-rise-chicago-this-february) concentrated on Chicago's West and South Side communities.

Officers may only use force when necessary because of a threat to life or imminent bodily harm to them or others, according to the policy. It also takes into account the suspect's "proximity or access to weapons."

"The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it," the rules say. "When or if the subject offers less resistance, however, the [officer] will decrease the amount or type of force accordingly."

Critics of the Police Department say the current rules are insufficient and do not protect against excessive force. The current policy focuses largely on whether a use of force is reasonable, which many experts say is an outdated way to judge an officer's actions.

The new policy "clearly, clearly" calls on officers to report others who don't follow the policy when using force, Chicago Police Supt. Eddie Johnson said (https://www.dnainfo.com/chicago/20170517/bronzeville/chicago-police-use-of-force-policy-cpd), and officers who don't report misdeeds can be "culpable."

Officers will undergo four-hour, in-person training by the fall, when the policy is expected to go into effect, and there will be another eight hours of training next year, officials said.

Read the new policy here:

Use of Force Full Text (https://www.scribd.com/document/348669630/Use-of-Force-Full-Text#from_embed) by Jen Sabella (https://www.scribd.com/user/58727968/Jen-Sabella#from_embed) on Scribd

| Chicago Police Department | | General Order G03-02 |
|---|---|---|
| **USE OF FORCE** | | |
| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
| RESCINDS: | | | |

# All Chicago police dispatchers now trained in mental health awareness



The training of Chicago police dispatchers on mental health awareness and de-escalation strategies is part of an effort to make the Police Department better prepared for crisis situations. (Brian Cassella / Chicago Tribune)

By **Patrick M. O'Connell**
Chicago Tribune

FEBRUARY 25, 2017, 1:33 PM

A ll call takers and dispatchers in the city's 911 police operations center have completed mental health awareness and de-escalation training as the department works to improve the way it responds to crisis situations.

Training for the frontline civilian employees included how to best communicate with callers who may be having a mental health crisis, techniques to calm a situation before officers arrive and how to recognize situations that may need a response from officers specially trained in crisis intervention.

All 911 center employees, 488 total including supervisors, completed an eight-hour training course, including information from the National Alliance on Mental Illness Chicago.

"Since the training, their awareness has been heightened, and they know what to look for," Dionne Tate, deputy director of 911 operations, said in an interview.

The wide-ranging training was announced by Mayor Rahm Emanuel in January 2016 on the heels of the fatal shootings of 19-year-old college student Quintonio LeGrier and neighbor Bettie Jones outside a West Side home a month earlier. Two 911 dispatchers were suspended without pay for failing to send police to the residence when LeGrier called for help, saying someone was threatening his life. When LeGrier called a third time, police were dispatched, and one of the officers shot and killed a bat-wielding LeGrier and — by mistake — Jones.

In its scathing report released last month, the U.S. Department of Justice said the incident "laid bare failures in CPD's crisis response systems," including dispatchers who didn't recognize that LeGrier might be mentally ill and officers who did not use crisis intervention techniques.

Tate said call takers and dispatchers know how to insert "triage questions" into conversations with callers to better identify signs of mental illness, whether there is a mentally ill person at the scene, or whether someone involved is off medication. Information gleaned from calls is entered into the computer system used by officers on their way to the scene, so responding police can be prepared and crisis-intervention officers deployed.

Dr. Julie Morita, Chicago public health commissioner, said additional training for dispatchers and police officers can end up helping those with mental or behavioral health problems receive the treatment and services they need. By identifying people who need help, Morita said, first responders can better connect those in crisis with service providers, including a new community triage center in Roseland, as opposed to sending them into the criminal justice system.

"This is one piece of the whole process," Morita told the Tribune. "This is really a coordinated effort."

The mayor announced plans for the added training for 911 operators and also police officers after LeGrier and Jones were killed and as the department faced intense scrutiny in the aftermath of the court-ordered release of the Laquan McDonald shooting video in November 2015. A committee, including experts and city officials, was established to study mental health issues and proposed reforms.

As a result of increased training and awareness, the Office of Emergency Management and Communications identified 25,691 CIT (Crisis Intervention Team) events in 2016, nearly five times more than were classified as such during the previous year. CIT officers responded to more than 16,000 events last year.

The Police Department also announced that Lt. Antoinette Ursitti, a 16-year veteran and licensed professional counselor, will lead the Crisis Response Unit. Police also are continuing to develop a uniform crisis intervention strategy across the entire department. The plan calls for all officers to attend mental health awareness and de-escalation training — to teach officers how to defuse tension and reduce the need to use force.

The call center employees, Tate said, will undergo yearly refresher mental health and de-escalation training. The Police Department, OEMC and Fire Department this spring will start a new pilot training program to help improve collaboration for recognizing and treating someone experiencing a mental health emergency.

