## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| COMMUNITIES UNITED; | ) | |
| COMMUNITY RENEWAL SOCIETY; | ) | |
| NEXT STEPS NFP; ONE NORTHSIDE; | ) | |
| and the ACLU OF ILLINOIS; on behalf | ) | |
| of their respective members, | ) | |
| | ) | Case No. 17-cv-7151 |
| Plaintiffs, | ) | |
| | ) | Hon. Elaine Bucklo |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND (B)(6)

## TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................2

I.     THIS COURT HAS SUBJECT MATTER JURISDICTION............................................2

     A.     Plaintiffs Have Associational Standing ................................................2

           1.     Plaintiffs' Claims Do Not Depend Upon an Assumption that Their Members Will Voluntarily Engage in Unlawful Conduct ...........................4

           2.     Plaintiffs Have Adequately Alleged an Official Pattern and Practice of Unlawful Use of Force............................................................10

     B.     Plaintiffs Have Organizational Standing ................................................13

     C.     Plaintiffs' Claims Are Not Moot.............................................................17

II.     THE CITY HAS NOT SHOWN THAT PLAINTIFFS' CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6)....................................................21

     A.     Plaintiffs Allege § 1983 Claims...............................................................21

           1.     Plaintiffs State a Claim for Violations of the Fourth Amendment ...........22

           2.     Plaintiffs State a Claim for Violations of the Fourteenth Amendment.............................................................................................26

     B.     Plaintiffs Adequately Allege that the City Violates the ADA and the Rehabilitation Act ...................................................................................28

           1.     Plaintiffs Allege that the City Uses Unreasonable Force Against People with Disabilities Because of Their Disabilities, Thereby Depriving Them of Safe and Lawful Police Services...............................29

           2.     Plaintiffs Allege that the City Fails to Accommodate Individuals with Disabilities ................................................................................32

                (a)     Title II's Reasonable Accommodation Obligation Applies to All Police Services.....................................................35

               (b)     The City Is on Notice of the Need to Accommodate People with Disabilities ...............................................38

               (c)     Reasonable Accommodations in Police Services Are Available ...................................................................39

           3.     Plaintiffs Allege Failure-to-Train Claims ...............................................40

           4.     Plaintiffs Allege that the City's Inadequate Policing Policies Have a Disparate Impact on Individuals with Disabilities ...............................42

     C.     Plaintiffs Are Entitled to Bring Claims Under the Illinois Constitution...............46

i

**TABLE OF CONTENTS**
**(continued)**

Page

D.      Plaintiffs Have Alleged a Disparate Impact Claim Under ICRA ..........................47

    1.      ICRA Prohibits Disparate Impact Discrimination by the CPD. ...............48

    2.      Plaintiffs Have Pled City Practices that Cause a Disparate Impact ..........49

    3.      Plaintiffs Have Otherwise Sufficiently Pled an ICRA Claim...................50

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ................................................................................16

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ..............................................................................................49

*Allee v. Medrano*,
    416 U.S. 802 (1974) ..............................................................................................12

*Allen v. Transamerica Ins.*,
    128 F.3d 462 (7th Cir. 1997) ................................................................................46

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014) ......................................................................14, 16

*Arlotta v. Bradley Ctr.*,
    349 F.3d 517 (7th Cir. 2003) ................................................................................22

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) ......................................................................5, 9, 10

*Arrington v. City of Chicago*,
    No. 17 C 5345, 2018 WL 620036 (N.D. Ill. Jan. 30, 2018) ..................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................21

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ..........................................................................14, 16

*Associated Gen. Contractors v. Jacksonville*,
    508 U.S. 656 (1993) .........................................................................................19, 20

*Association for Disabled Americans, Inc. v Claypool Holdings, LLC*,
    No. IP00-0344-C-T/G, 2001 WL 1112109 (S.D. Ind., Aug. 6, 2001)....................17

*Barrios v. City of Chi.*,
    No. 15 C 2648, 2016 WL 164414 (N.D. Ill. Jan. 14, 2016) ....................................7

*Bauer v. Shepard*,
    620 F.3d 704 (7th Cir. 2010) ..................................................................................3

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Bircoll v. Miami-Dade Cnty.*,
  480 F.3d 1072 (11th Cir. 2007) ................................................................36

*Bonte v. U.S. Bank, N.A.*,
  624 F.3d 461 (7th Cir. 2010) ...................................................................21

*Brad K. v. Bd. of Educ.*,
  787 F.Supp.2d 734 (N.D. Ill. 2011) .........................................................32

*Broadwater v. Fow*,
  945 F. Supp. 2d 574 (M.D. Pa. 2013) ...........................................33, 41, 42

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
  980 F. Supp. 2d 588 (S.D.N.Y. 2013).........................................................44

*Bryant v. Dart*,
  No. 13 C 3608, 2013 WL 5818810 (N.D. Ill. Oct. 29, 2013) ...................29

*Buben v. City of Lone Tree*,
  No. 08-cv-00127-WYD-MEH, 2010 WL 3894185 (D. Colo. Sept. 30, 2010) ..........33, 37, 40

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*,
  532 U.S. 598 (2001).......................................................................47

*Campbell v. Miller*,
  373 F.3d 834 (7th Cir. 2004) ...................................................................5

*Chi. Urban League v. State*,
  No. 08 CH 30490, 2009 WL 1632604 (Ill. Cir. Ct. Apr. 15, 2009).........................51

*Chortek v. City of Milwaukee*,
  356 F.3d 740 (7th Cir. 2004) ...................................................................22

*Church v. City of Huntsville*,
  30 F.3d 1332 (11th Cir. 1994) ...........................................................9, 10

*Ciarpaglini v. Norwood*,
  817 F.3d 541 (7th Cir. 2016) ...................................................................19

*City of L.A. v. Wells Fargo & Co.*,
  No. 2:13-CV-09007-ODW(RZx), 2015 WL 4398858 (C.D. Cal. July 17, 2015) ................................................................................50

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................... 3, 4, 11

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................................ 3

*Collier v. Rock Island Police Officers,*
    No. 4:14-cv-4103-SLD-JEH, 2016 WL 5796765 (C.D. Ill. Sept. 30, 2016) ........................... 25

*Common Cause/Ga. v. Billups,*
    554 F.3d 1340 (11th Cir. 2009) ............................................................................... 16

*Communities Actively Living Independent & Free v. City of Los Angeles,*
    No. CV 09-0287 CBM (RZx), 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) ................. 43, 44

*Crawford v. Marion County Election Board,*
    472 F.3d 949 (7th Cir. 2007) ........................................................................... 14, 15, 16

*CTL ex rel. Trebatoski v. Ashland Sch. Dist.,*
    743 F.3d 524 (7th Cir. 2014) ................................................................................... 28

*Dadian v. Vill. of Wilmette,*
    269 F.3d 831 (7th Cir. 2001) ................................................................................... 40

*Daniels v. Southfort,*
    6 F.3d 482 (7th Cir. 1993) ................................................................................. 12, 14

*Earl v. Espejo,*
    No. 17 C 195, 2017 WL 3704826 (N.D. Ill. Aug. 28, 2017) ............................................ 40

*Enos v. Arizona,*
    No. CV-16-00384-PHX-JJT, 2017 WL 553039 (D. Ariz. Feb. 10, 2017) ....................... 10, 44

*Ezell v. City of Chi.,*
    651 F.3d 684 (7th Cir. 2011) .................................................................................... 3

*Fair Elections Ohio v. Husted,*
    770 F.3d 456 (6th Cir. 2014) ................................................................................. 13, 14

*Fla. State Conference of NAACP v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ................................................................................ 5, 7

*Flores v. City of Westminster,*
    873 F.3d 739 (9th Cir. 2017), *appeal docketed*, No. 17-1101 (Feb. 7, 2018) ..................... 25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Floyd v. City of N.Y.*,
    283 F.R.D. 153 (S.D.N.Y. 2012) ...................................................................7

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*,
    528 U.S. 167 (2000)...........................................................................19, 21

*Gable v. City of Chicago*,
    296 F.3d 531 (7th Cir. 2002) .....................................................................25

*Gohier v. Enright*,
    186 F.3d 1216 (10th Cir. 1999) ............................................................31, 36

*Gomez v. City of West Chi.*,
    506 F. Supp. 1241 (N.D. Ill. 1981) ............................................................8

*Gorman v. Bartch*,
    152 F.3d 907 (8th Cir. 1998) .....................................................................30

*Grubbs v. Hous. Auth. of Joliet*,
    91 C 6454, 1997 WL 281297 (N.D. Ill. May 20, 1997) ..........................46

*Hainze v. Richards*,
    207 F.3d 795 (5th Cir. 2000) ...............................................................35, 36

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................13, 15

*Hicks v. City of Chicago*,
    No. 15 C 06852, 2017 WL 4339828 (N.D. Ill. Sept. 9, 2017)..................28

*Hobart v. City of Stafford*,
    No. 4:09-CV-3332, 2010 WL 3894112 (S.D. Tex. Sept. 29, 2010) ..........33

*Hobley v. Burge*,
    No. 03 C 3678, 2004 WL 2658075 (N.D. Ill. Oct. 13, 2004) ...................27

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) ....................................................................7

*Hogan v. City of Easton*,
    Civ. No. 04-759, 2004 WL 1836992 (E.D. Pa. Aug. 17, 2004) ..........41, 42

*Honig v. Doe*,
    484 U.S. 305 (1988).................................................................................4, 8

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Horton v. Burks*,
    No. 83 C 6484, 1986 WL 11003 (N.D. Ill. Oct. 1, 1986) ......................................................18

*Hvorcik v. Sheahan*,
    870 F. Supp. 864 (N.D. Ill. 1994) .........................................................................................6, 7

*Illinois Migrant Council v. Pilliod*,
    540 F.2d 1062 (7th Cir. 1976) ............................................................................................7, 13

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
    No. 3:08-CV-0546-D, 2016 WL 4494322 (N.D. Tex. Aug. 26, 2016) ...................................50

*Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Treasury*,
    No. 3:14-CV-3013-D, 2016 WL 6397643 (N.D. Tex. Oct. 28, 2016) ...................................50

*J.V. ex rel. C v. Albuquerque Public Schs.*,
    813 F.3d 1289 (10th Cir. 2016) .............................................................................................41

*Johnson v. California*,
    543 U.S. 499 (2005)..................................................................................................................5

*Johnson v. City of Chi.*,
    No. 10 C 2850, 2010 WL 4790905 (N.D. Ill. Nov. 18, 2010)................................................26

*Johnson v. Johnson*,
    No. 07 C 7036, 2008 WL 4874190 (N.D. Ill. June 26, 2008) ................................................26

*Jones v. Lacey*,
    108 F.Supp.3d 573, 588 (E.D. Mich. 2015)...........................................................................30

*Judicial Watch, Inc. v. King*,
    993 F. Supp. 2d 919 (S.D. Ind. 2012) ....................................................................................14

*Kikumura v. Turner*,
    28 F.3d 592 (7th Cir. 1994) ....................................................................................................19

*Kliegman v. County of Humboldt*,
    No. 09 CV 0006 NJV, 2010 WL 2382445 (N.D. Cal. June 10, 2010) ...................................20

*LaDuke v. Nelson*,
    762 F.2d 1318 (9th Cir. 1985) ...............................................................................................12

*Latuszkin v. City of Chicago*,
    250 F.3d 502 (7th Cir. 2001) ..................................................................................................27

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*League of United Latin Am. Citizens (LULAC) of Wis. v. Deininger*,
   No. 12-C-0185, 2013 WL 5230795 (E.D. Wis. Sept. 17, 2013)............................................14

*Leslie v. Bd. of Educ.*,
   379 F. Supp. 2d 952 (N.D. Ill. 2005) ..............................................................................50, 51

*Lewis v. Truitt*,
   960 F. Supp. 175 (S.D. Ind. 1997) ........................................................................................41

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................................................3

*Lynch v. Baxley*,
   744 F.2d 1452 (11th Cir. 1984) .............................................................................................9

*Mata v. Ill. State Police*,
   No. 00 C 0676, 2001 WL 292804 (N.D. Ill. Mar. 22, 2001) .................................................44

*McFadden ex rel. McFadden v. Bd. of Educ.*,
   No. 05 C 0760, 2006 WL 6284486 (N.D. Ill. Oct. 3, 2006) ..................................................46

*McQueen v. City of Chi.*,
   803 F. Supp. 2d 892 (N.D. Ill. 2011) ....................................................................................44

*McWright v. Alexander*,
   982 F.2d 222 (7th Cir. 1992) ................................................................................................40

*Md. State Conference of NAACP Branches v. Md. Dep't of State Police*,
   72 F. Supp. 2d 560 (D. Md. 1999)..........................................................................7, 8, 11, 49

*Estate of Michelle Robey v. City of Chicago*,
   No. 17-CV-2378, 2018 WL 688316 (N.D. Ill. Feb. 2, 2018) .................................................38

*Miranda v. Wis. Power & Light Co.*,
   91 F.3d 1011 (7th Cir. 1996) ................................................................................................44

*Monell v. Department of Social Services*,
   436 U.S. 658 (1978)...............................................................................................................22

*Morais v. City of Philadelphia*,
   No. 06-582, 2007 WL 853811 (E.D. Penn. Mar. 19, 2007) .............................................33, 38

*Moranski v. Gen. Motors Corp.*,
   433 F.3d 537 (7th Cir.2005) .................................................................................................44

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Murdock-Alexander v. Tempsnow Emp't & Placement Servs.*,
　No. 16-CV-5182, 2016 WL 6833961 (N.D. Ill. Nov. 21, 2016) ............................................45

*Murphy v. Hunt*,
　455 U.S. 478 (1982)...................................................................................................................4

*Nat'l Congress for Puerto Rican Rights v. City of N.Y.*,
　75 F. Supp. 2d 154 (S.D.N.Y. 1999)..............................................................................7, 8, 13

*Nat'l R.R. Passenger v. Morgan*,
　536 U.S. 101 (2002)................................................................................................................25

*O'Shea v. Littleton*,
　414 U.S. 488 (1974)...........................................................................................................4, 10

*Oconomowoc Residential Programs, Inc. v. City of Milwaukee*,
　300 F.3d 775 (7th Cir. 2002) .............................................................................................29, 41

*Pa. Prot. & Advocacy, Inc. v. Houston*,
　136 F.Supp.2d 353 (E.D. Pa. 2001) .......................................................................................14

*Paine v. City of Chicago*,
　No. 06 C 3173, 2009 WL 10687409 (N.D. Ill. May 21, 2009) ...............................................41

*Palmer v. City of Chi.*,
　755 F.2d 560 (7th Cir. 1985) ....................................................................................................5

*Pennsylvania Chiropractic Association v. Blue Cross Blue Shield Association*,
　No. 09 C 5619, 2010 WL1979569 (N.D. Ill. May 17, 2010) ..................................................17

*Perez v. Abbott*,
　267 F. Supp. 3d 750 (W.D. Tex. 2017)...................................................................................14

*PETA v. U.S. Dep't of Agric.*,
　797 F.3d 1087 (D.C. Cir. 2015) .......................................................................................14, 16