*poconnell@chicagotribune.com*

*Twitter @pmocwriter*

Copyright © 2017, Chicago Tribune

**This article is related to:** Chicago Police Department, U.S. Department of Justice

DNAinfo has closed.
Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

BRONZEVILLE & WASHINGTON PARK (//WWW.DNAINFO.COM/CHICAGO/BRONZEVILLE-WASHINGTON-PARK)

Crime & Mayhem (//www.dnainfo.com/chicago/topics/crime-mayhem)    Politics (//www.dnainfo.com/chicago/topics/politics)

# Chicago Police's New Use Of Force Policy Focuses On 'Sanctity Of Life'

By Kelly Bauer (//www.dnainfo.com/chicago/about-us/our-team/editorial-team/kelly-bauer) | May 17, 2017 12:23pm | *Updated on May 19, 2017 11:37am*

@bauerjournalism (http://twitter.com/bauerjournalism)

  



The Chicago Police Department unveiled its new use of force policy on Wednesday.

▲ View Full Caption

DNAinfo/Kelly Bauer

CHICAGO POLICE HEADQUARTERS — A new Chicago Police Department Use of Force policy that aims to focus on "sanctity of life" marks a "big win" for Chicagoans, said an activist whose work led to the changes.

The Police Department spent more than a year reworking the policy, which governs how and in what situations police can use force, including deadly force. The new policy advises officers that their force must be objectively "reasonable" and "proportional," said Supt. Eddie Johnson during a Wednesday news conference.

DNAinfo has closed.
Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

Officers still will be able to use deadly force when there is a threat of great bodily harm or death, Johnson said. The policy also tells officers how to "safely and humanely" use tools like Tasers or canines, Johnson said.

BRONZEVILLE & WASHINGTON PARK»
Chicago Police's New Use Of Force Policy Focuses On 'Sanctity Of Life'

"I'm not naive," Johnson said. "I know that there will be some who think that these policies are too restrictive for officers to do their jobs, and some who think it isn't restrictive enough. ... I do believe the set of policies we're releasing today are in the best interest of everyone."

The new policy "clearly, clearly" calls on officers to report others who don't follow the policy when using force, Johnson said, and officers who don't report misdeeds can be "culpable."

Johnson, Police Board President Lori Lightfoot and activist Will Calloway attributed the changed policy to the death of Laquan McDonald at the hands of an officer. (http://www.dnainfo.com/chicago/tags/laquan-mcdonald-case) The Police Department came under intense scrutiny after video of the teen's fatal shooting was released in November 2015.

"The incident with Laquan really was the catalyst, and it was paramount on how we got here," said Calloway, who fought for the video of McDonald's shooting to be released and worked with police on crafting the new use of force policy. "This is a big win for us. Our voices were heard."

The Police Department hopes the policy — as well as other reforms — can help police officers rebuild trust with Chicago community members.

"I know that CPD is only as good as the faith that the community has in it," Johnson said.

Officers will start online training sessions on the policy within the next few weeks. They'll have to go through four-hour, in-person training by the fall, when the policy will go into effect, Johnson said, and there will be another eight hours of training next year.

Police have been working on changing the policy for months, billing it as part of the reforms that have gone through the department since McDonald's death. The Police Department released drafts and asked officers and community members for feedback, something it hadn't done before. It received hundreds of comments during the process, which Lightfoot called "historic."

"I think the process that was used will serve as a precedent going forward," Lightfoot said. "It is inclusive, it is transparent, it is exactly what is needed.

"This policy is a good step in the right direction. Clearly, there's more work that needs to be done," she said.

A first draft of the policy had placed a "heavy emphasis on the sanctity of life," (https://www.dnainfo.com/chicago/20161007/bronzeville/chicago-police-use-of-force) police said in October, advising officers to only use force when absolutely necessary and to avoid using deadly force.

But a revised draft, unveiled in March, instead said officers could use force that is "reasonable and proportional," (https://www.dnainfo.com/chicago/20170316/bridgeport/chicago-police-use-of-force-policy-reform-brutality-department-of-justice-report-supt-eddie-johnson) Johnson said.

The draft also did away with language that had advised officers to use force only when "no alternative appears to exist."

**Read the new policy here:**

Use of Force Full Text (https://www.scribd.com/document/348669630/Use-of-Force-Full-Text#from_embed) by Jen Sabella (https://www.scribd.com/user/58727968/Jen-Sabella#from_embed) on Scribd

# Chicago police finalize tighter rules on when to shoot, other uses of force

ADVERTISEMENT

The Chicago Police Department has revised its use-of-force rules. (Chicago Tribune)

By **Dan Hinkel**
Chicago Tribune

MAY 17, 2017, 7:08 PM

hicago police officials on Wednesday announced policy changes intended to cut back on questionable shootings and other uses of force that have haunted the department for years.

The changes, made after months of back-and-forth revisions, will tighten department rules that experts and advocates have criticized as too permissive of unnecessary uses of force.

The policy changes — expected to take effect this fall — represent a milestone for a department upended nearly 18 months ago by the release of video of a white officer shooting black teenager Laquan McDonald 16 times.

The revised rules, however, do not go as far in some respects as the rules proposed by police Superintendent Eddie Johnson in October, when the department and Mayor Rahm Emanuel faced more intense federal scrutiny amid the immediate fallout over the video.

The final version of the department's main use-of-force policy substantially resembles the scaled-back proposal Johnson made in March after rank-and-file police complained that his first proposal was too extreme.