*Phipps v. Sheriff of Cook Cnty.*,
　681 F.Supp.2d 899 (N.D. Ill. 2009) ........................................................................................39

*Plotkin v. Ryan*,
　239 F.3d 882 (7th Cir. 2001) .............................................................................................17, 18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Poole v. Gatson Cnty.*,
   No. 3:15-CV-00309-FDW-DCK, 2016 WL 4267792 (W.D.N.C. Aug. 11,
   2016) ...................................................................................................................................41

*Prison Legal News v. County of Cook, Illinois*,
   No. 16-cv-6862, 2016 WL 6833977 (N.D. Ill. Nov. 21, 2016) .............................................19

*Rakas v. Illinois*,
   439 U.S. 128 (1978)..............................................................................................................12

*Raytheon Co. v. Hernandez*,
   540 U.S. 44 (2003)................................................................................................................42

*Rembert v. Sheahan*,
   62 F.3d 937 (7th Cir. 1995) ...................................................................................19, 20, 21

*Roberts v. City of Chi.*,
   817 F.3d 561 (7th Cir. 2016) .........................................................................................45, 46

*Roberts v. City of Omaha*,
   723 F.3d 966 (8th Cir. 2013) .....................................................................................35, 41, 42

*Robinson v. City of Chi.*,
   868 F.2d 959 (7th Cir. 1989) ...................................................................................................5

*Rodriguez v. Cal. Highway Patrol*,
   89 F. Supp. 2d 1131 (N.D. Cal. 2000) ..................................................................................49

*Roe v. City of N.Y.*,
   151 F. Supp. 2d 495 (S.D.N.Y. 2001)........................................................................ 7, passim

*Roell v. Hamilton County*,
   870 F.3d 471 (6th Cir. 2017) .................................................................................................40

*S.J. v. Perspectives Charter School*,
   685 F. Supp. 2d 847 (N.D. Ill. 2010) ....................................................................................46

*Salinas v. City of New Braunfels*,
   557 F. Supp. 2d 777 (W.D. Tex. 2006)..................................................................................30

*Estate of Saylor v. Regal Cinemas, Inc.*,
   54 F. Supp. 3d 409, 425-28 (D. Md. 2014)......................................................................41, 42

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sch. Bd. of Nassau Cnty. v. Arline*,
480 U.S. 273 (1987) ................................................................................36

*Schorr v. Borough of Lemoyne*,
243 F. Supp. 2d 232 (M.D. Pa. 2003) ......................................30, 37, 41

*Schreiner v. City of Gresham*,
681 F. Supp. 2d 1270 (D. Or. 2010) ....................................................32

*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*,
673 F.3d 333 (4th Cir. 2012) .................................................................36

*Sheehan v. City & Cnty. of S.F.*,
743 F.3d 1211 (9th Cir. 2014) ................................................30, 32, 35

*Smith v. City of Chicago*,
143 F. Supp. 3d 741 (N.D. Ill. 2015) .....................................6, 13, 20

*Spearman v. Elizondo*,
230 F. Supp. 3d 888, 895 (N.D. Ill. 2016) .............................................26

*Spencer v. Dawson*,
No. 04 C 5048, 2006 WL 3253574 (N.D. Ill. Nov. 7, 2006) ...........30, 36

*Spencer v. Kemma*,
523 U.S. 1 (1998) ....................................................................................4

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008) ...................................................................18

*Stanfield v. Dart*,
No. 10 C6569, 2011 WL 1429172 (N.D. Ill. Apr. 14, 2011) ..................51

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014) .............................................................................3

*Swan v. Bd. of Educ.*,
No. 13 C 3623, 2013 WL 3872799 (N.D. Ill. July 25, 2013) .................42

*Taylor v. Schaffer*,
No. 1:14-CV-123-jgm, 2015 WL 541058 (D. Vt. Feb. 10, 2015) ....32, 38

*Teesdale v. City of Ch.*,
690 F.3d 829 (7th Cir. 2012) ...............................................................22

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Texas Dep't of Housing & Comty Affairs v. Inclusive Cmtys Project, Inc.*,
  135 S. Ct. 2507 (2015) ......................................................................................51, 52

*Thao v. City of St. Paul*,
  No. 03-5306 PAM/RLE, 2006 WL 1004379 (D. Minn. Apr. 13, 2006) ...............................41

*Thomas v. County of Los Angeles*,
  978 F.2d 504 (9th Cir. 1992) .................................................................7, 8, 12, 13

*Toledo v. Sanchez*,
  454 F.3d 24 (1st Cir. 2006) ..................................................................................32

*Transit Express, Inc. v. Ettinger*,
  246 F.3d 1018 (7th Cir. 2001) ..............................................................................19

*Turner v. Wells*,
  No. 16-15692, 2018 WL 456955 (11th Cir. Jan. 18, 2018) ...................................18

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) .............................................................................................19

*Village of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) .........................................................................14, 15

*Wagoner v. Lemmon*,
  778 F.3d 586 (7th Cir. 2015) ................................................................................28

*Waller ex rel. Estate of Hunt v. City of Danville*,
  556 F.3d 171 (4th Cir. 2009) ...........................................................................31, 42

*Waller v. City of Danville*,
  515 F. Supp. 2d 659 (W.D. Va. 2007) ...................................................................41

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.*,
  181 F.3d 840 (7th Cir. 1999) ................................................................................32

*Washington v. Pierce*,
  No. 16 cv 9880, 2017 WL 1437054 (N.D. Ill. Apr. 24, 2017) ..............................28

*White v. O'Leary*,
  742 F. Supp. 990 (N.D. Ill. 1990) .........................................................................46

*Wisc. Cmty. Servs., Inc. v. City of Milwaukee*,
  465 F.3d 737 (7th Cir. 2006) ................................................................................32

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**STATE CASES**

*CANA v. City of Chicago*,
    1 N.E.3d 976 (Ill. App. Ct. 2013) ........................................................................48

*Newell v. City of Elgin*,
    34 Ill. App. 3d 719 (1976) ...................................................................................46

*People v. Cornelius*,
    213 Ill.2d 178 (2004) ..........................................................................................47

*Thomann v. Dep't of State Police*,
    66 N.E.3d 834 (Ill. App. Ct. 2016), *appeal denied*, 77 N.E.3d 86 (Ill. 2017) ........47

**FEDERAL STATUTES**

42 U.S.C. § 2000d *et seq.* ............................................................................................48

42 U.S.C. § 3604 ..........................................................................................................15

42 U.S.C. § 12132 ........................................................................................................28

**STATUTES - OTHER**

740 ILCS 23/5 ...............................................................................................................47

740 ILCS 23/5(a)(2) .....................................................................................................48

**FEDERAL REGULATIONS**

28 C.F.R. § 35.130(b)(7) ..............................................................................................32

28 C.F.R. § 35.139 .......................................................................................................36

28 C.F.R. § 35.139(b) ..................................................................................................36

28 C.F.R. § 35.160–164 ...............................................................................................35

28 C.F.R. § 42.101 .......................................................................................................48

28 C.F.R. § 42.503(e), (f) ............................................................................................35

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 101–485, pt. III (1990), *reprinted in* 1990 U.S.C.C.A.N. 445 ...............41

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

OTHER AUTHORITIES

Civil Rights Division, U.S. Dep't of Justice, *Examples and Resources to Support
Criminal Justice Entities in Compliance with Title II of the Americans with
Disabilities Act* (2017), https://www.ada.gov/cjta.html ............................................................ 29

Civil Rights Division, U.S. Dep't of Justice, *Examples and Resources to Support
Criminal Justice Entities in Compliance with Title II of the Americans with
Disabilities Act* (2017), https://www.ada.gov/cjta.html ............................................................ 37

Disability Rights Section, U.S. Dep't of Justice, *The ADA and City Governments:
Common Problems* (2008), https://www.ada.gov/comprob.htm ............................................. 29

Letter from Thomas E. Perez, Assistant Attorney Gen., U.S. Dep't Justice Civil
Rights Div., to Bill Montgomery, Cnty. Attorney, Maricopa Cnty. (Dec. 15,
2001); http://www.justice.gov/crt/about/spl/documents/mcso_findletter_12-
15-11.pdf ................................................................................................................................ 49

Letter from Thomas E. Perez, Assistant Attorney Gen., U.S. Dep't Justice Civil
Rights Div., to Leroy D. Baca, Sheriff, L.A. Cnty. Sheriff's Dep't (June 28,
2013); http://www.justice.gov/crt/about/spl/documents/antelope_findings_6-
28-13.pdf ................................................................................................................................ 49

## **INTRODUCTION**

Residents of Chicago deserve an enforceable commitment from the defendant City of Chicago ("City") to reform its well-documented policies and practices of unlawful use of force. They do not have one.  Plaintiffs' members include black and Latino residents, who are disproportionately subjected to the City's unjustified use of force, and people with disabilities, whose routine interactions with police too often unnecessarily escalate to severe injury when undertrained officers misread and mishandle symptoms of disabilities.  These harms will only continue as the City fails to meaningfully reform the Chicago Police Department ("CPD"). Plaintiffs bring this injunctive suit to ensure that the City no longer systematically violates the constitutional and civil rights of black residents, Latino residents, and residents with disabilities. Their pleading demonstrates their legal rights to do so.  The City's motion to dismiss does not allow it to avoid review.

The City's kitchen-sink motion mischaracterizes both the law and Plaintiffs' allegations. The City first attempts to avoid judicial scrutiny by questioning the court's subject matter jurisdiction, with misstatements of governing law and analogies to inapposite cases.  The City challenges Plaintiffs' associational standing by relying on cases that reject such standing when courts would have to assume that the plaintiffs will voluntarily engage in future illegal conduct; here, Plaintiffs describe how their members face a substantial threat of unreasonable and excessive police force even when they do nothing unlawful.  The City next advances an unjustifiably narrow view of organizational standing, in part arguing that the Court should reject its applicability when the plaintiffs' claims are equitable.  These arguments are contrary to extensive authority.  The City even argues that, because it has very recently adopted new policies that address some but not all of their past unlawful practices, this Court has no jurisdiction to

consider how those revisions were incomplete or to allow Plaintiffs to test in discovery whether the City's actual *practices* have changed. Courts do not allow a defendant to evade scrutiny of its unlawful behavior based merely on claims that it will do better in the future. This Court has jurisdiction over Plaintiffs' claims because they have Article III standing and their claims are, unfortunately, far from moot.

The City also presents a myriad of novel reasons for why the Plaintiffs have not stated claims. None of these arguments has merit. The City will have ample opportunity to seek to disprove Plaintiffs' allegations after discovery, but Plaintiffs have unquestionably pleaded far more than plausible claims for relief. For example, the City argues that Plaintiffs have not plausibly alleged a policy and practice of the use of excessive force. That argument is meritless in light of the extensive allegations supporting the existence of *multiple* policies and practices, many of which have been compellingly corroborated by the 2017 investigative report prepared by the United States Department Justice ("DOJ"), which is attached to the Amended Complaint ("Complaint"). Plaintiffs also plead facts showing the challenged policies and practices are ongoing. The motion to dismiss should be denied in its entirety: Plaintiffs state claims under the Fourth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, the Illinois constitution, and the Illinois Civil Rights Act.

## ARGUMENT

## I. THIS COURT HAS SUBJECT MATTER JURISDICTION

### A. Plaintiffs Have Associational Standing

All Plaintiffs allege that they have standing to sue on behalf of their members. To do so, they must plausibly allege that "(1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purpose; and (3) neither the claim asserted nor the relief requested requires the participation of

individual association members in the lawsuit." *Ezell v. City of Chi.*, 651 F.3d 684, 696 (7th Cir. 2011). Here, the City argues that Plaintiffs have failed to satisfy only the first requirement, that their members would have standing to sue in their own right. City's Mot. to Dismiss ("Mot.") at 5. That argument, based on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is meritless.

"To establish Article III standing, a plaintiff [or a member of the Plaintiff associations] must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'like[lihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Ezell*, 651 F.3d at 695 (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010)). Again, the City argues, based on *Lyons*, that Plaintiffs have not satisfied only the first requirement, injury in fact.

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Id.* at 2341 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09, 414 n.5 (2013)). Here, Plaintiffs have alleged facts sufficient to show that their members are at substantial risk of being subjected to unlawful force by the Chicago police, as well as having their rights that are protected by the ADA and Rehabilitation Act violated.

The City relies principally on the Supreme Court's decision in *Lyons*. There, the Court held that the plaintiff lacked standing because his allegations did "nothing to establish a real and

3

immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Lyons*, 461 U.S. at 105. The plaintiff in *Lyons* had not shown that he was likely to engage in illegal conduct in the future, or that Los Angeles had a practice of using chokeholds on individuals who did not act illegally. *Id.* at 105-10 & nn.7, 9.

The City's reliance on *Lyons* is misplaced for two reasons. Unlike in *Lyons*, Plaintiffs' claims do not depend upon an assumption that their members will voluntarily engage in unlawful conduct in the future, and Plaintiffs have adequately alleged that the City has engaged in a pattern and practice of the unlawful use of force.

### 1. Plaintiffs' Claims Do Not Depend Upon an Assumption that Their Members Will Voluntarily Engage in Unlawful Conduct

The Supreme Court has interpreted *Lyons* as requiring that, "for purposes of assessing the likelihood that state authorities will inflict a given injury, [a court must be] unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Honig v. Doe*, 484 U.S. 305, 320 (1988). Thus, the Court noted that it had denied standing where there was "no reason to believe that a party challenging denial of pre-trial bail 'will once again be in a position to demand bail,'" *id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 484 (1982)), and where it was "unlikely that parties challenging discriminatory bond-setting, sentencing, and jury-fee practices would again violate valid criminal laws," *id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)). *See also Spencer v. Kemma*, 523 U.S. 1, 15 (1998) (rejecting a plaintiff's standing because the asserted future injury "was contingent upon [his] violating the law, getting caught, and getting convicted").

The Seventh Circuit, consistent with this Supreme Court authority, has interpreted *Lyons* to preclude standing where the likelihood of future injury depended upon future illegal conduct

by the plaintiff. *See Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004) (plaintiff did not have standing because "[o]nly if *he* is apt to be arrested and searched again would prospective relief be apt, and nothing in this record suggests that [plaintiff] is a repeat offender"); *Robinson v. City of Chi.*, 868 F.2d 959, 966 (7th Cir. 1989) (plaintiffs did not have standing, where "[b]ecause the various plaintiffs' future conduct presumably will give the police no probable cause to arrest them, they cannot expect that they will encounter the police"); *Palmer v. City of Chi.*, 755 F.2d 560, 572 n.9 (7th Cir. 1985) ("when considering the likelihood that the . . . plaintiffs will suffer future harm from the defendants' alleged practice of withholding exculpatory evidence contained in 'street files,' '[w]e must assume that [the plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct'" (citations omitted)).

Other circuits have applied *Lyons* the same way. *See, e.g.*, *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1162-64 (11th Cir. 2008) (distinguishing *Lyons* where "the chain of events leading to the eventual injury does not begin with the assumption that someone will commit an illegal act"); *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001) ("standing is inappropriate where the future injury could be inflicted only in the event of future illegal conduct by the plaintiff"), *abrogated on other grounds by Johnson v. Calif.*, 543 U.S. 499 (2005).