In one key change, the policy holds that an officer can't shoot a fleeing person unless that person presents an imminent threat to police or others. The rule that has been in place says an officer can shoot any person fleeing after committing or trying to commit a felony using force.

The new policy also calls on officers to use their new de-escalation training to try to defuse incidents. The adopted language is less strict than Johnson's first proposal, though. Officers have to try de-escalation only "when it is safe and feasible to do so."

Johnson announced the new rules at an event at police headquarters designed to show unity among his command staff, rank-and-file officers and residents. Johnson spoke to a crowd of officers as he was flanked by Ald. Ariel Reboyras, 30th, an Emanuel ally who lauded the new rules in both English and Spanish.

Johnson was also joined by activist William Calloway, who helped force the release of the McDonald video. Onstage during questioning by the media, Calloway greeted Johnson with a handshake and "What's up, Supe?" He credited the protests over the McDonald shooting with creating change in the department.

"This is a big win for us, that our voices were heard," Calloway said.

But he added the caution that it won't be clear how effective the rules are until they are in place.

The policies are yet another point of disagreement between top department officials and the Fraternal Order of Police, the union that represents rank-and-file officers and whose contract with the city expires this year.

Kevin Graham, elected FOP president last month, released a statement Wednesday decrying the "anti-law enforcement climate" in Chicago. Graham has opposed the idea that the department needs outside oversight or tougher discipline.

"Three Chicago police officers have been shot in the last two weeks. The reality is that many offenders do not want to go to jail and they become resistant or combative with officers. These violators determine the level of response by officers," Graham said in a written statement.

"For these reasons, we do not believe that extensive changes should made to the current use of force policy. Nevertheless, we are always willing to discuss new measures with the superintendent that insure the safety of our officers and those of the public," the statement read.

Johnson, meanwhile, said the department can't compromise on either officer safety or residents' rights.

"I'm not naive. I know that there will be some who will think that these policies are too restrictive for officers to do their jobs, and there will be some who think it isn't restrictive enough," he said.

"However, I do believe that the set of policies we are releasing today is in the best interest of everyone," he said.

In a break from tradition for a department that has done little to train officers on policy changes, all of the approximately 12,000 officers will receive both computerized and in-person training on the new force rules, Johnson announced.

The rules are expected to take effect this fall after officers have each received four hours of in-person training. That will be followed by eight more hours of training next year.

Department rules can be more than symbolic — they set boundaries that officers can face punishment for breaking.

Officer discipline has been rare and often light in Chicago, and oversight officials aiming to strengthen accountability have sought changes to use-of-force policies widely criticized as too permissive. More specific rules could give disciplinary authorities stricter standards to apply to officers who use force in questionable circumstances.

Sharon Fairley, who runs the city's main police oversight agency and will head the city's revamped Civilian Office of Police Accountability when it begins operations this year, lauded the new rules.

"We believe these new policies incorporate new concepts that are essential to fair and effective policing," she said in a statement.

The department's force policies drew intense focus after Emanuel was forced in November 2015 to release video of Officer Jason Van Dyke shooting McDonald as the teen walked away from police with a knife in his hand.

Furious protests followed, and the U.S. Department of Justice launched an investigation into the department. Emanuel, meanwhile, made changes aimed at getting ahead of federal authorities. One of his early moves was to propose new rules on the use of force.

Johnson, appointed to lead the department as the crisis deepened, first proposed new force rules in October that were markedly more restrictive than the rules in place. Some officers said the draft policy was too exacting for cops making split-second decisions under pressure.

Months after Johnson put that proposal out for public comment, the Justice Department finalized a report that concluded officers used force too aggressively, often against minorities and with limited fear of repercussions.

But President Donald Trump's election and his appointment of Jeff Sessions as attorney general upended the political discussion about police reform. Sessions has signaled that he is unlikely to seek court enforcement of reforms, and the lack of federal pressure would leave Emanuel largely in control.

Emanuel, for his part, is trying to boost officer morale and tamp down surging violence on the South and West sides, which some blame on officers scaling back activity to avoid trouble.

Emanuel and Johnson have both vowed to continue pursuing reforms, but experts have voiced skepticism that meaningful change will come without federal pressure.

In March, Johnson scaled back and tweaked his proposal from October on the department's main use-of-force guidelines.

The final version of the main force policy resembles the one Johnson proposed in March.

Like past revisions of the rules proposed by Johnson, the final policy begins with a symbolic statement of the department's commitment to protecting human life.

Beyond rhetoric, certain changes are aimed at addressing long-standing issues in the department, including the new rule that an officer can only shoot a fleeing person who poses an imminent threat to an officer or other person. The rules that have been in place allow an officer to shoot a fleeing person who has committed a felony using force.

A database compiled by the Tribune last year showed that foot chases played a role in more than a third of the 235 police shootings from 2010 through 2015 that ended with someone wounded or killed.

The new policy expands on the comparatively bare-bones one that has been in place, which focuses largely on whether a use of force is reasonable. The department's new overarching rule on using force emphasizes that it must be objectively reasonable, necessary and proportional to the threat.

The new rules also require officers to intervene verbally or by other means when another officer uses excessive force. Johnson's original proposal suggested officers could physically intervene when colleagues use excessive force, inspiring ridicule from observers who suggested it could call for a cop to shoot his partner. The final version calls on an officer to intervene, but it does not specify that the intervention could be physical.