Here, Plaintiffs' standing does not depend upon an assumption that their members will voluntarily engage in illegal conduct in the future. Plaintiffs allege that they need relief because "[their] members are at risk of being subjected to CPD's pattern or practice of using excessive force against people who do *not* present a threat and who are *not* suspected of a crime." Compl. ¶¶ 97, 155, 168, 173, 236 (emphasis added). The DOJ concluded, following its investigation, that "CPD's pattern or practice of unreasonable force includes using excessive force against

people who do not present a threat and who are suspected only of low-level crimes or, in some cases, no crime at all." *Id.*, Ex. A at 32. The Complaint includes numerous specific allegations that Plaintiffs' members have been and are likely to be subjected to unlawful force by Chicago police even if their encounters with the police do not involve anything other than innocent behavior on their part, such as making a 911 call, *see id.* ¶¶ 181-194; being victimized by others' illegal conduct, *see id.* ¶¶ 169, 175, 177-180, 181-194, 238; walking, driving, or bicycling down the street while appearing to be black or Latino, *see id.* ¶¶ 52, 131-144, 157-161, 240, 244; in the case of Plaintiffs' members with disabilities, simply needing assistance, *see id.* ¶¶ 67-85, 120-127; or engaging in conduct that is misinterpreted as illegal conduct by poorly trained police officers, *see id.* ¶¶ 99, 100, 169, 175, 238. *See also id.* ¶ 65 & Ex. B at 117.

Courts have frequently distinguished *Lyons* and found that plaintiffs *do* have standing (1) where the likelihood of future injury does not depend upon an assumption that the plaintiffs will engage in illegal conduct in the future, (2) where it is alleged that particular racial or other groups have been targeted, or (3) where the plaintiffs' disabilities mean that they may not always be able to conform their conduct to the law or they may engage in behavior that is misinterpreted by law enforcement. All three exceptions are present here.

First, *Lyons* does not apply here because Plaintiffs allege that the City subjects their members to unlawful force even when they have not engaged in illegal conduct. In *Smith v. City of Chicago*, 143 F. Supp. 3d 741 (N.D. Ill. 2015), this Court (Judge St. Eve) distinguished *Lyons* because the *Smith* Plaintiffs had "alleged that they were engaging in innocent, lawful conduct— not unlawful conduct—prior to the alleged suspicionless stops and/or frisks, such as walking home from the grocery store." *Id.* at 752 (finding standing to challenge Chicago police policies and practices). In *Hvorcik v. Sheahan*, 870 F. Supp. 864 (N.D. Ill. 1994), this Court (Judge

Shadur) held that the plaintiffs had standing to challenge the Cook County Sheriff's failure to adopt policies that would minimize the presence of invalid warrants in its computerized record system. *Id*. at 867. The Court explained that standing was proper because "further criminal activity (or even asserted criminal activity) . . . is not at all necessary for the peril posed by the Sheriff's unconstitutional conduct to be converted into reality"; rather, the plaintiffs were at risk of future arrests based on invalid warrants even if they refrained from unlawful conduct. *Id*. Lastly, in *Hodgers-Durgin v. de la Vina*, the Ninth Circuit distinguished *Lyons* because "plaintiffs did nothing illegal to prompt the stops by the Border Patrol." 199 F.3d 1037, 1041 (9th Cir. 1999).[1]

Second, *Lyons* does not apply because Plaintiffs have plausibly alleged that the City's unlawful practices target identifiable groups, specifically black and Latino Chicagoans. In *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062 (7th Cir. 1976), the Seventh Circuit held the plaintiffs had standing because "[they] will be subjected to continued injury by the very nature of the policy challenged, viz., the questioning of individuals based on their racial characteristics." *Id*. at 1068. Other courts have reached similar conclusions. In *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992), for example, the Ninth Circuit upheld standing, over a *Lyons* argument, where plaintiffs alleged that "the misconduct is purposefully aimed at minorities." *Id*.

---

[1] *See also Fla. State Conference*, 522 F.3d at 1163-64 (distinguishing *Lyons* because "the chain of events leading to the eventual injury does not begin with an assumption that someone will commit an illegal act"); *Barrios v. City of Chi.*, No. 15 C 2648, 2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016) ("This case is distinguishable from *Lyons* because no allegations about intent to engage in future illegal activity are necessary."); *Floyd v. City of N.Y.*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (plaintiff had standing where he was "stopped and frisked while going about his daily life—walking down the sidewalk, sitting on a bench, getting into a car"); *Roe v. City of N.Y.*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001) (distinguishing *Lyons* because "the [complaint] alleges that the NYPD arrests [needle exchange program] members for engaging in *lawful* behavior" (emphasis in original)); *Md. State Conference of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 565 (D. Md. 1999) (plaintiffs had standing where "they may be stopped even if no traffic violation has been committed"); *Nat'l Cong. for Puerto Rican Rights v. City of N.Y.*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (distinguishing *Lyons* because "unlike the plaintiff in *Lyons*, plaintiffs do not have to break the law to be exposed to the alleged constitutional violations.").

at 508. In *National Congress for Puerto Rican Rights,* the district court held that the plaintiffs had standing where they alleged that the NYPD had a practice of "subject[ing] residents of high crime areas, particularly Black and Latino men, to stops and frisks based not on reasonable suspicion but on their race and national origin." 75 F. Supp. 2d at 158, 161; *see also Md. State Conference of NAACP Branches*, 72 F. Supp. 2d at 564-65 (plaintiffs had standing where they alleged "a pattern and practice of stops by the Maryland State Police based upon race"); *Gomez v. City of West Chi.*, 506 F. Supp. 1241, 1243 (N.D. Ill. 1981) (plaintiffs had standing where "treatment has been directed against plaintiffs solely because of their race and national origin").

Third, *Lyons* does not apply because Plaintiffs have alleged their members will be subjected to unreasonable force and ADA violations both because (1) they "will become the subject of a future 911 call dispatched to the CPD when the member or a family member calls 911 for emergency assistance related to the member's disability" and (2) "their disabilities manifest in ways that can be mistaken for criminal activity." Compl. ¶ 99. In *Honig*, the Supreme Court held that a plaintiff could challenge school authorities' practice of unilaterally excluding children from the classroom for dangerous or disruptive conduct growing out of their disabilities. 484 U.S. at 308, 317-23. The Court emphasized that, notwithstanding *Lyons*, no "reluctance" to assume that the plaintiff would repeat the type of misconduct that would place him at risk of injury was "warranted" because "[i]t is [plaintiff's] very inability to conform his conduct to socially acceptable norms that renders him 'handicapped' within the meaning of the [Education of the Handicapped Act]." *Id*. at 320. Because the record was "replete with evidence that [plaintiff] is unable to govern his aggressive, impulsive behavior," it was "certainly reasonable to expect . . . that he will again engage in classroom misconduct." *Id*.

Courts of appeal have also recognized the impact disabilities have on standing inquiries. In *Armstrong*, the plaintiffs sought to challenge California's alleged discrimination against prisoners and parolees with disabilities during parole and parole revocation hearing processes. 275 F.3d at 854. The State of California argued that the plaintiffs lacked standing under *Lyons* because "their right to parole and parole revocation hearings depends upon their engaging in illegal conduct that they are under an obligation to avoid." *Id*. at 865. The Ninth Circuit rejected the *Lyons* argument, in part because "a person with disabilities is more likely to be suspected of conduct that results in the revocation of parole than other parolees." *Id*. at 867. As the district court had found, "hearing impaired, learning impaired, and developmentally disabled individuals engage in a range of coping mechanisms that can give the false impression of uncooperative behavior or lack of remorse." *Id*. That fact made it "more likely that such parolees will be subjected to the parole revocation process, even though they have not committed any unlawful act or violated any condition of their parole." *Id*. So too here Plaintiffs' members with disabilities are more likely to be subject to encounters with the CPD and the use of unreasonable force even if they have not committed any unlawful act.

The Eleventh Circuit reached a similar conclusion. In *Lynch v. Baxley*, the court held, over a *Lyons* argument, that a plaintiff with mental illness had standing to seek an injunction against Alabama's practice of detaining individuals in county jails pending civil commitment hearings. 744 F.2d 1452, 1456-57 & nn.6, 7 (11th Cir. 1984). Although he was no longer incarcerated, "[plaintiff was] at risk of being detained in jail not because of volitional acts on his part but because his mental condition would prompt his family, as it [had] on two previous occasions, to petition for involuntary commitment." *Id*. at 1457 n.7. And, in *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994), the Eleventh Circuit held, again over a *Lyons*

argument, that homeless plaintiffs had standing to challenge unconstitutional practices directed at homeless persons by the City of Huntsville. Relying on *Lynch* and distinguishing *Lyons*, the court emphasized the plaintiffs' allegation that "[f]orces beyond [their] control, such as illness, unemployment, penury, and [lack of public shelters] . . . have compelled [them] to live and sleep in public." *Id*. at 1338 (alterations in original). The court held that, "[b]ecause of the allegedly involuntary nature of their condition, the plaintiffs cannot avoid future 'exposure to the challenged course of conduct' in which the City allegedly engages." *Id*. (quoting *O'Shea*, 414 U.S. at 497); *see also Enos v. Arizona*, No. CV-16-00384-PHX-JJT, 2017 WL 553039, at *1, *4-5 (D. Ariz. Feb. 10, 2017) (deaf and hard-of-hearing plaintiffs had standing to pursue injunctive relief with regard to defendants' failure to provide text-to-911 service because they alleged a real likelihood they would have to contact 911 because they were elderly and lived with other elderly people and, in one instance, because the plaintiff had diabetes and multiple sclerosis).

Here, Plaintiffs allege that their members with disabilities are likely to come into contact with the CPD both because their disabilities manifest in ways that can be mistaken for criminal activity, *see Armstrong*, *supra*, and because they or their family members will need to call 911, *see Lynch*, *supra*; *Enos*, *supra*. In addition, Plaintiffs allege that their members with disabilities are especially likely to interact with CPD officers because they are much more likely than others to be the victims of crime. *E.g.*, Compl. ¶ 100. Those allegations are more than sufficient to show that Plaintiffs' members with disabilities would have standing to bring this action.

## 2. Plaintiffs Have Adequately Alleged an Official Pattern and Practice of Unlawful Use of Force

In *Lyons*, the Supreme Court emphasized—following discovery—that there was no "evidence showing a pattern of police behavior that would indicate that the official policy would permit the application of the control holds on a suspect that was not offering, or threatening to

10

offer, physical resistance." 416 U.S. at 110 n.9. In other words, there was no showing of any pattern or practice of the police using the chokehold, and therefore no likelihood that he would suffer a similar injury in the future. *See Md. State Conference of NAACP Branches*, 72 F. Supp. 2d at 564-65 (distinguishing *Lyons* because plaintiffs alleged a pattern and practice whereas "[t]he *Lyons* complaint . . . did not assert that there was a pattern and practice of applying chokeholds without provocation or, if it did state such a claim, the Court found it was not supported by the record").

Here, Plaintiffs allege—and the DOJ already has found—that "'CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable' and 'CPD officers' force practices unnecessarily endanger themselves and others and result in unnecessary and avoidable shooting and other uses of force.'" Compl. ¶ 1; *see also id*. ¶ 400 ("the City encouraged, tolerated, and ratified a widespread practice of excessive force"); *id*. ¶¶ 409, 419 (Defendant "maintain[ed] use of force policies and practices that disparately impact people with disabilities"); *id*. ¶ 431 ("The City has implemented and enforced a policy, practice, and/or custom of using excessive or unnecessary force against black and Latino individuals."). In addition, Plaintiffs allege specific examples of the use of unlawful force by the CPD. *See, e.g.*, Compl. ¶¶ 62-64, 67-85, 111, 127, 134-141, 188, 200, 215, 227, 247, 281, 362-398.

While establishing a pattern or practice almost always involves allegations regarding past actions, the question is not, as the City apparently contends, whether any specific act was directed at a named plaintiff, *see* Mot. at 7-10. Rather, particular past acts, in combination with other allegations, are relevant as *evidence* of the Plaintiffs' substantial risk of a likelihood of *future* injury. *See Roe*, 151 F. Supp. 2d at 503. Here, Plaintiffs allege many past unlawful uses of excessive force by the CPD, including against their members, which strengthens their showing

of a likelihood of future harm. *See Thomas*, 978 F.2d at 507 ("the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented" (quotation marks omitted)); *Roe*, 151 F. Supp. 2d at 502 ("Alleging that police have repeatedly committed unlawful acts strengthens a plaintiff's argument that future injury is likely.").[2]

The Supreme Court has expressly held that, "[w]here, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." *Allee v. Medrano*, 416 U.S. 802, 815 (1974). Accordingly, federal courts have consistently distinguished *Lyons* to find standing where plaintiffs have alleged the existence of a pattern or practice of unlawful official conduct. For example, in *LaDuke v. Nelson*, the Ninth Circuit distinguished *Lyons* because "the district court . . . found that the defendants engaged in a standard pattern of officially sanctioned police behavior," whereas the *Lyons* Court "pointed to the absence of 'any [record] evidence showing a pattern of police behavior' suggestive of an unconstitutional application of the chokehold." 762 F.2d 1318, 1324 (9th Cir. 1985). Similarly, in *Smith*, this Court distinguished *Lyons* because "Plaintiffs have alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly subjected them to unconstitutional stops and frisks." 143 F. Supp. 3d at 752.[3]

---

[2] The City cites *Daniels v. Southfort*, 6 F.3d 482 (7th Cir. 1993), for the proposition that courts may consider only incidents in which plaintiffs were injured to evaluate whether a pattern of police misconduct has been alleged. *See* Mot. at 10. In *Daniels*, the Seventh Circuit stated that, "[s]ince Fourth Amendment rights are personal and cannot be vicariously asserted," the plaintiff "lacked standing to complain about injuries to his friends," *Daniels*, 6 F.3d at 485 (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)). But what *Rakas* addressed was not whether a pattern sufficient to support injunctive relief in a civil case could be proven based on incidents not involving the plaintiff, but whether a criminal defendant could assert the Fourth Amendment rights of others in a motion to exclude evidence allegedly obtained unlawfully. *Rakas*, 439 U.S. at 133-34. In other words, neither *Daniels* nor *Rakas* requires that, to have standing in a civil action for injunctive relief, a plaintiff must prove there was a "pattern and practice" of targeting her personally. Rather, a plaintiff need show only that a broader pattern and practice creates a substantial risk that she will be injured in the future.

[3] Numerous other courts have reached similar conclusions. *See, e.g.*, *Church*, 30 F.3d at 1339 (finding standing and distinguishing *Lyons* where plaintiffs alleged a City "custom, practice and policy of

Plaintiffs have alleged at length and in detail the existence of a pattern and practice of police use of excessive force that has been encouraged, tolerated, and ratified by the City. Moreover, as Plaintiffs allege, the DOJ found that such a pattern and practice exists. Those allegations are unquestionably sufficient to support Plaintiffs' standing.