The final rules also closely resemble Johnson's scaled-back proposal on officers giving medical attention. The earliest proposal mandated that officers give medical care to the wounded, but the final rules say officers may do so if they are properly trained.

Experts and reform advocates had little time Wednesday to digest the extensive new rules, but attorney Jon Loevy, who has often sued the department over uses of force, said he was pleased with the more specific rules.

"I'm not afraid to criticize the Chicago Police Department, but this is something that I think they deserve credit for," he said.

*dhinkel@chicagotribune.com*

*Twitter @dhinkel*

Copyright © 2017, Chicago Tribune

**This article is related to:** Shootings, Eddie Johnson, Rahm Emanuel, Chicago Police Department, Laquan McDonald, U.S. Department of Justice

# Daily Herald

Chicago | updated: 10/7/2016 1:49 PM

# Chicago Police Department drafts new use-of-force policy

**AP** **Associated Press**

CHICAGO -- Chicago's police chief on Friday released details of a proposed new policy that would require officers to use the least amount of force necessary and emphasizes the "sanctity of life."

The proposal requires officers to intervene if they see another officer violating department policy. Deadly force could only be used to prevent immediate threat of death or great bodily harm. The announcement comes as the U.S. Department of Justice investigates the department after a white officer was charged with murder for the fatal shooting of a black teenager in 2014. Laquan McDonald was shot 16 times.

Police Superintendent Eddie Johnson told reporters at a news conference that the draft aims to "clarify response options to officers during split-second decisions or in the critical time before those moments while placing a heavy emphasis on the sanctity of life."

The policy will undergo 45 days of public comment , something the superintendent called a department first and a step toward previously promised transparency efforts. He said the department would use less-lethal methods as often as possible.

"When I say to you that this is a new day at CPD, it's not a joke and I'm not kidding about it," Johnson said.

After the public feedback period ends Nov. 21, the department will review contributions with the goal of having a final version of the policy by the end of the year. Officers will then be trained according to the policy.

Anne Kirkpatrick, the department's chief of organizational development, said the policy includes the need for independent justification every time a tool, like a stun gun or baton, is used in force.

"This is a new way for us to do business," she said.

The policy also would require police to offer medical aid to those injured in use-of-force incidents. It asks them to de-escalate situations and not use force unless "all other reasonable alternatives have been exhausted."

Last month, the department started mandatory de-escalation training to help officers better assess how to respond to complex and tense situations. The department also has expanded its use of body cameras.

Mayor Rahm Emanuel, in his second term, has been trying to rebuild trust in his leadership, particularly after the McDonald shooting. Officer Jason Van Dyke was charged with first-degree murder, but only after a judge ordered the public release of the squad car video last year. The graphic video of the shooting prompted citywide protests and police leadership changes.

Emanuel's administration also has announced plans to add nearly 1,000 police officers. Earlier this week, the Chicago City Council voted to form a new agency to investigate the police force called the Civilian Office of Police Accountability and create a new deputy inspector whose job will be to monitor the department.

Chicago has seen a dramatic rise in the number of shootings and homicides this year, including 91 homicide victims in August, the deadliest month in the city in two decades. Overall, the city has recorded more than 500 homicides this year - higher than all of 2015 - and is on pace to climb past the 600-homicide mark for the first time since 2003.

The city's image has also come up on the presidential campaign trail with Republican nominee Donald Trump suggesting that Chicago is more violent than Afghanistan. Trump also endorsed a stop-and-frisk policing method for the city, which a federal judge said New York City used unconstitutionally because of its overwhelming impact on minority residents.



# News (https://chicago.suntimes.com/section/news/)

## CPD reform road map: Training, transparency and accountability

**CHICAGO NEWS (HTTPS://CHICAGO.SUNTIMES.COM/SECTION/NEWS/)** 03/14/2017, 09:17pm

☀: 43°

(https://chicago

**BUSINESS**

Trump seeks more tax breaks on Chicago tower with Ald. Ed Burke's help

**CHICAGO NEWS**

Man charged with armed robberies at CTA station, in Lake View (https://chicago.suntimes.com/news/r

**CHICAGO NEWS**

Fire crews battle extra-a River West commercial (https://chicago.suntime



*Chicago Police Superintendent Eddie Johnson discusses police reforms Tuesday.* | *James Foster/Sun-Times*

**Sam Charles (https://chicago.suntimes.com/author/scharlescst/)**

@samjcharles (https://twitter.com/intent/user?screen_name=samjcharles) | email (mailto:scharles@suntimes.com)

### Sign-Up for our News & Politics Newsletter

✉ Sign-Up (https://r1.surveysandforms.com/062jcp97-2819pvaa)

Chicago Police Supt. Eddie Johnson, the department's command staff and Chicago Police Board President Lori Lightfoot on Tuesday laid out plans for further reforms of the embattled department that range from improving community policing to revising CPD's use-of-force policy.

The five-pronged approach will focus on improving manpower and supervision; a further investment in community policing; better officer training; revised guidance on use-of-force, and more transparency and accountability.