### B.     Plaintiffs Have Organizational Standing

Each of the Plaintiff organizations, other than the ACLU, alleges that it has been and continues to be required to divert resources from its mission in order to counteract the effects of the Chicago police's use of excessive force against blacks, Latinos, and individuals with disabilities. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), those allegations suffice to give Plaintiffs standing to pursue their claims for declaratory and injunctive relief. The City's arguments to the contrary are meritless.

First, the City argues that "*Havens* is inapplicable where, as here, an organization seeks only equitable relief." Mot. at 11. In support, the City notes that in *Havens*, the organization sought only damages, and cites dictum in a footnote in a Sixth Circuit decision, noting that same fact about *Havens*. Mot. at 11-12 (citing *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014)).[4] The City simply ignores extensive precedent in the Seventh Circuit and elsewhere holding that *Havens* does apply to claims for equitable relief.

---

arresting, harassing and otherwise interfering with homeless people"); *Thomas*, 978 F.2d at 508 (finding standing and distinguishing *Lyons* where the alleged misconduct "was condoned and tacitly authorized by department policy makers"); *Ill. Migrant Council*, 540 F.2d at 1067 (finding standing where "[plaintiffs'] injuries resulted from a practice and policy of the INS to question individuals about their alienage simply because they appeared to be of Mexican ancestry"); *Nat'l Cong. for Puerto Rican Rights*, 75 F. Supp. 2d at 161 (distinguishing *Lyons* because plaintiffs alleged "a pervasive pattern of unconstitutional stops and frisks").

[4] In *Fair Elections*, the Sixth Circuit held, at the summary judgment stage, that the plaintiff organizations did not have standing under *Havens* because they had failed to support their diversion-of-resources allegations with any evidence. 770 F.3d at 460.

In *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007), the Seventh Circuit held that the Democratic Party had standing under *Havens* to pursue only injunctive relief. In *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1525-26 (7th Cir. 1990), the Seventh Circuit held that the plaintiff organization had standing under *Havens* to pursue injunctive relief. Other circuits have done the same.[5]

Second, citing *Daniels*, 6 F.3d 482, the City argues that damages would be an adequate remedy for Plaintiffs' injuries, "rendering injunctive relief unavailable." Mot. at 12. But *Daniels* does not apply here, where Plaintiffs have properly alleged a pattern and practice of excessive use of force. In *Daniels*, the Seventh Circuit held that the plaintiff had not established "a reasonable probability that the conduct [at issue] was part of an official policy to the end that there is a substantial likelihood that future violations will occur" and had not alleged "a pattern of unconstitutional deprivation." 6 F.3d at 486. In that different context, damages were an adequate remedy for the individual instances of alleged past harassment of the plaintiff. *Id*.

Finally, the City argues that Plaintiffs have alleged only "'ordinary expenditures' within the organizations' stated missions," Mot. at 13, and therefore do not qualify for standing under *Havens*. The argument is meritless as well. In *Havens*, the plaintiff organization ("HOME") alleged that "[i]ts activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." 455 U.S. at 368. HOME alleged that the defendants had engaged in discriminatory "racial steering" in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3604. *Id*. at 366-67. In support of its standing,

---

[5] *E.g.*, *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1091, 1093-97 (D.C. Cir. 2015); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 355, 360-61 (5th Cir. 1999); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1339, 1341-42 (11th Cir. 2014). District courts have as well. *E.g.*, *Perez v. Abbott*, 267 F. Supp. 3d 750 (W.D. Tex. 2017); *League of United Latin Am. Citizens (LULAC) of Wis. v. Deininger*, No. 12-C-0185, 2013 WL 5230795 at *1 (E.D. Wis. Sept. 17, 2013); *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 920, 925 (S.D. Ind. 2012); *Pa. Prot. & Advocacy, Inc. v. Houston*, 136 F.Supp.2d 353, 361-62 (E.D. Pa. 2001).

HOME alleged that "'[it] has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.'" *Id*. at 379. In other words, it was forced to devote more resources to investigating and counteracting housing discrimination, at the expense of its housing-counseling service. The Supreme Court held:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id*. Thus, HOME's diversion of resources from one of its regular activities—operation of a housing counseling service—to another—investigation of housing discrimination— unquestionably sufficed to establish that it had standing. The Seventh Circuit has interpreted *Havens* in precisely this manner:

> *Havens* makes clear . . . that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination.

*Village of Bellwood v. Dwivedi*, 895 F.2d at 1526.

In *Crawford*, *supra*, the Seventh Circuit held that, under *Havens*, the Democratic Party had standing to challenge an Indiana voting law because "the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." 472 F.3d at 951. Although the Seventh Circuit does not expressly say so, this Court may take judicial notice of the fact that getting Democratic voters to the polls is a regular activity of the Democratic Party. That

15

its injury was a diversion of additional resources to one of its regular activities did not mean the

party lacked standing under *Havens*. *See also Ass'n of Cmty. Orgs. for Reform Now*, 178 F.3d at

360-61 (plaintiff had standing when it had expended resources on one of its regular activities due

to defendants' alleged statutory violations).

Other circuits have repeatedly held that re-direction of an organization's resources to

counteract a defendant's allegedly unlawful conduct suffices to establish standing under *Havens*.

For example, in *PETA*, the D.C. Circuit held:

> [T]he USDA's allegedly unlawful failure to apply the [Animal Welfare Act's]
> general animal welfare regulations to birds has "perceptibly impaired [plaintiff's]
> ability" to both bring AWA violations to the attention of the agency charged with
> preventing avian cruelty and continue to educate the public. Because [plaintiff]
> has expended resources to counter these injuries, it has established Article III
> organizational standing.

797 F.3d at 1095 (citation omitted).[6]

Here, Plaintiff organizations have unquestionably made allegations sufficient to support

their standing under these principles. Communities United alleges that its mission is "to advance

social justice by developing local leadership and empowering communities to identify and

address the root causes of inequity at the neighborhood, city, and state levels." Compl. ¶ 87. In

addition to alleging that its mission has been injured and continues to be injured by the Chicago

police's use of excessive force, *id.*, Communities United alleges that it has been forced to divert

resources to police reform and away from "its work on the school to prison pipeline, quality

---

[6] *See also Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132-33
(D.C. Cir. 2006) (allegation that plaintiff organization had to divert resources and time from other
activities in order to help members and the public address unduly burdensome FDA requirements
established standing under *Havens*); *Arcia*, 772 F.3d at 1341 ("Under the diversion-of-resources theory,
an organization has standing to sue when a defendant's illegal acts impair the organization's ability to
engage in its own projects by forcing the organization to divert resources in response."); *Common
Cause/Ga. v. Billups*, 554 F.3d 1340, 1345, 1350 (11th Cir. 2009) ("an organization has standing to sue
on its own behalf it the defendant's illegal acts impair its ability to engage in its projects by forcing the
organization to divert resources to counteract those illegal acts" (citation omitted)).

education, youth jobs, and access to health care," *id*. ¶ 95. *See also id*. ¶¶ 89-94. Each Plaintiff organization (other than the ACLU) makes similar allegations. *See id*. ¶¶ 145-153 (Community Renewal Society ("CRS")); ¶¶ 163-166 (Next Steps); ¶¶ 171-172 (ONE Northside).

The cases cited by the City do not support its argument. In *Association for Disabled Americans, Inc. v Claypool Holdings, LLC*, No. IP00-0344-C-T/G, 2001 WL 1112109 (S.D. Ind., Aug. 6, 2001), the court acknowledged that, "under *Havens Realty*, an organization suffers a concrete and demonstrable injury if it diverts resources such as time and money from its primary activities to legal efforts to fight alleged discrimination by the defendant." *Id*. at *14. But the court held, *at summary judgment*, that the plaintiff had not presented evidence that it had diverted resources from other areas of advocacy. *Id*. In *Pennsylvania Chiropractic Association v. Blue Cross Blue Shield Association*, No. 09 C 5619, 2010 WL1979569 (N.D. Ill. May 17, 2010), the court similarly acknowledged that, "[i]f . . . the association alleges a 'perceptible impair[ment]' of its activities resulting from it having to divert resources to address defendants' actions, it has independent standing." *Id*. at *20 (citation omitted). In that case, however, the plaintiff had *not* been forced to divert resources from other work in order to address the defendants' allegedly unlawful practices. *Id*. Finally, in *Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001), the plaintiff organization claimed it had standing "simply by reason of its expenditure of time and money in pursuing the alleged fraud." *Id*. at 886. The court found, however, that the plaintiff had merely alleged "ordinary expenditures as part of [its] purpose," and no diversion from that primary purpose. *Id*. That is certainly not the situation here.

### C. **Plaintiffs' Claims Are Not Moot**

The City contends that Plaintiffs' claims are moot because the City and the CPD revised some policies in October 2017, and the City is in negotiations with the Illinois Attorney General

concerning a possible consent decree.[7] The City does not, and could not, contend that the

revised policies address all of the unlawful practices alleged in Plaintiff's Complaint. *See, e.g.*,

Compl. ¶¶ 288-300, 307, 312-315, 323, 328, 336-340, 344-346.

Moreover, the City does not present any evidence that, regardless of written policies, the

pattern and practice of using excessive force that was found by the DOJ, and about which

Plaintiffs complain, has ceased. Notably, the pre-existing CPD "Use of Force Guidelines,"

Conway Decl. [Mot. Ex. A], Ex. 1, both (1) authorized the use of only such force as is

"reasonably necessary based on the totality of the circumstances" and (2) stated that "[t]he use of

excessive force or unwarranted physical force or unprofessional conduct by a Department

member will not be tolerated." *Id.* ¶¶ III(A), (B). As the DOJ found and the Complaint alleges,

neither of these policies was remotely followed or enforced by the CPD.

Further, Plaintiffs allege that the City has previously promised change and failed to

follow through. *See, e.g.*, Compl. ¶ 6 (referring to "[d]ecades of half-measures and empty

promises" to self-reform). Particularly given that the Court must "must accept the complaint's

well-pleaded factual allegations as true and draw reasonable inferences from those allegations in

the plaintiff's favor" when assessing a mootness challenge, *Transit Express, Inc. v. Ettinger*, 246

---

[7] The City relies extensively on newspaper articles and other media reports, arguing that this Court may take judicial notice of those. *See* Mot. at 16 n.6. While a court may take judicial notice of such articles and reports to show that certain statements were *made* in the press, a court may not consider media reports for the *truth* of the statements made in them. *See Turner v. Wells*, No. 16-15692, 2018 WL 456955 at *12 n.5 (11th Cir. Jan. 18, 2018) ("[C]ourts may take judicial notice of documents such as newspaper articles for a limited purpose, but not for determining the truth of those statements."); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (judicial notice of media reports proper where "none of those materials were offered for the truth of the matter asserted"); *Horton v. Burks*, No. 83 C 6484, 1986 WL 11003, at *2 (N.D. Ill. Oct. 1, 1986) (denying motion to take judicial notice of newspaper article because it was inadmissible hearsay). Here, of course, the *fact* of the press reports is irrelevant; only the *truth* of the statements in them would be relevant, but they are inadmissible for that purpose, and judicial notice of them should therefore be denied.

F.3d 1018, 1023 (7th Cir. 2001), there is no reason simply to assume, as the City would have this Court do, that the new policies will be followed or enforced more closely.

As the City grudgingly acknowledges, "a defendant seeking dismissal based on its voluntary change of practice or policy must clear a high bar." Mot. at 23 (quoting *Ciarpaglini v. Norwood*, 817 F.3d 541, 545 (7th Cir. 2016)). Indeed, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 189 (2000). As the Supreme Court has stated:

> [T]he standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Id*. (citations omitted); *see also Prison Legal News v. Cnty. of Cook, Illinois*, No. 16-cv-6862, 2016 WL 6833977, at *4 (N.D. Ill. Nov. 21, 2016) (quoting *Laidlaw*). And it is improper to dismiss a case as moot where the actual effect of any voluntary changes by the defendant is a disputed factual matter. *Laidlaw*, 528 U.S. at 193; *see also Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994) (holding that the burden of proving mootness "is a heavy one") (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 635 (1953)).

The Seventh Circuit's decision in *Rembert v. Sheahan*, 62 F.3d 937 (7th Cir. 1995), is instructive here. There, the Cook County Sheriff claimed that a lawsuit challenging his eviction practices had been mooted by an intervening amendment to the pertinent Illinois statute, with which he represented that he would comply. *Id*. at 938-40. But the Seventh Circuit emphasized that, "when an intervening amendment provides no assurance that the complained-of conduct will cease, the case is not moot." *Id*. at 941 (citing *Associated Gen. Contractors v. Jacksonville*,

508 U.S. 656, 662, (1993)). "[I]f the injury of which a plaintiff complains continues even under the amended statute, then the possible issuance of an injunction promises a measure of relief, and a court may act." *Id*. Because "[t]he record fail[ed] to reveal exactly what the Sheriff's present *practice* is," the Seventh Circuit held that "[t]he district court must determine what the Sheriff's actual eviction practices are in order to assess whether the tenants' case is moot." *Id*. at 942 (emphasis added). Only if "the new practice has completely cured the injury of which the tenants originally complained" would dismissal for mootness be appropriate. *Id*.

In *Smith v. City of Chicago*, the City made an argument very similar to the one it makes here: that the plaintiffs' claims for injunctive relief concerning the City's "stop and frisk" policy were moot because it had entered into an agreement under which "it [had] committed to changing many of the CPD policies and practices that Plaintiffs challenge in the present lawsuit." 143 F. Supp. 3d at 749-50. The court rejected that argument, noting that the cases relied upon by the City stood only for "the proposition that injunctive claims become moot *after the challenged government misconduct actually ceased or has been corrected*." *Id*. at 750 (quoting *Kliegman v. Cnty. of Humboldt*, No. 09 CV 0006 NJV, 2010 WL 2382445 at *3 (N.D. Cal. June 10, 2010)) (emphasis added). The court held those cases could not be extended "to situations *where the government has promised to correct its misconduct, but before the government has actually corrected its misconduct*." *Id*. (quoting *Kliegman* at *3) (emphasis added). Because there was "no evidence that the defendant had actually complied with the settlement agreement," the action was not moot. *Id*.; *see also Roe v. City of N.Y.*, 151 F. Supp. 2d at 505 ("the existence of the Public Health Law and official police policy against such unlawful police action does not change the likelihood of actual, imminent harm where, as here, the complaint alleges that the police have a pattern and practice of disregarding these laws").

At most, the Motion shows that the City is discussing a potential agreement with the Illinois Attorney General and recently changed some of its written policies and training, as the Complaint itself acknowledges. The City has not shown that its new policies even purport to cure all of the unlawful practices identified by the DOJ and in the Complaint, far less that the misconduct has actually ceased. Particularly in light of CPD's past failure to confirm its practices even to its then-existing policies, *see Roe*, 151 F. Supp. 2d at 505 ("As [the complaint] alleges that the NYPD continues to violate its own operating orders, the recent . . . tightening of NYPD policy does not undermine plaintiffs' position."), the City has not carried its heavy burden of making "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Laidlaw*, 528 U.S. at 189, and showing that its new practices have "completely cured the [Plaintiffs'] injury," *Rembert v. Sheahan*, 62 F.3d at 942. Therefore, this action is not moot.