"I believe this framework demonstrates our commitment to keep the Chicago Police Department on the path to reform," Johnson, flanked by his staff, told reporters at a Tuesday news conference at police headquarters. "And while reform is critical, it won't be done in a vacuum."

Training to establish the new reforms will begin sometime before the end of this year, with officers in supervisory roles receiving it first, Johnson said.

Among the changes being proposed was the establishment of a new police training oversight committee, to be chaired by First Deputy Supt. Kevin Navarro, that will oversee "all aspects" of training, Johnson said.

Chicago Police Dept. Reforms

SPONSORED CONTENT

**How We Can Defend Ourselves From Ballistic Missiles**

By Ars Technica

A new hotline and website are being set up for officers to anonymously report misconduct by their colleagues "without fear of being ostracized," Johnson said.

The department also will allow for an additional public comment period — through March 16 — on another revision to the department's use-of-force policy.

"The new policies emphasize the sanctity of life, the reasonable and proportional use of force, de-escalation and force mitigation, and limitations on the use of deadly force," Johnson said.

He added that the public comments so far received by the department have been helpful in drafting new policies.

"We have to acknowledge that we don't know everything," he said.

Mayor Rahm Emanuel and the police department have been under intense pressure since November 2015, when a judge ordered the release of a police dashcam video that showed Chicago police officer Jason Van Dyke shooting black teenager Laquan McDonald 16 times.

Public outrage led to protests and calls for Emanuel to step down. Emanuel survived, but he also fired police Supt. Garry McCarthy. The McDonald controversy also is widely seen as a factor in the election defeat last year of Cook County State's Attorney Anita Alvarez, who did not charge Van Dyke with murder until after the release of the video. Van Dyke has pleaded not guilty.

In the waning days of President Barack Obama's administration, the U.S. Department of Justice issued a scathing report in which it concluded that the Chicago Police Department had a long history of civil rights violations and excessive force. The findings were announced in Chicago by then-Attorney General Loretta Lynch.

But last month, President Donald Trump's new attorney general, Jeff Sessions, sent his strongest signal to date that Emanuel will be on his own — without a consent decree and, therefore, without court oversight — to implement the sweeping police reforms that Lynch's Justice Department had recommended.

---

**BRIEFING:** The Laquan McDonald videos, police reports (https://chicago.suntimes.com/news/laquan-mcdonald-briefing-the-videos-the-police-reports-2/)

**RELATED:** Kim Foxx planning wrongful-conviction unit revamp (https://chicago.suntimes.com/politics/kim-foxx-planning-cook-county-wrongful-conviction-unit-revamp/)

---

Johnson said the department has been in discussion with all unions representing officers in crafting the reforms. Asked if the reforms could impact upcoming officer contract negotiations, Johnson said: "That remains to be seen."

Dean Angelo, president of Lodge 7 of the Fraternal Order of Police, said though the union has regular contact with the department, most of the specifics in the proposed reforms have not been discussed.

Training for Field Training Officers has been addressed, Angelo said, adding that he was confident the other proposed reforms would be addressed before they're implemented.

"I'm sure by the time this process gets to scheduling officers for classes and getting officers in the academy for familiarization and training, I will have had conversations with them," Angelo said.

"What we are looking for are opportunities to articulate protections within the development and expansion of the program to make sure members have review opportunities," he added.

Lightfoot acknowledged that the reforms would not be a cure-all, but could still help lay the groundwork for future improvements.

"This isn't everything, it's not the specifics of the project plan," Lightfoot said. "But if these specific reforms are implemented in 2017 I feel confident they will create a foundation on which the department can continue to build."

**Contributing:** *Stefano Esposito*

DNAinfo has closed.

Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

JEFFERSON PARK, PORTAGE PARK & NORWOOD PARK (//WWW.DNAINFO.COM/CHICAGO/JEFFERSON-PARK-PORTAGE-PARK-NORWOOD-PARK)

**Crime & Mayhem (#/www.dnainfo.com/chicago/topics/crime-mayhem)**  **Politics (#/www.dnainfo.com/chicago/topics/politics)**

# Police Training On When Police Can Use Force Begins

By Heather Cherone (//www.dnainfo.com/chicago/about-us/our-team/editorial-team/heather-cherone) | July 5, 2017 10:31am | *Updated on July 7, 2017 11:17am*
@HeatherCherone (http://twitter.com/HeatherCherone)

  



The Chicago Police Department unveiled its new use of force policy on Wednesday.

▲ View Full Caption                                                                 DNAinfo/Kelly Bauer

CHICAGO — Officials on Wednesday began training the city's 13,000 police officers on the Chicago Police Department's new use of force policy that aims to focus on the "sanctity of life."

The policy, which will be implemented once all members of the department have been trained, requires that the use of force be "reasonable and proportional."

Click here to read a message from our Founder and CEO (http://assets.dnainfo.com/message.html)

The policy was adopted in May after a year spent reworking the rules in the wake of the fatal shooting of Laquan McDonald (https://www.dnainfo.com/chicago/20151124/archer-heights/laquan-mcdonald-video-shows-police-shooting-him-16-times). That shooting prompted an investigation by the U.S. Justice Department that found Chicago officers routinely violated the civil rights of residents (https://www.dnainfo.com/chicago/20170113/downtown/chicago-police-doj-justice-department-probe-laquan-mcdonald-loretta-lynch-rahm-emanuel-civil-rights) by using excessive force; it also cited poor training and nonexistent supervision.