## II. THE CITY HAS NOT SHOWN THAT PLAINTIFFS' CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6)

In evaluating a motion to dismiss, the Court must "accept all facts in the complaint as true, view them in the light most favorable to the [Plaintiffs], and draw all reasonable inferences in their favor." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). "The bar to survive a motion to dismiss is not high[.]" *Id.* The Complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quotation marks omitted). Plaintiffs easily meet that standard here.

### A. Plaintiffs Allege § 1983 Claims

Under *Monell v. Department of Social Services*, the City is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." 436 U.S. 658,

694 (1978). Thus, "[t]o state a § 1983 claim against a municipality, a complaint must allege that a constitutional deprivation was caused by an official policy or custom." *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 521-22 (7th Cir. 2003). The Seventh Circuit has held that a plaintiff may allege a policy or custom in three ways: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a 'custom or usage' with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004); *see also Teesdale v. City of Ch.*, 690 F.3d 829, 834 (7th Cir. 2012). Here, Plaintiffs allege that both the City's express policies and its widespread practices result in the use of unlawful force and equal protection violations.

### 1.     Plaintiffs State a Claim for Violations of the Fourth Amendment

Defendant's arguments that Plaintiffs have failed to state a claim for violations of the Fourth Amendment are just repackaged versions of its faulty standing arguments. Here, too, those arguments fail: Defendant's narrow focus on a collection of *examples* from Plaintiffs' Complaint of instances of excessive force against members of Plaintiff organizations fails to account for Plaintiffs' *other* allegations of a custom and practice of excessive force.

Even though the DOJ has already *found* that the City has an unconstitutional pattern and practice of excessive force, the City argues that the Complaint fails because (1) Plaintiffs have supposedly alleged only three police "[e]ncounters" by their members within the past two years and (2) "[t]hree incidents is too few to establish a municipal policy or custom for purposes of *Monell*." Mot. at 24-25. But that argument misses the point entirely: Plaintiffs are not bringing claims based solely on three incidents or, for that matter, seeking particularized remedies for those specific violations. Rather, Plaintiffs bring claims based on the City's broader policy and

practice of constitutional violations, including violations of the rights of their members, of which those three incidents (and the numerous others described in the Complaint) are merely examples.

Plaintiffs allege that "[f]or decades, Chicagoans have complained and a series of government-authorized investigations have found that the Chicago Police Department ("CPD") habitually uses unnecessary force." Compl. ¶ 1. The DOJ issued a lengthy report that *concluded* that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable." *Id.* ¶ 1, Ex A. The DOJ report, standing alone, makes Plaintiffs' allegations of a pattern and practice of excessive force sufficiently plausible to warrant denial of the City's motion. *See, e.g.*, *Arrington v. City of Chicago*, No. 17 C 5345, 2018 WL 620036, *4 (N.D. Ill. Jan. 30, 2018) ("[W]here Plaintiff alleges that the City enables or condones a custom or practice of excessive force among its police officers, the DOJ Report citing evidence that such a custom or practice does in fact exist is a sufficient basis for Plaintiff's *Monell* claim to proceed.").

Plaintiffs also allege that their own members and employees have suffered at the hands of CPD. They allege, for example, that "Communities United . . . has members who have been injured by the City's unlawful use of force," including members in areas that are "home to some of the populations most hurt by the City's unconstitutional policing practices." Compl. ¶ 96. Plaintiffs also allege that Communities United members are "at risk of being subjected to CPD's pattern or practice of using excessive force against people who do not present a threat and who are not suspected of a crime." *Id.* ¶ 97; *see also id.* ¶¶ 154-156 (similar with respect to CRS); *id.* ¶ 168. 170 (Next Steps); *id.* ¶¶ 173-174 (ONE Northside); *id.* ¶¶ 236-237 (ACLU).

Plaintiffs support these allegations with numerous, detailed factual allegations that give examples of the City's policy and practice of constitutional violations, and the resulting consequences for members of Plaintiff organizations of this policy and practice. Plaintiffs allege

that "[t]he DOJ found that CPD officers use Tasers on suspects who flee under suspicion of minor offenses" and that the DOJ had noted many uses of force that were unconstitutional on their face. *Id.* ¶ 29. They also describe numerous specific examples (both involving their own members and the public more generally) of the City's use of unlawful force, including examples of the "unreasonable and repeated use of force against individuals in mental health crisis" listed in the DOJ Report, examples reported in the media (such as the killings of Michelle Robey, Tim Crotty, Phillip Coleman, Terrance Harris, and others), and a long list of incidents involving Plaintiffs' members. *See, e.g.*, Compl. ¶¶ 66-72, 101-144, 157-162, 177-235, 240-281, 362-398.

Plaintiffs further allege that the City is aware of these widespread constitutional violations, as evidenced by public statements, multiple government reports, and the payment of millions of dollars in settlements and jury verdicts arising from police misconduct. *See, e.g.*, *id.* ¶¶ 1, 33, 34-36, Exs. A and B. Even if those allegations were not enough (they are), Plaintiffs also have pointed to specific policies that result in these constitutional violations, including use-of-force policies that encourage unnecessary escalation, fail to account for disability, and authorize the use of force on fleeing suspects, *id.* ¶¶ 290-301; the refusal to adequately train officers, despite government reports and incidents making the need for better training obvious, *id.* ¶¶ 302-315, 348-398; the perpetuating of a "code of silence," including by agreeing to a collective bargaining agreement that guts the integrity of investigations and discourages external reporting, *id.* ¶¶ 324-330; and resolving serious misconduct cases through a "mediation" process that results in no real discipline, *id.* ¶¶ 341-343.

Defendant apparently misreads this litany of examples as a bill of particulars for a very different complaint than the one actually before this Court. To support its argument that Plaintiffs have not stated a claim for violations of the Fourth Amendment, Defendant asks this

Court to ignore the vast majority of Plaintiffs' allegations, and to consider only incidents (1) where Plaintiffs' members were involved and (2) that occurred within the past two years. Presumably, the City's time limitation is based on the two-year statute of limitation for *damages* actions. *See* MTD at 8 n.3. But Plaintiffs do not rely on historical instances of excessive force to support a claim for damages arising from those incidents; they rely on that evidence as proof of a policy and practice of using excessive force in support of their claims for injunctive relief.[8]

The City's cited cases in which the *only alleged evidence* of a policy and practice was a handful of incidents are inapposite. In *Gable v. City of Chicago*, Plaintiffs conceded that their injuries did not result from an express policy and could provide evidence of only three supposed constitutional violations in a four-year period. 296 F.3d 531, 538 (7th Cir. 2002). Similarly, in *Collier v. Rock Island Police Officers*, the plaintiff's allegations of the City's customs and practices was limited to allegations that officers had used unconstitutional force in just five arrests made over the course of four years. No. 4:14-cv-4103-SLD-JEH, 2016 WL 5796765, at *5-6 (C.D. Ill. Sept. 30, 2016). That is a far cry from the persistent policy and practice—backed up by not one, but *two* detailed government reports, *see* Compl. Exs. A and B, among other allegations—that Plaintiffs have alleged here.

---

[8] Further, the Ninth Circuit recently rejected an argument similar to the City's here: in *Flores v. City of Westminster*, 873 F.3d 739 (9th Cir. 2017), *appeal docketed*, No. 17-1101 (Feb. 7, 2018) the defendants sought to exclude evidence of acts outside the statute of limitations, but the Ninth Circuit held that the "evidence was relevant to Plaintiffs' claims that they were discriminated against under a custom or policy of the [Police] Department." *Id.* at 754; *see Nat'l R.R. Passenger v. Morgan*, 536 U.S. 101, 113 (2002) (a statute of limitations does not "bar an employee from using the prior acts as background evidence in support of a timely claim").

### 2.     Plaintiffs State a Claim for Violations of the Fourteenth Amendment

The City argues that Plaintiffs have not alleged a policy or custom that was the "moving force" behind an equal protection violation.  Mot. at 26-28.[9]  To the contrary, Plaintiffs plead a widespread custom or practice of equal protection violations.  Plaintiffs allege that "[b]lack and Latino Chicagoans are disproportionately victimized by the CPD" and that "[r]acism embedded in the CPD's policing tactics results in the CPD having more contacts with black and Latino residents."  Compl. ¶ 2.  Indeed, "the City's own Police Accountability Task Force . . . found that black people were twice as likely as white people to be threatened with a weapon by a CPD officer."  *Id.* ¶¶ 43-44.  Plaintiffs also allege that the DOJ found that CPD officers and *supervisors* "routinely use racist language" to describe black and Latino people.  *Id.* ¶¶ 47-57. Even the City admits that racially charged language is evidence of animus.  Mot. at 27.

Plaintiffs further allege that the City has violated the rights of their members and is likely to do so again in the future.  *See, e.g.*, Compl. ¶ 98 (noting that Communities United has members who are black and who are Latino, and who are "in danger of being subjected to the City's policies and practices authorizing unconstitutional and unnecessary use of force"); *id.* ¶¶ 101-144 (describing use of excessive force by CPD against Communities United members);

---

[9] The City's argument focuses entirely on whether Plaintiffs have alleged a *policy*, not on whether Plaintiffs have alleged that the policy *causes* their injures.  Regardless, Plaintiffs have alleged causation. At the pleading stage, "[a] *Monell* complaint sufficiently states a claim for relief, even without alleging specific facts demonstrating a causal link between alleged policies and alleged injuries, if its allegations and the inferences they create provide the defendant with notice of the assertions it must defend against." *Johnson v. City of Chi.*, No. 10 C 2850, 2010 WL 4790905, at *1 (N.D. Ill. Nov. 18, 2010).  As explained in more detail below with respect to Plaintiffs' ICRA claims, Plaintiffs have met that standard.  *See also, e.g*, *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 895 (N.D. Ill. 2016) (plaintiff alleged causation where she pled that the City had a "code of silence" that was the "moving force" behind her injuries and that this code of silence gave the officers "comfort" that they could violate citizens' rights); *Johnson v. Johnson*, No. 07 C 7036, 2008 WL 4874190, at *3 (N.D. Ill. June 26, 2008) ("[Plaintiffs'] allegations and the inferences they support, *i.e.,* that the City allowed its officers to arrest and charge innocent people with impunity, the defendant officers knew they could do so, and their knowledge caused them to inflict the injuries of which plaintiffs complain, are sufficient to withstand a motion to dismiss.").

*id.* ¶¶ 146, 156, 170 (same, against CRS members); *id.* ¶¶ 174, 177-235 (same, against ONE Northside members); *id.* ¶¶ 237, 240-281 (same, against ACLU members).

Plaintiffs also allege that the City was *aware* of these equal protection violations. *See Latuszkin v. City of Chi.*, 250 F.3d 502, 505 (7th Cir. 2001) (plaintiffs must plead that "City policymakers were aware of the behavior of officers, or that the activity was so widespread that City policymakers should have known about the behavior"). Plaintiffs have pled that the City's Police Accountability Task force concluded in 2016 that "CPD's own data gave 'validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color.'" Compl. ¶ 44. Plaintiffs also allege that Mayor Rahm Emanuel has admitted that "CPD officers would not treat young black men the way they treat him, or his own children," *id.* ¶ 57, and that a Blue Ribbon Panel convened by Representative Metcalfe issued a report documenting that "75% of persons killed in Chicago were black, and that a black person was over six times as likely to be killed by police as was a white person," *id.* ¶ 350.

The City argues that the Court should disregard Plaintiffs' allegations because (1) racial animus exhibited by "a handful of officers who had no dealings with Plaintiffs' members" is not sufficient to plead a custom or practice, (2) the DOJ report is insufficient to state a claim, and (3) statistics alone are not sufficient to plead a disparate impact violation. Mot. at 27-28. First, Plaintiffs plead far more than racial animus by a "handful" of officers. Plaintiffs allege that the City's 2016 Task Force heard "over and over again" that "some CPD officers are racist," Compl. ¶ 47; that CPD officers "routinely" use racist language, including calling black youth "nigger" and "animal," *id.* ¶ 49; and that "credible complaints of racially discriminatory language by CPD officers are not adequately addressed," *id.* ¶ 55. Statistics combined with allegations about racist language are sufficient to state a claim for intentional discrimination. *See Hobley v. Burge*, No.

03 C 3678, 2004 WL 2658075, at *13 (N.D. Ill. Oct. 13, 2004) (statistics combined with allegations that officers used "racially offensive language" sufficient to survive dismissal).

Nor is the City correct that the Court should ignore the City's history of excessive force against black and Latino people and the findings of the 2017 DOJ report. In the two cases that the City cites, *Hicks v. City of Chicago* and *Washington v. Pierce*, the alleged equal protection violations were different in kind from the City's previous incidents of violence and those found in the DOJ report. *See Hicks v. City of Chi.*, No. 15 C 06852, 2017 WL 4339828 (N.D. Ill. Sept. 9, 2017) (details about officer's presence at shooting of Laquan McDonald had no connection to the plaintiff's extortion claims); *Washington v. Pierce*, No. 16 cv 9880, 2017 WL 1437054 (N.D. Ill. Apr. 24, 2017) (DOJ report insufficient where the plaintiff's claims related to the lack of training with respect to the execution of search warrants). That is not the case here.

### B.     Plaintiffs Adequately Allege that the City Violates the ADA and the Rehabilitation Act

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[10]  To state an ADA or Rehabilitation Act claim, a plaintiff must allege "that he is a qualified individual with a disability, that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was by reason of his disability." *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

Here, the City does not dispute that Plaintiffs' members are qualified individuals with disabilities, or that the City is a public entity. Plaintiffs have therefore stated a claim if they have

---

[10] Because "the [ADA and Rehabilitation Act] are coextensive," for ease of reference this brief largely focuses on the ADA. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014).

plausibly alleged that (1) their members were denied the benefits of the City's services, programs or activities, or otherwise discriminated against by the City, and (2) that denial or discrimination was by reason of their disabilities.  Plaintiffs' Complaint satisfies both elements.

<blockquote>

**1.      Plaintiffs Allege that the City Uses Unreasonable Force Against People with Disabilities Because of Their Disabilities, Thereby Depriving Them of Safe and Lawful Police Services**

</blockquote>

The City argues that Plaintiffs' claims should be dismissed because Plaintiffs "fail to establish that their members were denied the benefits of any service, program, or activity, much less that such denial was 'by reason of' a disability." Mot. at 29.  That claim ignores both Plaintiffs' allegations and the law.