# 503 Service Temporarily Unavailable

Mayor Rahm Emanuel (https://www.dnainfo.com/chicago/people/rahm-emanuel) Wednesday said the effort to revise the use of force policy was "one part of the comprehensive reform" coming to the Police Department.

Emanuel has said the goal of the policy is to give officers the "certainty" they need to be proactive to fight a surge of murders and shootings (https://www.dnainfo.com/chicago/20170301/downtown/shootings-murders-rise-chicago-this-february) concentrated on Chicago's West and South Side communities.

Officers may only use force when necessary because of a threat to life or imminent bodily harm to them or others, according to the policy. It also takes into account the suspect's "proximity or access to weapons."

"The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it," the rules say. "When or if the subject offers less resistance, however, the [officer] will decrease the amount or type of force accordingly."

Critics of the Police Department say the current rules are insufficient and do not protect against excessive force. The current policy focuses largely on whether a use of force is reasonable, which many experts say is an outdated way to judge an officer's actions.

The new policy "clearly, clearly" calls on officers to report others who don't follow the policy when using force, Chicago Police Supt. Eddie Johnson said (https://www.dnainfo.com/chicago/20170517/bronzeville/chicago-police-use-of-force-policy-cpd), and officers who don't report misdeeds can be "culpable."

Officers will undergo four-hour, in-person training by the fall, when the policy is expected to go into effect, and there will be another eight hours of training next year, officials said.

Read the new policy here:

Use of Force Full Text (https://www.scribd.com/document/348669630/Use-of-Force-Full-Text#from_embed) by Jen Sabella (https://www.scribd.com/user/58727968/Jen-Sabella#from_embed) on Scribd

| Chicago Police Department | | General Order  G03-02 | |
|---|---|---|---|
| **USE OF FORCE** | | | |
| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
| RESCINDS: | | | |

# All Chicago police dispatchers now trained in mental health awareness



The training of Chicago police dispatchers on mental health awareness and de-escalation strategies is part of an effort to make the Police Department better prepared for crisis situations. (Brian Cassella / Chicago Tribune)

By **Patrick M. O'Connell**
Chicago Tribune

FEBRUARY 25, 2017, 1:33 PM

All call takers and dispatchers in the city's 911 police operations center have completed mental health awareness and de-escalation training as the department works to improve the way it responds to crisis situations.

Training for the frontline civilian employees included how to best communicate with callers who may be having a mental health crisis, techniques to calm a situation before officers arrive and how to recognize situations that may need a response from officers specially trained in crisis intervention.

All 911 center employees, 488 total including supervisors, completed an eight-hour training course, including information from the National Alliance on Mental Illness Chicago.

"Since the training, their awareness has been heightened, and they know what to look for," Dionne Tate, deputy director of 911 operations, said in an interview.

The wide-ranging training was announced by Mayor Rahm Emanuel in January 2016 on the heels of the fatal shootings of 19-year-old college student Quintonio LeGrier and neighbor Bettie Jones outside a West Side home a month earlier. Two 911 dispatchers were suspended without pay for failing to send police to the residence when LeGrier called for help, saying someone was threatening his life. When LeGrier called a third time, police were dispatched, and one of the officers shot and killed a bat-wielding LeGrier and — by mistake — Jones.

In its scathing report released last month, the U.S. Department of Justice said the incident "laid bare failures in CPD's crisis response systems," including dispatchers who didn't recognize that LeGrier might be mentally ill and officers who did not use crisis intervention techniques.

Tate said call takers and dispatchers know how to insert "triage questions" into conversations with callers to better identify signs of mental illness, whether there is a mentally ill person at the scene, or whether someone involved is off medication. Information gleaned from calls is entered into the computer system used by officers on their way to the scene, so responding police can be prepared and crisis-intervention officers deployed.

Dr. Julie Morita, Chicago public health commissioner, said additional training for dispatchers and police officers can end up helping those with mental or behavioral health problems receive the treatment and services they need. By identifying people who need help, Morita said, first responders can better connect those in crisis with service providers, including a new community triage center in Roseland, as opposed to sending them into the criminal justice system.

"This is one piece of the whole process," Morita told the Tribune. "This is really a coordinated effort."

The mayor announced plans for the added training for 911 operators and also police officers after LeGrier and Jones were killed and as the department faced intense scrutiny in the aftermath of the court-ordered release of the Laquan McDonald shooting video in November 2015. A committee, including experts and city officials, was established to study mental health issues and proposed reforms.

As a result of increased training and awareness, the Office of Emergency Management and Communications identified 25,691 CIT (Crisis Intervention Team) events in 2016, nearly five times more than were classified as such during the previous year. CIT officers responded to more than 16,000 events last year.

The Police Department also announced that Lt. Antoinette Ursitti, a 16-year veteran and licensed professional counselor, will lead the Crisis Response Unit. Police also are continuing to develop a uniform crisis intervention strategy across the entire department. The plan calls for all officers to attend mental health awareness and de-escalation training — to teach officers how to defuse tension and reduce the need to use force.