First, the "service, program, or activity" whose benefits are being denied to Plaintiffs is safe and lawful policing services.  *See, e.g.*, Compl. ¶¶ 61, 99-100, 411, 421 (alleging that the City denies people with disabilities the benefit of safe and lawful police services during encounters with the police, in response to 911 calls and during stops, investigations, and arrests). Title II of the ADA "applies to anything a public entity does."  *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (citation omitted); *see also Bryant v. Dart*, No. 13 C 3608, 2013 WL 5818810, at *3 (N.D. Ill. Oct. 29, 2013). Guidance issued by the Department of Justice—the federal agency charged with promulgating regulations regarding Title II of the ADA—explains that all aspects of policing, including responding to calls and making stops, detentions, and arrests, fall within the scope of Title II.[11]

---

[11] *See* Civil Rights Division, U.S. Dep't of Justice, *Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act* (2017), https://www.ada.gov/cjta.html; Disability Rights Section, U.S. Dep't of Justice, *The ADA and City Governments: Common Problems* (2008), https://www.ada.gov/comprob.htm ("When dealing with persons with disabilities, law enforcement agencies often fail to modify policies, practices, or procedures in a variety of law enforcement settings—including citizen interaction, detention, and arrest procedures . . . . When interacting with police and other law enforcement officers, people with disabilities are often

Accordingly, courts have consistently recognized the lawful provision of policing services as services, programs, or activities covered by Title II.  *See, e.g.*, *Sheehan v. City & Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds* ("We agree with the majority of circuits to have addressed the question that Title II applies to arrests."); *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (Title II applies to police treatment of arrestee during transport); *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 777, 781 (W.D. Tex. 2006) (Title II applies to a municipality's 911 services); *Spencer v. Dawson*, No. 04 C 5048, 2006 WL 3253574, at *11 (N.D. Ill. Nov. 7, 2006) (explaining types of ADA claims arising from arrests); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003) (ADA extends to "the lawful exercise of police powers, including the appropriate use of force by government officials acting under color of law"); *Jones v. Lacey*, 108 F.Supp.3d 573, 588 (E.D. Mich. 2015) (Title II applies to a police detention during a traffic stop).

Second, Plaintiffs have alleged that the denial of safe and lawful policing services is "by reason of" disability.  Although the Seventh Circuit has not addressed this issue, district courts in this Circuit and courts nationwide have recognized that police violate the ADA when they wrongfully arrest an individual with disabilities because they "misperceived the effects of that disability as criminal activity."  *Spencer*, 2006 WL 3253574, at *11.  In *Spencer*, for example, the court denied summary judgment on the plaintiff's Rehabilitation Act claim because a jury could find that the officers arrested and pepper sprayed the plaintiff "for threatening an officer when he was merely attempting to communicate using sign language."  *Id.*; *see also Sheehan*, 743 F.3d at 1232 (ADA is violated "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity" (citing *Waller ex rel.*

_____

placed in unsafe situations or are unable to communicate with officers because standard police practices and policies are not appropriately modified.").

*Estate of Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009))); *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999).

Here, Plaintiffs have pled the same type of Title II claim by alleging that police officers use unlawful force against people with disabilities because police misperceive conduct or behavior related to the disability as resistance. Plaintiffs' members have disabilities that affect their interactions with the police, including in ways that "can be mistaken for criminal activity," Compl. ¶¶ 99, 169, 175, 238, and because CPD officers do not know how "to recognize or respond to people with disabilities," they "react quickly and violently to any perceived sign of non-cooperation—whether intentional or not—with escalating and too often deadly force," *id.* ¶ 61. The 2016 Task Force *found as a factual matter* that "police officers are arresting individuals experiencing mental illness and [who] are symptomatic in their illness. This occurs because symptoms of mental illness are sometimes demonstrated in behaviors that may look criminal." *Id.* ¶ 65, Ex. B.

Although those allegations alone suffice, Plaintiffs also have given many examples of both members and non-members who have been subjected to specific instances of unlawful force due to their disabilities.[12] To name just a few, Plaintiffs allege that:

- Officers justified use of a Taser by saying it was used to "subdue a mental who ignored verbal commands," as well as against another unarmed woman who was "off meds" and "not violent," *id.* ¶ 67;

- Officers shot Joe Doe, a teenager with autism and schizophrenia, after wrongfully perceiving him to be "elusive and unresponsive," *id.* ¶¶ 276-380; and

- Officers Tasered P.F.—who has several disabilities, including autism, bipolar disorder, ADHD and epilepsy—after they "misinterpreted" P.F.'s calls for help, *id.* ¶ 248.

These allegations state a discrimination claim for the use of force because of disability.

---

[12] The City highlights several allegations involving incidents that did not rise to the level of excessive use of force, but misses the point of these pleadings, which is to demonstrate the many ways that people with disabilities are denied safe and appropriate police services.

## 2. Plaintiffs Allege that the City Fails to Accommodate Individuals with Disabilities

The regulations implementing Title II of the ADA require that a public entity:

> make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). The Seventh Circuit has therefore held that public entities have an *independent* duty to take "prophylactic" steps to accommodate individuals with disabilities when necessary to avoid discrimination. *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). In other words, Plaintiffs can "demonstrate discrimination on the basis of disability by [the City's] refusal to make a reasonable accommodation." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999).[13]

Courts have repeatedly recognized that the failure to reasonably accommodate an individual with disabilities during police encounters—including by refraining from using force in favor of police practices that use time, space, containment, and communication—violates the ADA. *See, e.g.*, *Sheehan*, 743 F.3d at 1231-33 (a jury "could find that the situation had been defused sufficiently . . . to afford the officers an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that [plaintiff] asserts were necessary"); *Schreiner v. City of Gresham*, 681 F. Supp. 2d 1270, 1279 (D. Or. 2010) ("at the time Officer Silva tased plaintiff, the situation was under control . . . . A question of fact remains as to whether defendants reasonably accommodated plaintiff's diabetes in rendering the City's emergency services."); *Taylor v. Schaffer*, No. 1:14-CV-123-jgm, 2015 WL 541058, at *6-8 (D. Vt. Feb. 10, 2015) (plaintiff stated an ADA claim where she alleged that police officers failed to

---

[13] *See also Brad K. v. Bd. of Educ.*, 787 F. Supp. 2d 734, 746 (N.D. Ill. 2011) (Hart, J.) (Title II "imposes an affirmative obligation" on public entities to make their programs accessible to individuals with disabilities (citing Toledo v. Sanchez, 454 F.3d 24, 32 (1st Cir. 2006)).

accommodate her son's disability by Tasing him, rather than leaving the area outside of her home when requested); *Morais v. City of Philadelphia*, No. 06-582, 2007 WL 853811, at *11-12 (E.D. Penn. Mar. 19, 2007) (denying summary judgment where the plaintiff alleged that the police had "overreacted to [his] disorderly conduct, which was a symptom of his mental illness," and ultimately killed him); *Hobart v. City of Stafford*, No. 4:09-CV-3332, 2010 WL 3894112, at *10-11 (S.D. Tex. Sept. 29, 2010) (denying motion to dismiss ADA and Rehabilitation Act claims where the plaintiff alleged that the police failed to accommodate by overreacting to conduct that was a symptom of mental illness).

Courts also have recognized failure-to-accommodate claims based on police departments' failure to modify their policies and practices to account for individuals with disabilities. In *Broadwater v. Fow*, the court found that the plaintiff had stated an ADA claim where he alleged that he was denied the benefit of lawful policing services because the Commonwealth had "failed to establish a proper policy for handling . . . encounters" with people with disabilities. 945 F. Supp. 2d 574, 591 (M.D. Pa. 2013). Similarly, in *Buben v. City of Lone Tree*, the court denied summary judgment on ADA and Rehabilitation Act claims based on repeated Tasering of the plaintiff, where the plaintiff claimed that the defendants failed to accommodate plaintiff's disabilities because they relied on their "general nondiscrimination policy" instead of having "a specific policy directed to the handling of mentally impaired individuals." No. 08-cv-00127-WYD-MEH, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010).

Here, as in those cases, Plaintiffs allege that the City failed to reasonably accommodate individuals with disabilities by, among other things, (1) dramatically under-identifying the number of 911 calls that are mental-health-related, sending CIT officers to respond to identified calls only 25% of the time, and failing to have an adequate policy to guide call-takers on how to

direct calls or whether to note important information conveyed regarding disabilities, Compl. ¶¶ 282-289; (2) enacting a use-of-force policy that fails to identify disability as a relevant consideration in determining whether force is appropriate, *id.* ¶¶ 297-299; (3) failing to require officers to consider disability when deciding whether and how to use force, including Tasers, *id.* ¶ 300; and (4) failing to supervise or monitor the City's use of force, including against individuals with disabilities, *id.* ¶¶ 316-323.

Plaintiffs also allege that the City fails to use appropriate de-escalation and communication techniques. Plaintiffs allege, for example, that the City "unlawfully uses force on Chicagoans with disabilities" because "CPD officers react quickly and violently to any perceived sign of non-cooperation—whether intentional or not—with escalating and too often deadly force." *Id.* ¶ 61. Further, both the 2016 Task Force and the 2017 DOJ report found that the CPD fails to accommodate individuals with disabilities during police investigations and arrest. *See id.* ¶ 65 (2016 Task Force finding that, during encounters with people with mental illness, officers "would further escalate a situation" instead of providing reasonable accommodations that could avoid use of force); *id.* ¶ 66 (2017 DOJ report finding that "CPD uses force against people in crisis where force might have been avoided").

Plaintiffs also allege numerous specific examples of the City's failure to accommodate Plaintiffs' members, including:

- Using unnecessary force on John Doe when R.S. called police for assistance when John Doe was having a panic attack, *id.* ¶¶ 110-111;

- Using unlawful force—including discharging a Taser—against N.T. while N.T. was experiencing a mental health crisis, *id.* ¶¶ 221-233;

- Hitting P.F. with an object repeatedly and telling P.F. to "shut up" while arresting P.F., and, in an unrelated incident, Tasering P.F. when he called out to police for help, *id.* ¶¶ 247-248;

34

- Failing to provide R.R., who is deaf, with *any* effective means of communication (including handcuffing R.R.) during a police stop and placing R.R. in a police car, in violation of 28 C.F.R. § 35.160–164 and 28 C.F.R. § 42.503(e), (f), *id.* ¶¶ 260-273; and

- Shooting Joe Doe after misperceiving him as "elusive and unresponsive," *id.* ¶ 280.

In the face of these detailed allegations, the City argues that (1) there is no duty to accommodate prior to arrest, (2) the officers at the scene were not on notice of Plaintiffs' members disabilities, and (3) exigent circumstances rendered accommodation unreasonable. None of these arguments provides a basis to dismiss the ADA and Rehabilitation Act claims.

### (a) Title II's Reasonable Accommodation Obligation Applies to All Police Services

First, the City asserts that "the ADA and Rehabilitation Act do not require police to provide reasonable accommodations during pre-arrest encounters." Mot. at 32. The City relies largely on the Fifth Circuit's decision in *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). Mot. at 32. *Hainze* wrongly created an exception to Title II that does not exist in the statutory language by holding that the ADA does not apply in exigent circumstances to "an officer's on-the-street responses to reported disturbances or other incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801.

Every other Circuit to address this issue, however, has rejected the blanket exception to the ADA described in *Hainze*. Although those Circuits take into account whether exigent circumstances exist in determining whether a potential accommodation was *reasonable*, they have found that the ADA does not categorically exclude pre-arrest police encounters. *See, e.g.*, *Sheehan*, 743 F.3d at 1232 ("The ADA therefore applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform the reasonableness analysis . . . ."); *Roberts v. City of Omaha*, 723 F.3d 966, 973 (8th Cir. 2013) ("[T]he ADA and the

Rehabilitation Act apply to law enforcement officers taking disabled suspects into custody.");
*Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012) ("[T]he
ADA applies to the investigation of criminal conduct."); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d
1072, 1084 (11th Cir. 2007) (Title II prohibits discrimination by public entities, including by
failing to make reasonable accommodations during arrest); *Gohier,* 186 F.3d at 1221 ("a broad
rule categorically excluding arrests from the scope of Title II . . . is not the law").[14]

Second, the City argues that the ADA's direct-threat defense, *see, e.g.*, 28 C.F.R.
§ 35.139 (identifying an exception where the "individual poses a direct threat to the health or
safety of others"), and DOJ guidance support the complete exclusion of non-arrest police
services from the reach of the ADA. *See* Mot. at 36. That argument is also wrong. The direct-
threat defense can apply when police officers responding to imminent dangers have to take quick
action. By its own terms, however, the direct-threat defense is not a categorical exclusion; it
applies only with an "individualized assessment" based on "the best available objective
evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the
potential injury will actually occur; and whether reasonable modifications of policies, practices,
or procedures or the provision of auxiliary aids or services will mitigate the risk." 28 C.F.R.
§ 35.139(b); *see also Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287-89 (1987).

The DOJ Guidance does not state otherwise. Rather, it explains that the direct-threat
defense does not require reasonable accommodations to be provided where accommodations
cannot mitigate a threat to the health and safety of others. *See* Civil Rights Division, U.S. Dep't of

---

[14] Even under the *Hainze* analysis, the ADA still applies once the area is secure. *Id.* at 801-02 (ADA does
not apply in exigent circumstances to "an officer's on-the-street responses to reported disturbances or
other incidents . . . *prior to the officer's securing the scene and ensuring that there is no threat to human
life*."). In other words, the *Hainze* exception is extremely narrow. *Id.* at 801; *see also Spencer*, 2006 WL
3253574, *11 (in rejecting *Hainze* at the summary judgment, "there was no exigent threat to the officers
or third parties because [plaintiff], while agitated and angry, was not threatening anyone's safety").

Justice, *Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act* (2017), https://www.ada.gov/cjta.html. Indeed, the Guidance gives specific examples of how police officers must provide reasonable accommodations in non-arrest or pre-arrest encounters with people with disabilities. *Id.*

Third, and in any event, Plaintiffs have pled a failure to accommodate *in the absence of exigent circumstances*, and those allegations must be accepted as true. In particular, Plaintiffs allege that the City's *policies* fail to accommodate individuals with disabilities. That failure to accommodate occurs *prior to* any exigent circumstance that might arise. *See Buben*, 2010 WL 3894185, at *12 (exigent circumstances exception "does not apply" where "Plaintiff does not bring his ADA claim against the individual defendants, but against the City of Lone Tree based on its alleged failure to make reasonable modifications in policies, practices, or procedures"); *Schorr*, 243 F. Supp. 2d at 238 (similar).

Plaintiffs have also given examples of the City's failure to accommodate specific individuals with disabilities in circumstances that were not exigent. C.N., for example, was mocked after *he* was assaulted, and there are no allegations suggesting an ongoing emergency. Compl. ¶¶ 178-179. Nor is there any indication of exigency when police handcuffed R.R. and put him into a police car while he was standing outside of a convenience store eating snacks. *Id.* ¶¶ 260-272. John Doe was "irate and swearing," but there are no allegations suggesting he had a weapon or was otherwise dangerous. *Id.* ¶ 110. While P.F. was "complaining and crying" during his arrest, there are no allegations suggesting that anyone was in any physical danger, and, when police Tasered P.F. during a separate incident, he was asking the police for *help*, not posing any threat to them. *Id.* ¶¶ 247-248. With respect to N.T., while the City emphasizes that

family members had called the police after N.T. had grabbed a knife, by the time officers arrived, N.T. had "let go of the knife" and "been backed into a corner." *Id.* ¶ 223.