The call center employees, Tate said, will undergo yearly refresher mental health and de-escalation training. The Police Department, OEMC and Fire Department this spring will start a new pilot training program to help improve collaboration for recognizing and treating someone experiencing a mental health emergency.

poconnell@chicagotribune.com

*Twitter @pmocwriter*

Copyright © 2017, Chicago Tribune

**This article is related to:** Chicago Police Department, U.S. Department of Justice



(/content/city/en.html)

City of Chicago　　　　　Mayor Rahm Emanuel

# OFFICE OF THE MAYOR

## August 30, 2017

## Citywide Mental Health Steering Committee Takes Steps on Police Reform, Mental Health Crisis Response

West Side Outreach Project trains more than 500 community members in mental health symptoms and how to respond

Mayor's Press Office　　312.744.3334

　　　　Download this Press Release (/content/dam/city/depts/mayor/Press Room/Press Releases/2017/August/083017_MentalHealth.pdf)

Mayor Emanuel today announced another step forward in the city's efforts to improve crisis response for individuals with mental illness as part of the city's ongoing police reform efforts that includes strengthening mental health crisis response. Over the last eight months, more than 500 community members in Austin, Garfield Park and North Lawndale have received free mental health awareness training to reduce stigma and provide information on emergency response resources.

"Effective training is another a critical part of our continued police reform efforts and ensuring that the city is providing an effective and compassionate mental health emergency response," said Mayor Emanuel. "Over the past year, the city has advanced mental health training that takes a holistic look at all aspects of the response. By not only training police officers and 911 dispatchers and call takers on effective emergency response, but also training the community on mental health symptoms and resources available, we can reduce stigma and better meet the needs of individuals who may be experiencing a mental health crisis."

The successful pilot trained more than 500 west side residents in awareness and identification of the signs and symptoms of a possible mental health crisis. In addition, residents learned about support services available from the City and community organizations, including the option to request a specially

trained Crisis Intervention Team (CIT) trained police officer in the event of a crisis.

"We know that individuals who have experienced trauma are more likely to face mental health challenges and engage in risky behaviors," said Chicago Department of Public Health Commissioner, Dr. Julie Morita. "The early results of our efforts of improving crisis response through trauma-informed practices show promise that with evidence-based training and interventions we are better able to identify, serve and ultimately treat those individuals with mental health challenges during a crisis."

The pilot project grew out of Mayor Emanuel's Citywide Mental Health Response Steering Committee, a coordinated effort to address how the city's first responders can better serve individuals with mental illness. The goal was to free mental health training to 400 community members in partnership with schools, faith-based institutions and community organizations in the west site.

"These results show evidence that this approach to addressing stigma and improving crisis response may be an effective way to engage communities in the solution." said Kelly O'Brien, Executive Director for The Kennedy Forum, which advocates for ending stigma and discrimination against people dealing with mental health and addiction challenges. "We recommend that trainings be expanded to additional communities."

The University in Chicago (UIC) Jane Addams College of Social Work is spearheading an evaluation of the effectiveness of this training and presented an interim report to West Side Outreach Project organizers. UIC researchers confirmed that the preliminary results of the pilot show decreased stigma associated with mental health and addiction, increased knowledge and comfort in contacting a CIT trained police officer, increased knowledge about mental health and increased confidence that they could assist someone in need. Additionally, of the 296 people who participated in the study, a majority, approximately 70 percent, said that either they personally have, or a family member has, experienced mental health challenges.

"These results are significant and indicate the community trainings are having an impact," said Amy Watson, PhD, UIC Jane Addams College of Social Work faculty who led the evaluations.
Trainings were offered to faith leaders, school staff and staff and volunteers from community based organizations. UIC led the pre-and-post evaluations of the effectiveness of the trainings, which were provided by Ann & Robert H. Lurie Children's Hospital of Chicago: Center for Childhood Resilience, Laynie Foundation, National Alliance for Mentally Ill (NAMI) Chicago, Presence Health, Sinai Health System: Under the Rainbow, Thresholds and Trilogy Behavioral Healthcare. The pilot is funded through the Chicago Department of Public Health.

"There are service calls that an officer may respond to involving individuals who are experiencing some type of mental health crisis," said Police Deputy Superintendent Kevin Navarro. "Participating in this effort is part of our commitment to changing how we police in Chicago and making sure that individuals suffering from these crises receive treatment in a hospital and not a jail cell."

The final report from UIC will be released early 2018 and will include additional findings to determine if the trainings resulted in referrals to community mental health services and increased requests for CIT trained officers in these communities.

The Citywide Mental Health Response Steering Committee includes representatives from Mayor's Office, Chicago Police Department, Office of Emergency Management and Communications (OEMC), Chicago Fire Department, Chicago Department of Public Health, NAMI Chicago, The Kennedy Forum, Thresholds,

Mount Sinai Health System and University of Illinois at Chicago. The Steering Committee continues to meet monthly to address its goals of improving training, increasing access to social services, reducing the stigma of mental health, educating the public on mental health first response, and collecting better data on outcomes.