In these types of situations, courts have repeatedly refused to find exigent circumstances. *See, e.g.*, *Estate of Michelle Robey v. City of Chi.*, No. 17-CV-2378, 2018 WL 688316, at *6 (N.D. Ill. Feb. 2, 2018) (St. Eve, J.) (no exigent circumstances at the pleading stage where the plaintiff allegedly "became upset in a CVS store, that she then sat on a CTA bench outside the store" and "walked away" when police officers approached her); *Taylor*, 2015 WL 541058, at *6-8 (no exigency where the scene was secure and there was no threat to human life because the plaintiff did not have a weapon); *Morais*, 2007 WL 853811, at *1, *13 (no exigent circumstances where "the police had confined Decedent to his apartment, closed the nearby street to traffic and pedestrians, and secured the apartment building," even though the Decedent had been "berating and cursing" the police). Indeed, given the factual nature of the exigent circumstances inquiry, "courts typically consider ADA claims relating to arrests at the summary judgment stage when they can assess the record," not on motions to dismiss. *Robey*, 2018 WL 688316, at *5.

In short, even if an exigent circumstances exception existed, it would not apply here.

> (b) *The City Is on Notice of the Need to Accommodate People with Disabilities*

The City's argument that it was not on notice of the need for an accommodation is spurious. Mot. at 33-35. As an initial matter, the City is wrong to focus on only a few individual examples, rather than on Plaintiffs' allegations as a whole. Plaintiffs allege that the CPD comes into contact with and uses force against a disproportionate number of people with disabilities, that many of these unlawful uses of force are widely reported in the press, and that the 2016 Task Force report highlighted the disproportionate use of force against individuals with disabilities. *See, e.g.*, Compl. ¶¶ 65-66, 286-287, 361-398. Those allegations show that the City was on

notice of the need to modify its policies and procedures to accommodate individuals with disabilities. *See Phipps v. Sheriff of Cook Cnty.*, 681 F.Supp.2d 899, 926-27 (N.D. Ill. 2009) (Where "a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim. . . . [T]he ADA embodies no such requirement." (citations omitted)).

Even if the City were right to focus on only the specific incidents described in the Complaint, Plaintiffs have alleged that the need for an accommodation was obvious or that the City was notified of the individuals' disability. In some of the alleged incidents, the 911 operator had, as the City acknowledges, been told that the person was in mental-health crisis or had a disability. *See* Compl. ¶ 225.[15] For other incidents, Plaintiffs allege that the need for an accommodation was obvious. C.N., for example, was mocked *because of* his disability, from which the Court may infer that the police officers knew about it. *Id.* ¶¶ 178-179. RR was "having a conversation *in sign language*" when police approached him. *Id.* ¶ 261 (emphasis added). John Doe was handcuffed and pushed to the ground while he was wearing "house shoes, jogging pants, and a t-shirt, despite cold winter weather," and his mother was "tr[ying] to warn police not to scare [Doe]." *Id.* ¶¶ 110-113. Those allegations satisfy Plaintiffs' pleading burden.

*(c)    Reasonable Accommodations in Police Services Are Available*

The City's argument that Plaintiffs' proposed accommodations are unreasonable or would pose an undue hardship is wrong. Mot. at 35. The reasonability assessment is a "highly fact-specific" inquiry, "determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001).

---

[15] The City argues that there is no allegation that the officer himself knew—but it cites no authority for the proposition that such a specific allegation is required, or that there is no duty for that crucial information to be communicated to the responding officers. Indeed, the ADA claims are against the City and not any individual officers.

At the pleading stage, it is enough to make plausible allegations from which the need for an accommodation can be inferred. "As for the balance between 'reasonable accommodation' and 'undue hardship,' these matters are questions of fact and thus generally inappropriate for resolution on the pleadings." *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992); *see also Earl v. Espejo*, No. 17 C 195, 2017 WL 3704826, *3 (N.D. Ill. Aug. 28, 2017) (allegations are sufficient if they "allow the plausible inference that at least some . . . reasonable accommodation" was warranted).[16] In any event, as explained above, Plaintiffs have alleged that there were no exigent circumstances here that would make an accommodation unreasonable.

### 3. Plaintiffs Allege Failure-to-Train Claims

Plaintiffs also have stated claims based on the City's failure to adequately train CPD officers to serve and protect individuals with disabilities. *See* Compl. ¶¶ 308-314. The City does not dispute that Plaintiffs have alleged that the City does not adequately train CPD officers about how to serve and protect individuals with disabilities. *See id.* ¶¶ 308-315. Rather, the City asserts that "courts have consistently held that the ADA and Rehabilitation Act do not support a theory of recovery based on a 'failure to train.'" Mot. at 38. That statement is false. While a handful of courts have not recognized an ADA claim for failure to train, numerous others have recognized such a claim for relief. *See, e.g.*, *Buben*, 2010 WL 3894185, at *11-12 ("Plaintiff may go forward with its ADA claim based on his allegations that Lone Tree . . . should have properly trained its officers to recognize and reasonably accommodate individuals exhibiting

---

[16] Indeed, the one case that the City cites, *Roell v. Hamilton County*, 870 F.3d 471 (6th Cir. 2017), was decided on summary judgment.

signs of 'excited delirium,' mental illness or disability"); *Schorr*, 243 F. Supp. 2d at 234-39

(failure-to-train theory cognizable under Title II). [17]

Nothing in the text of the ADA suggests that training would be exempted. To the

contrary, the Act has been interpreted broadly to apply to "anything a public entity does," which

includes training. *Oconomowoc Residential Programs, Inc.*, 300 F.3d at 782. Further, the

legislative history supports a reading of the statute that allows for a failure-to-train claim. The

House Judiciary Committee observed, for example, that:

> In order to comply with the non-discrimination mandate, *it is often necessary to provide training to public employees about disability*. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures. Such discriminatory treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101–485, pt. III, at 50 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 473 (emphasis

added) (quoted in *Lewis v. Truitt*, 960 F. Supp. 175, 178 (S.D. Ind. 1997)). Thus, the text of the

statute, the legislative history, and the case law all support Plaintiffs' failure-to-train claim.

In arguing otherwise, the City relies on *Paine v. City of Chicago*, No. 06 C 3173, 2009

WL 10687409, at *3 (N.D. Ill. May 21, 2009).[18] *Paine* reasoned that failure-to-train claims are

---

[17] *See also, e.g.*, *Roberts v. City of Omaha*, 723 F.3d at 975-76 (recognizing a failure-to-train claim under the ADA); *J.V. ex rel. C v. Albuquerque Public Schs.*, 813 F.3d 1289 (10th Cir. 2016) (adjudicating Title II disparate treatment, disparate impact, and failure to accommodate claims under "failure to train" theories); *Poole v. Gatson Cnty.*, No. 3:15-CV-00309-FDW-DCK, 2016 WL 4267792, at *6-7 (W.D.N.C. Aug. 11, 2016) (denying motion to dismiss based on argument that failure to train did not violate the ADA); *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 425-28 (D. Md. 2014) ("Relying on the legislative history of Title II, courts have also recognized an implicit duty to train officers as to how to interact with individuals with disabilities . . . ."); *Broadwater*, 945 F. Supp. 2d at 590-91; *Hogan v. City of Easton*, Civ. No. 04-759, 2004 WL 1836992, at *7 (E.D. Pa. Aug. 17, 2004) ("the Complaint states a valid claim under the ADA based on the failure of the [defendants] to properly train its police officers").

[18] *Paine* relied on *Waller v. City of Danville*, 515 F. Supp. 2d 659, 665 (W.D. Va. 2007) and *Thao v. City of St. Paul*, No. 03-5306 PAM/RLE, 2006 WL 1004379, at *8 (D. Minn. Apr. 13, 2006). To the extent *Thao* held that a failure-to-train claim is not cognizable under the ADA, that holding has been placed in serious doubt. The Eighth Circuit in *Roberts v. City of Omaha* implicitly recognized a failure-to-train claim under the ADA, although it held that such claims required proof of deliberate indifference. 723

not cognizable under the ADA because any ADA violation occurs when an individual with disabilities is denied a public service, program or activity, not at the time of training. *Id.  Paine*, however, misunderstood the nature of the service, program, or activity being denied.  Proper training of police officers is, in and of itself, a service, benefit, or activity of a public entity.  *See Estate of Saylor*, 54 F. Supp. 3d at 426.

Based on the Eight Circuit's decision in  *Roberts v. City of Omaha*, 723 F.3d at 975-76, the City may argue that Plaintiffs must plead deliberate indifference.  Other courts, however, have not required deliberate indifference.  *See, e.g.*, *Broadwater*, 945 F. Supp. 2d at 590-91 (allowing failure-to-train claim to go forward without analyzing whether the plaintiff had pled deliberate indifference); *Hogan*, 2004 WL 1836992, at *7 (same).  And, in any event, Plaintiffs have pled deliberate indifference, including by alleging that both the DOJ and the 2016 Task Force recommended better training, *see* Compl. ¶¶ 310-314, and that numerous incidents involving individuals with disabilities made the need for training obvious, *id.* ¶¶ 361-398.

### 4.     Plaintiffs Allege that the City's Inadequate Policing Policies Have a Disparate Impact on Individuals with Disabilities

Not only do the City's inadequate police training, policies, and practices fail to accommodate individuals with disabilities, but they also have a disparate impact on those individuals.  To state a disparate impact claim, Plaintiffs must allege that the City "adopt[ed] a policy or practice that is 'facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity.'"  *Swan v. Bd. of Educ.*, No. 13 C 3623, 2013 WL 3872799, at *5 (N.D. Ill. July 25, 2013) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003)).

---

F.3d at 975-76.  The Fourth Circuit too declined to adopt *Waller*'s rationale when that case was on appeal, choosing instead not to decide the issue.  *See Waller*, 556 F.3d at 177 n.3.

The City claims that the Complaint "do[es] not point to any specific practice by the CPD that results in disabled individuals being unfairly targeted." Mot. at 37. But Plaintiffs do not have to allege that individuals with disabilities were "targeted"—only that the City's policies have a disparate impact on those individuals. Here, one of the written policies at issue is the City's Use of Force policy. *See* Conway Decl. [Mot. Ex. A], Ex. 2, General Order G03-02-01§ (IV), ECF 49-1, pp. 43-44 of 115. Plaintiffs allege that this policy, while facially neutral, falls more harshly on people with disabilities who, because of behaviors related to their disability, are viewed as resisters, thereby authorizing the use of physical force against them under the policy. *See, e.g.*, Compl. ¶ 65 ("[S]ymptoms of mental illness are sometimes demonstrated in behaviors that may look criminal."); *id.* ¶¶ 276-280 (alleging that officers shot Joe Doe because they wrongly perceived him to be "elusive and unresponsive" due to symptoms of his disabilities).

Plaintiffs have also alleged a number of other specific policies and practices that have a disparate impact on individuals with disabilities, including: (1) the City's deploying of officers with inadequate training, *id.* ¶¶ 65, 308-315; (2) the City's pattern and practice of the unconstitutional use of force, *id.* ¶¶ 66-67, 297-300; (3) the City's policies and procedures regarding 911 operations, including its procedures for identifying 911 calls as a CIT response, for sending CIT officers to respond, and for identifying key information prior to dispatch, *id.* ¶¶ 282-289; and (4) the City's policies and practices regarding the supervision of officers, which leads "again and again to mistreatment of . . . people with disabilities," *id.* ¶¶ 316-347.

The City's failure to consider disability in its use of force practices is analogous to cities' failure to plan for people with disabilities in their emergency planning procedures. In *Communities Actively Living Independent & Free v. City of Los Angeles*, No. CV 09-0287 CBM

(RZx), 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011), the court rejected the city's arguments that it satisfied the ADA by responding to the needs of people with disabilities on an *ad hoc* basis. *Id.* at *14. Reasoning that "purpose of the City's emergency preparedness program is to *anticipate* the needs of its residents in the event of an emergency and to *minimize* the very type of last-minute, individualized requests for assistance described by the City," the court held that people with disabilities are "disproportionately burdened" in violation of Title II by the City's "failure to consider their unique needs in the administration of its emergency preparedness program." *Id.*; *see also Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 658-59 (S.D.N.Y. 2013) (the city failed to provide people with disabilities meaningful access to its emergency preparedness program by failing to sufficiently plan and account for the needs of people with disabilities, in violation of Title II); *Enos*, 2017 WL 553039, at *3-4 (plaintiffs stated a Title II claim by alleging that deaf people lacked meaningful access to 911 call centers and noting that people with disabilities are more likely to need to call 911).

The City faults Plaintiffs for failing to "present statistical evidence," Mot. at 38, but statistical evidence is not required at the pleading stage. *See, e.g.*, *McQueen v. City of Chi.*, 803 F. Supp. 2d 892, 906-07 (N.D. Ill. 2011) (stating that a disparate impact claim "need not allege statistical support to survive a motion to dismiss" and citing cases); *Mata v. Ill. State Police,* No. 00 C 0676, 2001 WL 292804, *4 (N.D. Ill. Mar. 22, 2001) (at the motion to dismiss stage, "there is no reason [a plaintiff] would have this kind of statistical evidence yet"); *see also Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir.2005) ("A Title VII plaintiff need not set forth allegations of a prima facie case in the complaint.").[19]

---

[19] Although these cases are Title VII cases, in analyzing claims under the ADA, the Seventh Circuit "borrow[s] from [its] approach to the respective analog under Title VII." *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996).

In any event, Plaintiffs *have* alleged statistical evidence. They allege that individuals with disabilities are more likely to interact with police because they are 2.5 times more likely to be victims of violence, with people with developmental disabilities four to ten times more likely to be victimized, Compl. ¶ 238; that one-third to one-half of people killed by police have a disability, with approximately one-quarter of people killed having a mental illness, *id.* ¶ 3; and that, while the City does not keep statistics, when governments have made such information available, the impact is shown to be "devastating," including a New Mexico report that "approximately 75% of recent police-involved shootings had a 'mental health context'" and in Portland, Oregon, "75% of the people shot and killed by police over a three-year period were affected by mental illness," *id.* ¶ 60.

The City argues that these statistics are insufficient because they do not show that the alleged disparity was "*because of* [individuals'] disabilities, rather than *as of a consequence of* their disabilities.*" Mot. at 38. That is not the correct standard. In the Seventh Circuit, the plaintiff must allege sufficient "factual content . . . tending to show that the City's [policies], or some particular part of [them], caused a relevant and statistically significant disparity between disabled and non-disabled [individuals]." *Roberts v. City of Chi.*, 817 F.3d 561, 566-67 (7th Cir. 2016) (citation omitted); *see also Murdock-Alexander v. Tempsnow Emp't & Placement Servs.*, No. 16-CV-5182, 2016 WL 6833961, at *7-8 (N.D. Ill. Nov. 21, 2016) (stating in the Title VII context that, "[t]o survive a motion to dismiss, a disparate impact claim must: (1) identify a specific . . . practice; (2) allege its causation of the disparate impact; and (3) give the Defendants fair notice of the claim"). In other words, to state a disparate impact claim, Plaintiffs must allege only that the challenged policies and practices *cause* the observed disparity.