West Side Outreach Project partners include: Advocate Health Care, Alderman Burnett, Alderman Ervin, Alderman Mitts, Alderman Scott, Alderman Taliaferro, Anixter Center, Ann & Robert H. Lurie Children's Hospital of Chicago: Center for Childhood Resilience, BBF Family Services, Bethany Fund, Blue Cross Blue Shield Illinois, Bobby E. Wright Comprehensive Behavioral Health Center, Catholic Charities, Chicago Area Project, Chicago Department of Public Health, Chicago Police Department, Chicago Public Schools, Chicago Urban League, Cook County Health and Hospitals System, Gateway Foundation, Hartgrove Behavioral Health, Health and Disability Advocates, Hope Community Church, I Am Able, Interfaith Mental Health Coalition, The Kennedy Forum Illinois, Laynie Foundation, Loretto Hospital, Mt. Vernon Baptist Church, MADO Healthcare, Marshall High School, Michael Reese Health Trust, NAMI Chicago, Next Level Health, Presence Health, Primo Center, St. Anthony's Hospital, Sandy Hook Promise, Sinai Health System, Thresholds, Trilogy Behavioral Healthcare, Westside Community Stakeholders, Westside Health Authority, and University of Illinois-Chicago.

These efforts build on citywide initiatives to improve how emergency responders respond to incidents. This has included training police officers and all OEMC 911 call takers and dispatchers in CIT and de-escalation. These efforts helped increase the number of CIT officers dispatched to mental health-related calls more than seven-fold over last year.

The full report can be found here: http://thekennedyforumillinois.org/wp-content/uploads/2017/08/Interim-Report-Westside-Community-Outreach-Pilot-Project.pdf (http://thekennedyforumillinois.org/wp-content/uploads/2017/08/Interim-Report-Westside-Community-Outreach-Pilot-Project.pdf)

###

Copyright © 2010 - 2018 City of Chicago

 (/content/city/en.html)

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

COMMUNITIES UNITED, et al.,

                            Plaintiffs,

           v.

CITY OF CHICAGO,

                       Defendants.

Case No. 17cv7521

Hon. Elaine E. Bucklo

## <u>DECLARATION OF COMMANDER DANIEL GODSEL</u>

Pursuant to 28 U.S.C. § 1746, I, Daniel Godsel, state and affirm as follows:

1.      I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.      I am a Commander at the Chicago Police Department ("CPD") at the Training and Education Division. In that capacity, I have been involved in the process of developing training for Department members on CPD's revised use of force policies.

3.      In 2016, CPD developed a new 16-hour, in-service course focused on force mitigation principles, skills and tactics and interacting with individuals in crisis, including mental health crisis. CPD's Training Academy developed the course with input from a large group of nationally recognized experts including the Los Angeles Police Department, Washington DC Metropolitan Police Department, and the National Alliance on Mental Illness Chicago.

4.      The training is intended to equip officers with tools to de-escalate conflicts safely, recognize the signs of mental illness, trauma and crisis situations and respond quickly when deadly force is necessary. The course emphasizes live, scenario-based training – a shift in how CPD conducts continuing education for officers away from classroom-based training – and provides the tools necessary for the wide range of situations officers face daily. CPD launched

the training in September 2016 and is committed to training all officers, supervisors and exempt staff on these critical skills to complement and support training on the revised policies.

5.      CPD has also delivered training on the revised use of force policies to all Department members.  Between June and October 2017, a four-hour training on the revised policies was provided to all CPD members in a classroom setting.  This training was provided before the revised policies went into effect to ensure that all CPD members understand and received direction on the revised policies before they became effective.

6.      In addition to this four-hour training, supervisors received one additional hour of in-person training on the new supervisory responsibilities in investigating and reviewing uses of force before the policies became effective. CPD also develop and delivered an additional eLearning module on Tactical Response Reports ("TRRs") for supervisors and issued a help guide.

7.      The four-hour training is being supplemented by a 16-hour training for all CPD members. Approximately 3,000 members received 16-hour training in 2017; the remainder of CPD's members will receive it in 2018.  The 16-hour training includes scenario-based training in which CPD members apply the revised policies to situations they are likely to encounter during the course of their duties.

8.      Going forward, CPD anticipates that it will continue to provide use of force training to all CPD members on an annual basis.

9.      In addition to the centralized use of force training provided to the entire Department in 2017, and further Department-wide training which will be provided in 2018, CPD has also provided supplemental use of force training through its newly established "de-centralized" training model.  Under this model, a cadre of CPD Academy instructors provides

2

roll-call and one-on-one training within the individual police districts to supplement and reaffirm centralized training efforts.

10.     The Department's de-centralized trainers focused on topics including force mitigation and force options during the 12th and 13th CPD Periods (i.e., from November 12, 2017 through January 6, 2018; a CPD Period is a 28-day period that CPD uses for administrative purposes, including vacation scheduling and watch changes).  The decentralized training model is anticipated to cover specific topics with CPD officers within the districts during each CPD Period.

11.     I declare under penalty of perjury that the foregoing is true and correct.


Date: January 12, 2018

_____
Commander Daniel Godsel
Education and Training Division
Chicago Police Department