In arguing otherwise, the City relies entirely on one sentence, taken out of context, from *Roberts v. City of Chicago*. There, the Seventh Circuit upheld the dismissal of an ADA disparate-*treatment* claim because the plaintiffs did not plausibly allege that the city had not hired them because of their disabilities. 817 F.3d at 566-67. The language that the City quotes on page 38 of its motion—and which is the source of its "because of . . . rather than as a consequence of" pleading test—is from its discussion of disparate treatment, not disparate impact. *Id*. (emphasis omitted).

And even if the City's standard were correct, Plaintiffs have met it. Plaintiffs have alleged that *because* of their disabilities, they are more likely to be victimized, and *because* of individuals' disabilities, officers are more likely to perceive lawful conduct as uncooperative or criminal. *See* Compl. at ¶¶ 3, 61, 65-66, 100, 169, 175, 238.

## C.     <u>Plaintiffs Are Entitled to Bring Claims Under the Illinois Constitution</u>

Plaintiffs' state constitutional claims are properly pled. Citing *S.J. v. Perspectives Charter School*, 685 F. Supp. 2d 847, 862-63 (N.D. Ill. 2010), Defendant claims that a plaintiff may not seek relief under the Illinois Constitution where adequate remedies exist under state common law or federal law. *See* Mot. at 39. The Illinois Supreme Court has not addressed this question. Illinois appellate courts, however, have recognized private causes of action under the Illinois Constitution, including under Section 6, even when a remedy existed under federal law. *See Newell v. City of Elgin*, 34 Ill. App. 3d 719, 725 (1976) (plaintiff stated claims under both the Illinois and U.S. Constitutions for an illegal police search); *see also Allen v. Transamerica Ins.*, 128 F.3d 462, 466 (7th Cir. 1997) ("Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate courts control . . . ."). Federal courts have held the same. *See, e.g.*, *McFadden ex rel. McFadden v. Bd. of Educ.*, No. 05 C 0760, 2006 WL 6284486, at *7-8 (N.D. Ill. Oct. 3, 2006) (allowing an injunctive claim under the Illinois

Constitution); *Grubbs v. Hous. Auth. of Joliet*, 91 C 6454, 1997 WL 281297, at *28 n.17 (N.D. Ill. May 20, 1997) (Section 6 "authorizes personal suits against government actors"); *White v. O'Leary*, 742 F. Supp. 990, 992 (N.D. Ill. 1990) ("Section 6 does give rise to a cause of action against public officials or government actors who violate citizens' rights contained therein.").

These cases were rightly decided because the U.S. Constitution does not provide exactly the same rights and remedies as the Illinois Constitution. First, the Illinois Civil Rights Act ("ICRA") provides for attorneys' fees for an action brought "to enforce a right arising under the Illinois Constitution." 740 ILCS 23/5. ICRA explicitly *overturned* limitations on attorney fees imposed by the U.S. Supreme Court. *Id.* at (d)(1-3); *compare Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001).[20] Second, the Illinois Constitution is not in lockstep with the U.S. Constitution in other respects and may provide different rights and remedies. *See People v. Cornelius*, 213 Ill.2d 178 (2004). It would be premature to dismiss Plaintiffs' claim under the Illinois constitution, when it is not yet clear whether that claim will provide broader rights and remedies than Plaintiffs' federal claims.

### D. Plaintiffs Have Alleged a Disparate Impact Claim Under ICRA

In Count 6, Plaintiffs bring claims under ICRA, which states:

> No unit of State, county, or local government in Illinois shall: … utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender.

---

[20] ICRA "facilitates private enforcement of civil rights laws by allowing the award of attorney fees to parties who prevail in litigation brought under … the Illinois Constitution . . . . This is in direct response to recent reversals and direction by the Supreme Court." State of Ill. 93d Gen. Assem., Senate Proceedings 135 (2003) (Sen. Harmon), http://www.ilga.gov/Senate/transcripts/Strans93/09300044.pdf.

A recent case erroneously found this provision to apply only to state constitutional claims regarding discrimination, despite the clear and unambiguous language in the statute to the contrary, and without addressing the legislative history. *Thomann v. Dep't of State Police*, 66 N.E.3d 834, 840 ¶ 29 (Ill. App. Ct. 2016), *appeal denied*, 77 N.E.3d 86 (Ill. 2017). If this Court is inclined to follow the narrow construction of the court in *Thomann*, then plaintiffs respectively request leave to plead a claim under Section 2 of the Illinois Constitution.

740 ILCS 23/5(a)(2). The City argues that ICRA should not apply to police departments, that plaintiffs have not identified which of the City's practices violate ICRA, and that Plaintiffs have not adequately pled causation. *See* Mot. at 41, 45. All three arguments are meritless.

### 1. ICRA Prohibits Disparate Impact Discrimination by the CPD.

The City claims that police departments cannot be liable under a disparate impact theory. *See* Mot. at 44. The City admits that it has no authority to support this proposition, and argues instead that the Court should so hold because allowing such a claim to proceed would "[i]ntrud[e] into core policing policy decisions" or "policing strategy." *Id.* Neither the statute nor case law permits narrowing ICRA in this way.

On its face, ICRA applies without limitation to any "unit of State, county, or local government in Illinois," 740 ILCS 23/5(a)(2), and Illinois courts have already rejected the City's argument that "policing strategies" are exempt. Specifically, in *CANA v. City of Chicago*, the City unsuccessfully argued that applying disparate-impact standards to "policing strategies" would intrude on the City's policy decisions about policing, which improperly raised a political question. The court disagreed. It held there was no political question implicated by the claim, that the court could apply disparate-impact standards to the CPD, and that the claim under the ICRA should not be dismissed. 1 N.E.3d 976, 985 ¶ 28 (Ill. App. Ct. 2013).

The City's suggestion here that courts should not review policing strategies using a disparate-impact analysis ignores decades of federal agencies' application of disparate-impact prohibitions to police. The DOJ investigates and litigates claims alleging disparate-impact discrimination by law enforcement agencies, under Title VI regulations. 42 U.S.C. § 2000d *et seq.*; 28 C.F.R. § 42.101. There are numerous examples of these investigations and consent

decrees based on claims of disparate impact.[21]  Federal courts also have recognized the viability of private disparate-impact claims against police departments.  *See Md. State Conference of NAACP Branches*, 72 F. Supp. 2d 560 (refusing to dismiss disparate-impact claim under Title VI against state police based on pattern of racially discriminatory stops, detentions, and searches); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131 (N.D. Cal. 2000) (refusing to dismiss disparate-impact claim under Title VI based on allegations that defendants targeted African-American and Latino motorists in conducting stops, detentions, interrogations, and searches).

ICRA was passed to ensure that private litigants in Illinois could bring disparate-impact claims after the decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which held there was no private right of action under Title VI regulations.  *See* State of Ill. 93d Gen. Assem., Senate Proceedings, 135, http://www.ilga.gov/Senate/transcripts/Strans93/09300044.pdf (Sen. Harmon) (ICRA was a "direct response to recent reversals and direction by the United States Supreme Court" which "[i]n the case of the disparate impact . . . reversed a thirty-year history on a five to four vote.").  There is no basis in the statute, legislative history, or case law that would allow courts to avoid review of the City's disparate use of force against black and Latino people.

### 2.    Plaintiffs Have Pled City Practices that Cause a Disparate Impact

Contrary to the City's claims, *see* Mot.at 41-42, the Complaint alleges specific policies and practices that result in a disparate impact.  In addition to the policies noted with respect to

---

[21]  *See, e.g.*, Letter from Thomas E. Perez, Assistant Attorney Gen., U.S. Dep't Justice Civil Rights Div., to Leroy D. Baca, Sheriff, L.A. Cnty. Sheriff's Dep't (June 28, 2013), at 15-18 (on Investigation of Los Angeles County Sheriff's Department Stations in Antelope Valley, finding a disparate impact in pedestrian and vehicle stop-and-search practices in violation of Title VI) http://www.justice.gov/crt/about/spl/documents/antelope_findings_6-28-13.pdf; Letter from Thomas E. Perez, Assistant Attorney Gen., U.S. Dep't Justice Civil Rights Div., to Bill Montgomery, Cnty. Attorney, Maricopa Cnty. (Dec. 15, 2001), at 2, 4, 6-9 (on United States' Investigation of the Maricopa County Sheriff's Office, finding that racial profiling of Latinos in unlawful stops, detentions, and arrests violated Title VI and its implementing regulations), http://www.justice.gov/crt/about/spl/documents/mcso_findletter_12-15-11.pdf.

Plaintiffs' ADA claims, Plaintiffs allege that the City has a practice of using Tasers as a "tool of convenience," Compl. ¶ 30; a policy of authorizing use of force during unnecessary foot pursuits, *id.* ¶¶ 291-296; a policy and practice of authorizing officers to stun, OC spray, use canines and discharge Tasers at fleeing suspects, *id.* ¶ 301; and a practice of authorizing inadequately trained officers to use force, *id.* ¶¶ 302, 303. Allegations regarding any one of these "barriers" would be sufficient to state an ICRA claim.[22]

### 3. Plaintiffs Have Otherwise Sufficiently Pled an ICRA Claim.

To state an ICRA claim, plaintiffs need only "allege[] injuries from the discriminatory effects of defendant's actions." *Leslie v. Bd. of Educ.*, 379 F. Supp. 2d 952, 963 (N.D. Ill. 2005). Plaintiffs met this standard by plausibly alleging that the CPD's policies authorizing use of force and its practices of using excessive and unnecessary force have resulted in a disparate impact on black and Latino Chicagoans.

Plaintiffs have pled that black and Latino Chicagoans are disproportionately in contact with the police and victimized by the CPD through use of force. Despite roughly equal representation of white, black, and Latino people in Chicago's population, black drivers accounted for 60.5% of vehicle stops and Latino drivers 20.3%, while white drivers accounted for only 15.9%. Compl. ¶ 37. The disparity is more glaring in pedestrian stops: during the first six months of 2016, almost 71% of people stopped were black, 21% were Latino, and 8% were

---

[22] The out-of-circuit cases cited in pages 41 and 42 of the Motion are not to the contrary. *See City of L.A. v. Wells Fargo & Co.*, No. 2:13-CV-09007-ODW(RZx), 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) (granting summary judgment where, rather than challenging an existing policy, plaintiffs sought a *new* policy); *Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Treasury*, No. 3:14-CV-3013-D, 2016 WL 6397643, at *11 (N.D. Tex. Oct. 28, 2016) (no claim stated where plaintiffs wanted defendant to take future action to end discrimination by providing tax credits in white neighborhoods); *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2016 WL 4494322, at *6 (N.D. Tex. Aug. 26, 2016) (dismissing case where plaintiff failed to point to a facially neutral policy that caused a disparate impact because it would require a race-based quota to resolve). Unlike in the City's cases, Plaintiffs do not seek race-conscious quotas to remedy disparate impact. Rather, Plaintiffs seek to end the policies that result in the disproportionate use of unreasonable and unnecessary force.

white.  *Id.* ¶ 38.  The CPD's disproportionate contacts with black and Latino Chicagoans means that the City's authorization to use unreasonable and unnecessary force has a disparate impact on them because they are more often injured by these policies and practices.  *Id.* ¶ 39.  Additionally, even taking the relative extent of contacts into account, the CPD uses force disproportionately against people of color.  Black and Latino Chicagoans constitute 96% of those shot and 97% of those Tased by the City.  *Id.* ¶¶ 39, 40.  Plaintiffs have black and Latino members who have been injured by the City's uses of force and who are in danger of being subjected to unlawful force in the future.  *Id.* ¶¶ 96-144, 154-162, 168-170, 173-235, 236-281.

These allegations state an ICRA claim.  *See Leslie*, 379 F. Supp. 2d at 963 (plaintiffs stated an ICRA claim where they alleged minority students had longer commutes and deficient services); *Stanfield v. Dart*, No. 10 C6569, 2011 WL 1429172, at *6 (N.D. Ill. Apr. 14, 2011) (plaintiff stated an ICRA claim by alleging that policies had the effect of "discriminating against, depriving and tending to deprive equal employment" due to her gender); *Chi. Urban League v. State*, No. 08 CH 30490, 2009 WL 1632604, at *4 (Ill. Cir. Ct. Apr. 15, 2009) (finding claim where plaintiffs pled a funding program subjected students to schools with lesser services in districts with a majority of minority students).

The City, relying on a non-ICRA case, argues that Plaintiffs have failed to allege "facts or identify statistical evidence" to show a causal connection between CPD's policies and the disparities.  Mot. 4 at 45-46 (discussing *Texas Dep't of Housing & Comty Affairs v. Inclusive Cmtys Project, Inc.*, 135 S. Ct. 2507 (2015)).  That case interprets the federal Fair Housing Act and should not be read to limit ICRA's reach.

Further, even if *Inclusive Communities* were considered here, it does not support the City's argument.  In *Inclusive Communities*, plaintiffs alleged that a state's disproportionate

allocation of tax credits for low-income housing in urban, rather than suburban, communities caused residential segregation by race. 135 S. Ct. at 2514. The Supreme Court questioned whether a state policy actually caused the disparity. *Id* at 2523. Here, in contrast, there is no attenuated chain between state action and the racial disparity. Plaintiffs' claims are based on the CPD's own policies and practices regarding the use of force. There is no question whether, based on the allegations of the Amended Complaint, the challenged CPD practice (use of excessive and unnecessary force) is causing the relevant legal disparity (racial disparities in the use of excessive and unnecessary force).

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny the Motion to Dismiss in its entirety.

DATED: February 20, 2018   Respectfully submitted,

        COMMUNITIES UNITED; COMMUNITY
        RENEWAL SOCIETY; NEXT STEPS; ONE
        NORTHSIDE; and the ACLU OF ILLINOIS

        By: */s/ Bradley S. Phillips*
          Bradley S. Phillips
        *Co-Lead Counsel for Plaintiffs*

Barry C. Taylor         Bradley S. Phillips
Laura J. Miller         Jacob S. Kreilkamp
Amanda Antholt        Allyson R. Bennett
EQUIP FOR EQUALITY     MUNGER, TOLLES & OLSON LLP
20 N. Michigan Ave., Ste. 300   350 South Grand Avenue, 50th Floor
Chicago, IL 60602      Los Angeles, CA 90071
(312) 341-0022       (213) 683-9100
barryt@equipforequality.org    brad.phillips@mto.com
laura@equipforequality.org    jacob.kreilkamp@mto.com
amanda@equipforequality.org   allyson.bennett@mto.com

         Karen Sheley
         Kathryn Hunt Muse
         Lindsay S. Miller

Rachel Murphy
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
ksheley@aclu-il.org
kmuse@aclu-il.org
lmiller@aclu-il.org
murphy@aclu-il.org

## <u>CERTIFICATE OF SERVICE</u>

I, Bradley S. Phillips, an attorney, hereby certify that on February 27, 2018, I caused true and correct copies of the foregoing OPPOSITION TO DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND (B)(6) to be served upon all counsel of record via the Court's ECF filing system.

*/s/ Bradley S. Phillips*